19981
FieldRptr

93

1        and less on who's the demographic we're selling to.    11:54:37

2        I suppose some of that information could -- could    11:54:41

3        be pulled from it.  I think that was a little more    11:54:43

4        of it.  Internally -- internally, I don't believe    11:54:45

5        we have.    11:54:50

6  Q     Do you know when this was done?    11:54:51

7  A     I -- I don't recall.  I'd say sometime in the last    11:54:54

8        two years.  And I -- and I don't actually even    11:54:58

9        recall if they followed through on it or they just    11:55:01

10       proposed it.    11:55:04

11 Q     Do you know if it concerned the Jake logo as well?    11:55:05

12 A     I -- I don't, but I -- I assume that it did.    11:55:09

13            MR. KIRBY:  I hope you brought enough for    11:55:37

14       everybody.    11:55:40

15            MR. SOMMERS:  I think you know the    11:55:41

16       source.    11:55:43

17            I'm going to have marked as the next    11:55:45

18       Exhibit 8 --    11:55:47

19            MR. KIRBY:  9.    11:55:49

20            MR. SOMMERS:  Or 9.  Thank you.    11:55:50

21            -- a -- a T-shirt which I believe is    11:55:52

22       from -- from your company, Mr. Jacobs, but I'll    11:55:54

| | | | |
|---|---|---|---|
| 1 | | that in some way we are Jake, also. | 12:00:39 |
| 2 | | BY MR. SOMMERS: | 12:00:45 |
| 3 | Q | Am I also -- let me strike that and ask -- ask the | 12:00:46 |
| 4 | | reporter to mark as Exhibit -- | 12:00:50 |
| 5 | A | Can I put this aside, or are we still working on | 12:00:52 |
| 6 | | this? | 12:00:56 |
| 7 | Q | I'll refer to it in the context.  I just needed to | 12:00:56 |
| 8 | | have an example. | 12:00:59 |
| 9 | A | I'm just going to fold it up.  Is that all right? | 12:01:00 |
| 10 | Q | Thank you. | 12:01:03 |
| 11 | | MR. SOMMERS:  If I can have her mark as | 12:01:04 |
| 12 | | Exhibit 10, a spring/summer 2005 catalog. | 12:01:05 |
| 13 | | (Exhibit No. 10 marked for | 12:01:21 |
| 14 | | identification.) | 12:01:28 |
| 15 | | THE WITNESS:  Would be a lot cheaper to | 12:01:28 |
| 16 | | produce them like this. | 12:01:30 |
| 17 | | BY MR. SOMMERS: | 12:01:31 |
| 18 | Q | Mr. Jacobs, if I could have you identify for me | 12:01:32 |
| 19 | | what Exhibit 10 is. | 12:01:36 |
| 20 | A | I'm sorry. | 12:01:37 |
| 21 | Q | If I could have you identify for me what Exhibit 10 | 12:01:47 |
| 22 | | is. | 12:01:51 |

| | | | |
|---|---|---|---|
| 1 | A | Oh. It's a spring/summer -- it's a copy of our | 12:01:51 |
| 2 | | spring/summer 2005 domestic or United States | 12:01:55 |
| 3 | | catalog. | 12:01:59 |
| 4 | Q | And if I could have you turn to page 15 of that | 12:02:00 |
| 5 | | catalog.  And I see that there are a number of | 12:02:07 |
| 6 | | T-shirts depicted on there. | 12:02:20 |
| 7 | A | Uh-huh. | 12:02:21 |
| 8 | Q | Each one bearing a -- a cartoonish type of | 12:02:22 |
| 9 | | depiction with some words underneath it.  Is that | 12:02:30 |
| 10 | | an accurate -- | 12:02:34 |
| 11 | A | Yes. | 12:02:36 |
| 12 | Q | For example, up at the top left-hand corner, there | 12:02:37 |
| 13 | | is a -- a T-shirt depicted with a cabin with the | 12:02:45 |
| 14 | | words "Life is good." and the upper right-hand | 12:02:49 |
| 15 | | corner is -- is a depiction of Jake and a dog in a | 12:02:52 |
| 16 | | kayak with the words "Roll Over."  Do you see that? | 12:03:00 |
| 17 | A | Yes. | 12:03:03 |
| 18 | Q | In each of these contexts, I see that there is a -- | 12:03:04 |
| 19 | | a saying underneath each of the character | 12:03:10 |
| 20 | | depictions.  Do you see that? | 12:03:12 |
| 21 | A | Yes. | 12:03:14 |
| 22 | Q | What is the reason, for example, that you use the | 12:03:15 |

1    words "Roll Over" or "Think Outside The Box" or    12:03:19

2    "Get Out" on these -- on these T-shirts?    12:03:24

3  A    We often use common phrases to poke fun in some way  12:03:28

4    at the seriousness and the pressures out there in    12:03:39

5    the world and -- and bring things down to earth a    12:03:45

6    little more.  So we do that with many different    12:03:49

7    phrases.    12:03:52

8  Q    So am I correct that these phrases are imparting a    12:03:53

9    message?    12:03:56

10  A    Yes.    12:03:57

11  Q    All right.  Now, I also see here that some of    12:03:57

12    the -- the depictions contain the words "Life is    12:04:07

13    good." underneath them.  Do you see those?    12:04:12

14  A    Yes.    12:04:13

15  Q    And this particular context, is this also    12:04:14

16    communicating a message?    12:04:20

17  A    Yes.    12:04:21

18  Q    The -- in -- in connection with the -- the T-shirts  12:04:23

19    that are depicted here that say "Roll Over," "Think  12:04:36

20    Outside The Box," "Get Out," are these being used    12:04:39

21    as trademarks?    12:04:42

22  A    I would have to refer to counsel.  But some of them  12:04:43

| | | |
|---|---|---|
| 1 | may be trademarks.  We -- we own several | 12:04:50 |
| 2 | intellectual properties.  And some of our more | 12:04:55 |
| 3 | popular ones, for example, "Get Out," it may be a | 12:04:58 |
| 4 | registered trademark.  I don't know.  I guess in | 12:05:02 |
| 5 | answer to your question, some are and some are not. | 12:05:04 |
| 6 Q | Okay.  And did you do any trademark searches for | 12:05:08 |
| 7 | any of these words before you placed them on your | 12:05:16 |
| 8 | T-shirt? | 12:05:20 |
| 9 A | As I indicated earlier, if it was very early in our | 12:05:20 |
| 10 | career, we would have been unsophisticated and may | 12:05:26 |
| 11 | not have.  As we developed a relationship with | 12:05:28 |
| 12 | legal counsel, we began to do searches before | 12:05:30 |
| 13 | commercializing products, slogan sayings, et | 12:05:34 |
| 14 | cetera. | 12:05:39 |
| 15 Q | And when did that occur? | 12:05:39 |
| 16 A | I think that our relationship with Pierce and | 12:05:41 |
| 17 | Mandell probably began in 1995, 1996, something | 12:05:50 |
| 18 | like that, Bob?  1996 as a guess. | 12:05:56 |
| 19 Q | Then am I correct that you would have searched | 12:05:59 |
| 20 | before you used the words "Get Out" or "Roll Over" | 12:06:02 |
| 21 | before they appeared on a T-shirt? | 12:06:05 |
| 22 A | I think that it makes the assumption that they're | 12:06:07 |

| | | | |
|---|---|---|---|
| 1 | | calls from any member of the public that were | 01:46:49 |
| 2 | | intended for LG? | 01:46:53 |
| 3 | A | You mean has the company received any? | 01:46:54 |
| 4 | Q | Yes. | 01:46:58 |
| 5 | A | Not to my knowledge. | 01:46:59 |
| 6 | Q | And when I have been using the word "you," I have | 01:47:00 |
| 7 | | been referring to you as the company, since you | 01:47:04 |
| 8 | | understand you're appearing here on behalf of the | 01:47:07 |
| 9 | | company. | 01:47:10 |
| 10 | A | I think that's clear. | 01:47:10 |
| 11 | Q | Okay.  Thank you. | 01:47:12 |
| 12 | | You mentioned earlier the company Miller, | 01:47:13 |
| 13 | | and I believe you indicated that Miller was using | 01:47:20 |
| 14 | | "life is good." Am I correct? | 01:47:25 |
| 15 | A | That's right. | 01:47:27 |
| 16 | Q | When was that? | 01:47:27 |
| 17 | A | Quite a while ago.  I -- I'm going to take a wild | 01:47:29 |
| 18 | | guess and say it was 1998, 1999.  I'm not certain. | 01:47:35 |
| 19 | Q | Was it at a time that you were using Life is good.? | 01:47:42 |
| 20 | A | Yes. | 01:47:46 |
| 21 | Q | Okay.  And did you receive an objection from | 01:47:47 |
| 22 | | Miller? | 01:47:51 |

| | | | |
|---|---|---|---|
| 1 | A | I don't recall. | 01:47:52 |
| 2 | Q | Did you object to Miller's use? | 01:47:54 |
| 3 | A | I don't recall if we legally objected.  I can tell | 01:47:58 |
| 4 | | you what I do recall.  Would you like me to? | 01:48:04 |
| 5 | Q | Please. | 01:48:07 |
| 6 | A | What I recall is that we were very concerned about | 01:48:11 |
| 7 | | the use, in particular that they were printing | 01:48:14 |
| 8 | | promotional T-shirts that said "life is good" to | 01:48:20 |
| 9 | | promote their beer products.  But in addition, we | 01:48:24 |
| 10 | | were very concerned about the -- the vastness of | 01:48:27 |
| 11 | | the ad campaign as we saw it on television.  And we | 01:48:33 |
| 12 | | got together with legal counsel -- | 01:48:39 |
| 13 | | MR. KIRBY:  Let me interrupt and caution | 01:48:43 |
| 14 | | you not to reveal in your answer any advice you may | 01:48:46 |
| 15 | | have received from counsel. | 01:48:50 |
| 16 | | THE WITNESS:  Great.  Yeah.  We got | 01:48:51 |
| 17 | | together with legal counsel and were determining | 01:48:54 |
| 18 | | what our options were and potential action plans. | 01:48:59 |
| 19 | | And fortunately, by the time we had come to some | 01:49:05 |
| 20 | | conclusions -- I'm not even sure if we came to some | 01:49:12 |
| 21 | | conclusions yet -- as beer companies often do, the | 01:49:15 |
| 22 | | ad campaign came and went.  So the problem went | 01:49:18 |

1     away.                               01:49:21

2     BY MR. SOMMERS:                    01:49:22

3 Q    Did you ever contact Miller?       01:49:26

4 A    I don't remember, to be honest with you.   01:49:27

5 Q    Did you receive any instances of confusion?  01:49:30

6 A    I don't recollect and -- yeah, I don't recollect  01:49:34

7     whether we did.                  01:49:44

8 Q    You indicated that you were concerned in particular 01:49:45

9     about promotional T-shirts that said "life is good" 01:49:48

10    to promote their beer products.  What was it about 01:49:52

11    the T-shirts that you -- that concerned you?  01:49:56

12 A   We were concerned because they said the exact same 01:50:01

13    words that our registered trademark says, "life is 01:50:04

14    good."  We were concerned about confusion.  01:50:08

15 Q   When you use the words "promotional T-shirts," what 01:50:10

16    do you exactly mean?            01:50:15

17 A   I mean that, to my knowledge, Miller is in the  01:50:20

18    business of selling beverages and not in the  01:50:23

19    business of selling clothing.  However, they  01:50:28

20    utilize clothing and accessories, which are a  01:50:31

21    registered classification of ours, to promote their 01:50:35

22    beer and other beverages.          01:50:40

1  Q    And to your knowledge, is it a common practice for    01:50:43

2       companies to utilize clothing and accessories to      01:50:47

3       promote their products?                               01:50:51

4  A    Yes.                                                  01:50:52

5  Q    In connection with this matter concerning Miller,     01:50:53

6       did you express concern about Miller's activity to    01:51:07

7       anyone other than your attorneys?                     01:51:12

8  A    I'm sure I probably did.  Friends, relatives,         01:51:14

9       business associates.                                  01:51:21

10 Q    Did you tell anybody other than your attorneys the    01:51:22

11      reasons that you were concerned and whether you       01:51:26

12      were considering any legal action?                    01:51:29

13 A    I want to clarify that I don't recollect in           01:51:31

14      particular, but -- well, two things.  I don't         01:51:37

15      recollect whether I told other people, but I assume   01:51:42

16      that I did.  Considering legal actions, I guess, is   01:51:45

17      something that hasn't been established in this         01:51:48

18      conversation, and I also don't recollect whether it   01:51:51

19      was discussed.                                        01:51:54

20 Q    Okay.  Thank you.  I stand corrected.                 01:51:55

21            Was the purpose of consulting with your         01:52:04

22      attorneys to discuss the issue of whether certain     01:52:06

19981
FieldRptr                                                                      136

| | | | |
|---|---|---|---|
| 1 | A | Baseballs? | 02:04:35 |
| 2 | Q | Have you ever seen a baseball imprinted with | 02:04:38 |
| 3 | | corporate logos as promotional items? | 02:04:44 |
| 4 | A | Sure.  I've seen the Boston Red Sox put it on | 02:04:47 |
| 5 | | there. | 02:04:52 |
| 6 | Q | Yeah. | 02:04:52 |
| 7 | | MR. SOMMERS:  If I could have the next | 02:05:08 |
| 8 | | exhibit marked as 11.  It is a one-page article | 02:05:13 |
| 9 | | entitled "Everything is Jake at Life is good." | 02:05:20 |
| 10 | | (Exhibit No. 11 marked for | 02:05:33 |
| 11 | | identification.) | 02:05:34 |
| 12 | | BY MR. SOMMERS: | 02:05:34 |
| 13 | Q | Mr. Jacobs, do you recognize Exhibit 11? | 02:05:38 |
| 14 | A | I do. | 02:05:41 |
| 15 | Q | I have just a few questions about that.  And the | 02:05:42 |
| 16 | | first one is, at the bottom of the fourth | 02:05:51 |
| 17 | | paragraph, there is a sentence that reads, "We made | 02:05:59 |
| 18 | | a list of sayings, and 'life is good' is the one | 02:06:02 |
| 19 | | everybody liked."  Do you see that? | 02:06:05 |
| 20 | A | Yes. | 02:06:08 |
| 21 | Q | And that's -- quote is attributed to you, is it | 02:06:08 |
| 22 | | not? | 02:06:12 |

| | | | |
|---|---|---|---|
| 1 | A | Yes, it is. | 02:06:12 |
| 2 | Q | Is this consistent with what we talked about | 02:06:13 |
| 3 | | earlier today? | 02:06:18 |
| 4 | A | I think it's fairly consistent.  I think it's | 02:06:19 |
| 5 | | probably paraphrasing a little bit the same story I | 02:06:22 |
| 6 | | relayed to you. | 02:06:27 |
| 7 | Q | If I could have you run down to the -- four -- four | 02:06:27 |
| 8 | | paragraphs later, and the last couple of lines that | 02:06:31 |
| 9 | | read as follows:  Life is good.says, quote, enjoy | 02:06:39 |
| 10 | | your day, period, have fun, close quote.  Where | 02:06:42 |
| 11 | | other slogans can be negative, ours says, quote, | 02:06:47 |
| 12 | | relax and enjoy what you are doing, period, close | 02:06:52 |
| 13 | | quote.  Do you see that? | 02:06:55 |
| 14 | A | I do. | 02:06:56 |
| 15 | Q | And that statement is also attributed to you.  Do | 02:06:57 |
| 16 | | you see that? | 02:07:00 |
| 17 | A | Yes. | 02:07:01 |
| 18 | Q | Is that -- is that an accurate statement? | 02:07:01 |
| 19 | A | Yes, I think it is. | 02:07:06 |
| 20 | Q | If you come down, just the next paragraph, and the | 02:07:14 |
| 21 | | last line on that paragraph reads:  "Buying items | 02:07:18 |
| 22 | | proclaiming that life is good."  Do you see that? | 02:07:22 |

1     work in customer service and we have not sent out a    03:11:30

2     notice to watch out for something like this.  And    03:11:35

3     we also don't have systems in place to necessarily    03:11:38

4     record such actions or -- or experiences.    03:11:41

5  Q  Do you know of any customers who are or have    03:11:44

6     negative feelings towards LG and its products?    03:11:57

7  A  Sure.    03:12:01

8  Q  And who are those?    03:12:03

9  A  People that bought a cell phone and didn't like it.    03:12:04

10 Q  Do you know of any?    03:12:11

11 A  Sure.    03:12:13

12 Q  Who is that?    03:12:16

13 A  You know, I don't -- I can't think of the name off    03:12:17

14    the top of my head, but I just have heard people    03:12:22

15    complain about it.    03:12:25

16 Q  Anyone else?    03:12:26

17         MR. KIRBY:  If it makes it easier, Mark,    03:12:27

18    we're not pursuing a tarnishment theory.  And I    03:12:31

19    assume that's where this line is going and what    03:12:34

20    it's contemplating.    03:12:37

21         MR. SOMMERS:  Uh-huh.    03:12:39

22         MR. KIRBY:  So if it makes your life    03:12:41

1    easier, you can take that representation.         03:12:42

2              MR. SOMMERS:  Okay.                     03:12:44

3              THE WITNESS:  And I've heard just as many 03:12:44

4    people that are pleased with "life's good"        03:12:46

5    telephones.                                       03:12:49

6         MR. SOMMERS:  Bob, the only reason I         03:13:13

7    hesitate, I -- I assume that's also for the likely 03:13:15

8    injury that they've claimed on irreparable harm as 03:13:19

9    well?                                             03:13:24

10             MR. KIRBY:  Correct.                    03:13:24

11             MR. SOMMERS:  Okay.  Thank you.  For both 03:13:26

12   the LG logo face and the "life's good" tag line?  03:13:43

13             MR. KIRBY:  Yes.                        03:13:48

14             Don't you like it when I have to answer 03:13:49

15   the questions?                                    03:13:51

16             THE WITNESS:  Excellent.                03:13:51

17             MR. SOMMERS:  He's just saving -- saving 03:13:52

18   some time, which helps us.                        03:13:54

19   BY MR. SOMMERS:                                   03:15:09

20 Q Mr. Jacobs, has your company's business reputation 03:15:09

21   been injured in any manner because of the public's 03:15:14

22   false association --                              03:15:27

19981
FieldRptr

208

1      advertising?     03:56:45

2 A   We do not have present plans to engage in    03:56:46

3      traditional forms that are not related to our    03:56:52

4      charitable beneficiaries.    03:56:56

5          MR. SOMMERS:   If I could have marked as   03:58:42

6      the next number of exhibits starting with 18 -- 18, 03:58:44

7      19, 20 and 21.    03:58:51

8          (Off-the-record discussion held.)    04:00:03

9          (Exhibits No. 18, 19, 20, 21 and 22

10      marked for identification.)

11      BY MR. SOMMERS:

12 Q   Okay.   Mr. Jacobs, if I could have you first look   04:02:08

13      at Exhibit 22 and ask if you can identify that   04:02:12

14      exhibit for me?    04:02:21

15 A   If I can identify what?    04:02:24

16 Q   Exhibit 22 for me.    04:02:26

17 A   I think these are photographs of examples of "life   04:02:30

18      is good" ad campaign by Miller.    04:03:04

19 Q   Earlier you referred to a -- an ad campaign run by   04:03:05

20      Miller.   Am I correct that this would be the ad   04:03:10

21      campaign that you're referring to?    04:03:16

22 A   It looks like it.    04:03:19

| | | | |
|---|---|---|---|
| 1 | Q | Do you have any reason to believe that this | 04:03:21 |
| 2 | | wouldn't be the ad campaign? | 04:03:29 |
| 3 | A | No. | 04:03:31 |
| 4 | Q | If I could turn -- have you turn to Exhibit 21, | 04:03:31 |
| 5 | | which is a collection of documents taken from the | 04:03:48 |
| 6 | | U.S. Trademark Office bearing some Bates stamps | 04:03:58 |
| 7 | | produced to us from your -- from your lawyers, and | 04:04:10 |
| 8 | | ask you, is this the Miller applications that you | 04:04:16 |
| 9 | | referred to earlier as having a concern about? | 04:04:28 |
| 10 | A | As -- as having a what? | 04:04:33 |
| 11 | Q | A concern. | 04:04:35 |
| 12 | A | Yes. | 04:04:36 |
| 13 | Q | Do you know whether or not your company took action | 04:04:36 |
| 14 | | against any of these listed registrations back at | 04:04:42 |
| 15 | | the time that you learned of this use? | 04:04:49 |
| 16 | A | We're talking about Miller Lite only right now? | 04:04:53 |
| 17 | Q | I'm referring to the instance that you referred to | 04:04:59 |
| 18 | | earlier of Miller's use of the -- | 04:05:04 |
| 19 | A | Yeah, just Miller. | 04:05:07 |
| 20 | Q | Just Miller, yes. | 04:05:08 |
| 21 | A | Okay.  And can you define what you mean by take | 04:05:10 |
| 22 | | action? | 04:05:17 |

1  Q    Let me ask this:  Did your company take any action    04:06:24

2       before the United States Trademark Office to         04:06:27

3       challenge or otherwise seek to cancel the various    04:06:32

4       registrations that are listed in Exhibit 21?         04:06:37

5  A    I don't know.  You'd have to ask Bob Pierce from     04:06:40

6       Pierce and Mandell.                                  04:06:45

7  Q    If I could ask you to turn to Exhibit 20.  Am I      04:06:46

8       correct that what I'm looking at here is a listing   04:07:02

9       for a trademark registration for the mark "life is   04:07:05

10      good; we make it better"?                            04:07:12

11 A    "Life is good; we make it better."  It looks like    04:07:13

12      that to me.                                          04:07:17

13 Q    And I see it's registered by a company called        04:07:18

14      Davinci Gourmet.  Do you see that?                   04:07:22

15 A    I do.                                                04:07:25

16 Q    Do you know, has your company ever looked into this  04:07:26

17      registration?                                        04:07:33

18 A    I don't know.                                        04:07:34

19 Q    Do you know if it's taken any action against this    04:07:35

20      company?                                             04:07:39

21 A    I don't know.                                        04:07:40

22 Q    Do you know if it's filed suit against this          04:07:41

1  company?                                              04:07:49

2  A  I can be reasonably certain that -- well, I know    04:07:49

3     that we have not filed suit against this company.   04:07:53

4  Q  Okay.  Do you know if it's filed any cancellation   04:07:57

5     proceedings?                                        04:08:00

6  A  I do not know.                                      04:08:02

7  Q  Who would be the individual that would know this?   04:08:03

8  A  I think that Bob Pierce is the best source for      04:08:06

9     that.                                               04:08:10

10 Q  In looking at this listing, does your company have  04:08:10

11    an objection to the use of this trademark?          04:08:21

12 A  I don't think I have complete information on --     04:08:25

13    on -- what's being put in front of me is the        04:08:29

14    application for the word mark.  Can I ask you the   04:08:32

15    question, is what's in front of me an application   04:08:36

16    for a word mark "life is good,"  period, "we make   04:08:38

17    it better," period.                                 04:08:41

18 Q  Yes, that's what the records would show.            04:08:43

19 A  Again, not knowing, not being extremely well-versed 04:08:46

20    in the law, I would certainly pipe up and ask our   04:08:51

21    counsel to stop this, if possible, because I think  04:08:55

22    it can cause confusion.  And I don't know what our  04:08:58

213

1       rights are if this company was able to obtain this    04:09:02

2       trademark.  My guess is they'd always have to say     04:09:05

3       "we make it better" after it, and that would be a     04:09:09

4       little less confusing so we -- we'd have to live      04:09:12

5       with it.  If that answers your question.              04:09:14

6  Q    I guess my -- my question is little more basic.       04:09:16

7       Is -- is this particular usage one to which you       04:09:28

8       object?                                               04:09:31

9  A    What do they use it for?                              04:09:31

10 Q    The listing would say --                              04:09:32

11              MR. KIRBY:  035.                              04:09:35

12      BY MR. SOMMERS:                                       04:09:37

13 Q    -- wholesale distributorships, retail outlets, mail  04:09:38

14      order, on-line ordering services featuring gourmet   04:09:41

15      flavorings, syrups, sauces and confection.           04:09:47

16 A    Yeah.  I guess in answer to your question, I don't   04:09:51

17      like it, but I don't know if we have a right to      04:09:54

18      stop it.  You know, we may or may not.               04:09:56

19 Q    Okay.  What would that depend on?                    04:09:58

20 A    That would depend on the law.                        04:09:59

21 Q    Do you offer any food products?                      04:10:01

22 A    Not currently.  But as stated before, we have        04:10:05

1     ambition to do so.                       04:10:09

2  Q    And those are packaged products?     04:10:10

3  A    As stated before, we're open to packaged and  04:10:14

4     unpackaged.                       04:10:21

5  Q    Have you ever had the intention to use the brand  04:10:22

6     for breakfast cereal?             04:10:26

7  A    Breakfast cereal?               04:10:27

8  Q    Yeah.                        04:10:29

9  A    It's -- it's been put on the list before.  We've  04:10:30

10     sat and had brainstorming where we listed products,  04:10:32

11     and it's been put on there.         04:10:36

12  Q    What about jams and confections?     04:10:37

13  A    Yes.                       04:10:45

14  Q    If I could refer you to Exhibit 19.  My question  04:11:04

15     is, is this a use of -- I'm sorry.  Let me strike  04:11:11

16     that.                       04:11:24

17         Is this a registration that you are aware 04:11:24

18     of?                       04:11:27

19  A    Yes, it is.               04:11:29

20  Q    And what are you aware of about it?  Strike that.  04:11:30

21     That was an awful question.         04:11:37

22         What -- what -- how did you become aware 04:11:38

| 1 |  | of this? | 04:11:40 |
|---|---|---|---|
| 2 | A | The law firm Pierce and Mandell did a search at | 04:11:40 |
| 3 |  | some point. I believe we were looking into | 04:11:49 |
| 4 |  | registering for ice cream. And they did a search | 04:11:52 |
| 5 |  | and -- | 04:11:56 |
| 6 |  | MR. KIRBY: I think you -- | 04:12:02 |
| 7 |  | THE WITNESS: -- found this. | 04:12:04 |
| 8 |  | BY MR. SOMMERS: | 04:12:06 |
| 9 | Q | And they did a search and revealed what? | 04:12:07 |
| 10 | A | They found this information. | 04:12:09 |
| 11 | Q | To your knowledge, have you taken any action | 04:12:12 |
| 12 |  | against this company? | 04:12:18 |
| 13 | A | I don't -- I don't think so. | 04:12:20 |
| 14 | Q | When did -- | 04:12:24 |
| 15 | A | I can't be certain, but I don't think so. | 04:12:27 |
| 16 | Q | When did you come to learn about this? | 04:12:29 |
| 17 | A | I don't -- I don't recall. A few years back, | 04:12:32 |
| 18 |  | anyway. | 04:12:39 |
| 19 | Q | And have you sued this company? | 04:12:40 |
| 20 | A | We have not. | 04:12:42 |
| 21 | Q | Do you know whether you have filed any action | 04:12:43 |
| 22 |  | before the trademark office to cancel this | 04:12:47 |

19981
FieldRptr

227

```
 1        '97 --                                           04:47:32

 2        BY MR. SOMMERS:                                  04:47:32

 3 Q      I guess what I'm -- I'm asking is, if you'll turn 04:47:32

 4        to page 8, paragraph 49.                         04:47:35

 5 A      Yeah.                                            04:47:37

 6 Q      I'm just understanding --                        04:47:37

 7 A      Well-known throughout the United States, yeah.   04:47:40

 8 Q      I'm trying to understand.  What do you mean by   04:47:42

 9        well-known?                                      04:47:45

10 A      Well, I think it's easy to say this, 49, but it's 04:47:45

11        hard to say what you're saying.  And I'll tell you 04:47:49

12        what I mean by that.  It's easy to say that today 04:47:51

13        they're well-known, because we sell to over 5,000 04:47:55

14        retailers; we do $60 million in business.  And you 04:47:58

15        know, I suppose if we did a survey, we could find 04:48:03

16        out that, you know, today the brand is well-known. 04:48:06

17        Okay?                                            04:48:09

18              However, to pinpoint when it becomes       04:48:10

19        well-known, that means you have to identify exactly 04:48:14

20        at what point a brand is well-known.  So I don't  04:48:18

21        know if that's '96, '97, '98, '99 or 2000 or -- or 04:48:21

22        who's determining that.  I think almost anyone    04:48:28
```

| | | | |
|---|---|---|---|
| 1 | | Sportswear Monthly. | 04:50:22 |
| 2 | | BY MR. SOMMERS: | 04:50:26 |
| 3 | Q | Would you agree with me that engaging in national | 04:50:27 |
| 4 | | mass advertising helps a brand become well-known? | 04:50:31 |
| 5 | A | In most cases, yes. | 04:50:35 |
| 6 | Q | And in what cases would it not? | 04:50:38 |
| 7 | A | I suppose a poorly planned ad campaign. | 04:50:44 |
| 8 | Q | Do you have any specific examples? | 04:50:48 |
| 9 | A | I don't. | 04:50:54 |
| 10 | Q | Mr. Jacobs, are you aware of companies using smiley | 04:51:10 |
| 11 | | faces as trademarks? | 04:51:14 |
| 12 | A | Companies using smiley faces as trademarks.  No. | 04:51:19 |
| 13 | | I'm sure there's probably some examples, but, | 04:51:28 |
| 14 | | offhand, I don't have specific ones in my memory. | 04:51:31 |
| 15 | Q | Are you aware of companies using smiling faces or | 04:51:33 |
| 16 | | smiley faces as ornamentation? | 04:51:37 |
| 17 | A | Yes.  Again, I don't have specific examples in | 04:51:42 |
| 18 | | mind, but I'm sure it happens. | 04:51:45 |
| 19 | Q | Are you aware of whether Wal-Mart uses smiley -- a | 04:51:47 |
| 20 | | smiley face? | 04:51:51 |
| 21 | A | Yes, I've seen that.  I think it's the traditional | 04:51:52 |
| 22 | | smiley face, is it? | 04:51:57 |

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700          800-336-6646

230

| | | | |
|---|---|---|---|
| 1 | Q | Yes.  Are you aware of Yahoo! using smiley -- | 04:51:59 |
| 2 | | smiley faces? | 04:52:03 |
| 3 | A | I don't use Yahoo! myself, so no.  But I'll take | 04:52:03 |
| 4 | | your word. | 04:52:09 |
| 5 | Q | What about McDonald's; are you aware of their use | 04:52:09 |
| 6 | | of smiley faces? | 04:52:13 |
| 7 | A | McDonald's is another one that I don't frequent. | 04:52:15 |
| 8 | | So again, I'll -- I'll take your word for it that | 04:52:18 |
| 9 | | they're using smiley faces. | 04:52:20 |
| 10 | Q | What about Joe Boxer? | 04:52:22 |
| 11 | A | Yes.  I'm familiar with that one; that's within the | 04:52:24 |
| 12 | | industry. | 04:52:27 |
| 13 | Q | Have you ever seen a Massachusetts license plate | 04:52:27 |
| 14 | | with smiley faces? | 04:52:30 |
| 15 | A | No, I don't recall that. | 04:52:32 |
| 16 | Q | Does Joe Boxer's use of a smiley face -- smiley | 04:52:33 |
| 17 | | face concern you? | 04:52:46 |
| 18 | A | No, it doesn't. | 04:52:47 |
| 19 | Q | Why is that? | 04:52:48 |
| 20 | A | I believe -- I'm -- I'm sorry.  A few reasons. | 04:52:49 |
| 21 | | First of all, it's the -- it's also the traditional | 04:52:56 |
| 22 | | smiley face, if I remember correctly.  And not -- | 04:53:03 |

1    not too similar, in our opinion, to our Jake    04:53:11

2    character.  But more importantly, it doesn't use a    04:53:18

3    word mark or word marks that are confusingly    04:53:24

4    similar to ours.  So I think people have any right    04:53:30

5    to use a smiley face.  I don't think we have the    04:53:33

6    rights to all smiley faces.    04:53:37

7 Q    Outside of LG's use of the words "life's good", to    04:53:40

8    your knowledge, have they engaged in any other    04:53:52

9    conduct or actions that you believe infringe your    04:53:57

10    rights?    04:54:02

11 A    I'm sorry.  I'm going to ask you to restate it.    04:54:03

12 Q    Please.  Other than the use of the words "life's    04:54:11

13    good", is LG engaging in any other action to draw    04:54:15

14    an association or connection with your company?    04:54:30

15 A    Yes.    04:54:32

16 Q    What's that?    04:54:33

17 A    I would say that in addition to using the brand    04:54:34

18    slogan "life's good," they have also used "life is    04:54:38

19    good."  In addition to that, they have associated    04:54:44

20    either or both of these with a smiley face, which,    04:54:46

21    in our opinion, is added confusion.    04:54:51

22 Q    You just used the words "life is good."  In what    04:54:55

258

1    information that your company puts out in press    05:43:57

2    releases is factually accurate?    05:44:02

3  A    The information our company -- sure.    05:44:06

4             MR. SOMMERS:  If I could have the next    05:45:53

5    exhibit marked as 25.  We'll get a copy for you.    05:45:55

6             (Exhibit No. 25 marked for

7    identification.)    05:46:14

8    BY MR. SOMMERS:    05:46:14

9  Q    Mr. Jacobs, I've handed you some financial    05:46:14

10    information that appears as Exhibit 25.  My    05:46:18

11    question to you is, do you know -- or let me strike    05:46:21

12    that.    05:46:26

13             Were you involved in the preparation of    05:46:26

14    this material?    05:46:28

15  A    Not directly.    05:46:29

16  Q    Is this something that you would have    05:46:31

17    responsibility for?    05:46:36

18  A    I would have the responsibility to look over the    05:46:44

19    P&L sheet and balance sheet, but not to prepare the    05:46:46

20    information.    05:46:49

21  Q    Would these numbers accurately reflect the    05:46:49

22    financial performance of your company?    05:46:52

259

1  A    Looks about right.                                    05:46:54

2           MR. KIRBY:  Is this a document that we            05:47:07

3  produced, Mark?                                            05:47:10

4           MR. SOMMERS:  Yeah.                               05:47:12

5           THE WITNESS:  The only one I find a               05:47:13

6  little funny is the advertising and marketing.            05:47:14

7  BY MR. SOMMERS:                                            05:47:17

8  Q    And why is that?                                      05:47:17

9  A    Maybe it's not high.  Seems a bit high.  1.3         05:47:19

10 million on 40 million in 2004.  But maybe we spent        05:47:25

11 a lot in trade shows and things.  Seems a bit high.       05:47:29

12          MR. SOMMERS:  Thank you.  Mr. Jacobs, I          05:47:34

13 want to thank you for taking the time today to come       05:47:35

14 and testify on behalf of your company.  I                 05:47:38

15 personally thank you, as does my client, for              05:47:44

16 appearing here today.  I have no further questions        05:47:47

17 at this time.                                              05:47:51

18          MR. KIRBY:  Thank you.                           05:47:52

19          THE VIDEOGRAPHER:  The time is 5:48.             05:47:55

20 This is the end of cassette number 8.  The                05:47:58

21 deposition is concluded.                                  05:48:01

22          (Whereupon, this deposition was concluded at     05:48:04