20115
FieldRptr

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3 --------------------------------x

4 LIFE IS GOOD, INC.,

5                              Plaintiff

6                                              Civil Action

7 vs.                                          No. 04 11290 REK

8

9 LG ELECTRONICS U.S.A., INC. and

10 LG ELECTRONICS MOBILECOMM U.S.A.,

11 INC. (formerly LG INFOCOMM U.S.A.,

12 INC.),

13                              Defendant

14 --------------------------------x

15          DEPOSITION OF THOMAS KENNEY, a witness called

16    by and on behalf of the Defendants, taken pursuant to

17    Rule 30(b)(6) of the Federal Rules of Civil Procedure,

18    before Nicole E. Guilbert, a Notary Public in and for

19    the Commonwealth of Massachusetts, at Finnegan,

20    Henderson, Farabow, Garrett & Dunner, LLP, 55 Cambridge

21    Parkway, Cambridge, Massachusetts, on Thursday,

22    November 17, 2005, commencing at 9:21 a.m.

### ACE-FEDERAL REPORTERS, INC.

| | | | |
|---|---|---|---|
| 1 | A. | I have not seen this before today, I don't | 09:58:51 |

2 believe, and I'm not aware of anyone at my firm seeing this    09:58:57

3 before.    09:59:01

4    Q.    And did you review the -- your files to look for    09:59:01

5 all correspondence related to the application that is the    09:59:06

6 subject of Exhibit 43?    09:59:12

7    A.    Yes.    09:59:13

8    Q.    And did you locate any photographs related to or    09:59:14

9 resembling the photograph that appears on the backside of    09:59:22

10 page -- the last page of Exhibit 43?    09:59:26

11    A.    I didn't locate anything that looks like this.    09:59:28

12            MR. SOMMERS:   If I could have marked    09:59:31

13        as the next exhibit, 44, a multipage    09:59:33

14        document dated July 19, 1995.    09:59:48

15            (Exhibit 44, 7/19/95 Office Action,

16        marked for identification.)    10:00:04

17    Q.    (By Mr. Sommers)   Mr. Kenney, if I could have you    10:00:04

18 identify that for me?    10:00:07

19    A.    This document is an office action sent by the U.S.    10:00:14

20 Trademark Office with respect to a Life is Good    10:00:22

21 application.    10:00:25

22    Q.    And do you see the number that's at the bottom of    10:00:27

1 that right-hand page?                                      10:00:32

2    A.    Yes.                                              10:00:33

3    Q.    And what number is that?                          10:00:33

4    A.    002441.                                           10:00:36

5    Q.    Do you know why that number appears there?        10:00:39

6    A.    I believe that's a Bates stamp number provided    10:00:42

7 with respect to the production of documents to the         10:00:46

8 defendants in this case.                                   10:00:48

9    Q.    Do you know where this document and -- let me     10:00:52

10 strike that.  Mr. Kenney, have you seen this document     10:00:56

11 before?                                                   10:01:00

12   A.    Yes.                                              10:01:00

13   Q.    If I could ask you to refer to the second page of 10:01:02

14 that document and, under the numeric paragraph that begins 10:01:10

15 with 3, ask you to read into the record the last sentence  10:01:19

16 of that paragraph.                                         10:01:22

17   A.    The last sentence?                                10:01:25

18   Q.    Please.                                           10:01:26

19   A.    "The proposed mark 'Life is Good' thus appears to 10:01:28

20 be a general comment on the merits of the simple life      10:01:32

21 without acting as a source identifier," and then in        10:01:37

22 parentheses, "trademark for applicants goods."             10:01:42

| | | | |
|---|---|---|---|
| 1 | Q. | Do you understand -- let me strike that.  Do you | 10:01:46 |

2 have an understanding of the reason that the trademark        10:01:50

3 office made that comment?                                     10:01:54

4     A.    I'm not sure I understand the reason why they made  10:02:01

5 that --                                                       10:02:04

6     Q.    Do you --                                           10:02:05

7     A.    -- comment.                                         10:02:06

8     Q.    -- understand the meaning of the language that the  10:02:06

9 trademark has included?                                       10:02:11

10    A.    I think I do.                                        10:02:13

11    Q.    And what would that be?                              10:02:15

12    A.    My understanding is the trademark office initially   10:02:20

13 took the position that the use of the word -- the words       10:02:24

14 "life is good" on the applicant's goods or the goods          10:02:30

15 submitted was simply -- or was used in an ornamental          10:02:43

16 fashion, meaning to make a statement rather than from the     10:02:48

17 trademark's -- trademark office's position to serve as a      10:02:56

18 source identifier.                                            10:02:59

19    Q.    When you say, "make a statement," what do you        10:03:00

20 mean?                                                         10:03:07

21    A.    I think the trademark office would or -- was         10:03:07

22 taking the position that the use of the phrase "life is       10:03:13

| 1 | A. | Yes. | 10:30:52 |

2    Q.    And what was Mr. Pierce's comments concerning    10:30:53

3 those facts?    10:30:59

4    A.    My recollection was that his comments were that it    10:31:16

5 was our position and the client's position that the use of    10:31:24

6 the mark was not ornamental and that we, therefore, should    10:31:29

7 submit a response to the trademark office making those    10:31:38

8 arguments.    10:31:44

9    Q.    If I could refer you to page 4 of Exhibit 45 --    10:31:44

10    A.    Yes.    10:31:49

11    Q.    -- and the first paragraph, and if you could read    10:31:49

12 the first line into the record for me.    10:31:52

13    A.    The first sentence?    10:31:54

14    Q.    Please.    10:31:55

15    A.    "In fact, previously the applicant manufactured    10:31:57

16 the subject goods with a patch stating 'Jacobs Gallery'    10:32:00

17 sewn into the outside back of the T-shirt."    10:32:07

18    Q.    Could you explain to me what that means.    10:32:12

19    A.    I understand it to mean that in -- at one time,    10:32:21

20 the applicant manufactured goods that had a patch sewn on    10:32:29

21 it that said "Jacobs Gallery."    10:32:34

22    Q.    Would I be correct that the Jacobs Gallery would    10:32:38

1 have been the name of the entity back then?  10:32:44

2   A.   That's accurate, yes.  10:32:47

3   Q.   Would I also be accurate in concluding that the  10:32:49

4 patch that appeared on the shirts was a patch which showed  10:32:57

5 where the product came from?  10:33:03

6   A.   I don't know that.  10:33:10

7   Q.   I guess what I'm trying to find out is were there  10:33:13

8 any labels sewn into the garments that showed who the  10:33:23

9 manufacturer of the T-shirt was,  10:33:33

10   A.   That, I don't know.  10:33:34

11   Q.   Would I be correct in assuming that this language  10:33:42

12 that appears on Exhibit 45 indicates that at some time  10:33:48

13 there was a patch with the name "Jacobs Gallery" sewn into  10:33:55

14 the outside back of the T-shirt?  10:34:02

15   A.   That's what that says, yes. That's what that  10:34:04

16 sentence says, yes.  10:34:09

17   Q.   Now, were there any other markings on the T-shirts  10:34:11

18 at that time other than the patch which is explained on  10:34:19

19 page 4 of Exhibit 45 and the various depictions that are  10:34:24

20 represented on the page bearing Bates Stamp Number 2432?  10:34:33

21   A.   I don't know the answer to that question.  10:34:43

22   Q.   Did you -- were you involved in any manner with  10:34:48

1          December 3, 2001 as Exhibit 52.                    11:49:47

2                    (Exhibit 52, 12/3/01 Office Action,

3          marked for identification.)                         11:50:08

4     Q.   (By Mr. Sommers)  Mr. Kenney, if you could          11:50:08

5 identify Exhibit 52 for me.                                  11:50:17

6     A.   Sure.  It is a -- an office action sent by the      11:50:19

7 U.S. Trademark Office in connection with a Life is Good      11:50:29

8 trademark application.                                       11:50:33

9     Q.   Are you the individual that this is addressed to?   11:50:34

10    A.   Yes.                                                11:50:37

11    Q.   If I could refer you to the first paragraph that    11:50:42

12 says, "Registration Refused:  Likely to confusion" --       11:50:45

13    A.   Yes.

14    Q.   -- do you see that?                                 11:50:49

15    A.   Yes.                                                11:50:52

16    Q.   Do you see that?                                    11:50:52

17    A.   I do.                                               11:50:53

18    Q.   Can you explain to me what the purpose of that      11:50:54

19 paragraph is.                                               11:50:57

20    A.   I believe the purpose is to indicate or to inform   11:51:02

21 the applicant that the trademark office has found or        11:51:08

22 located a prior registration -- in this case, registration  11:51:13

1        sorry.                                                    11:53:03

2            MR. SOMMERS:  Exhibit 52 discussing                  11:53:03

3        the "Registration Refused" paragraphs.                   11:53:05

4            THE WITNESS:  By citation, do you                    11:53:09

5        mean the registration that's cited?                      11:53:11

6            MR. SOMMERS:  Perhaps I can ask it                   11:53:13

7        this way.                                                11:53:13

8    Q.    (By Mr. Sommers)  Did you have an understanding of     11:53:13

9 what the basis of the paragraph that -- let me strike that.    11:53:17

10 Did you have an understanding of the nature of the            11:53:24

11 registration refusal that appears on the first page of        11:53:33

12 Exhibit 52?                                                    11:53:37

13    A.    Yes.                                                  11:53:40

14    Q.    And what was that understanding?                      11:53:40

15    A.    My understanding was that the trademark office was    11:53:42

16 taking, at least, the initial position that the               11:53:46

17 registration should be refused, I believe, at least, with     11:53:52

18 respect to one of the classes that the application was        11:53:56

19 classified in or the goods that were included in the          11:54:03

20 application because of a registration at the time by Miller   11:54:08

21 Brewing Company.                                              11:54:17

22    Q.    When you say classes, what do you mean?               11:54:17

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646          410-684-2550

1    A.    I would assume that's accurate.                      11:55:46

2    Q.    Mr. Kenney, did you have an understanding of the     11:55:50

3 particular manner in which your client could respond to       11:56:01

4 this refusal?                                                  11:56:05

5    A.    Yes.                                                  11:56:11

6    Q.    And would I be correct that the manner in which      11:56:13

7 your client responded to the refusal was to amend the         11:56:19

8 pending application to delete the class to which the          11:56:26

9 refusal pertained?                                            11:56:30

10   A.    I believe that's accurate.                           11:56:32

11   Q.    To your knowledge, did your client, in fact,         11:56:40

12 delete the class that pertained to beverages?                11:56:43

13   A.    Yes.                                                 11:56:51

14   Q.    Do you have an understanding of whether this was     11:56:53

15 sufficient to remove the refusal that the trademark office   11:56:56

16 set forth in Exhibit 52?                                     11:57:02

17   A.    I believe it was.                                    11:57:05

18   Q.    And what was your understanding to the reason why    11:57:06

19 the refusal was removed?                                     11:57:10

20   A.    It's my understanding that the refusal was removed   11:57:16

21 because the -- the goods that had been listed in the         11:57:23

22 application that the trademark office determined could       11:57:36

20115
FieldRptr

94

| | | |
|---|---|---|
| 1 | don't know if it's the company's -- that -- | 12:05:14 |
| 2 | that he did not wish the Life is Good | 12:05:17 |
| 3 | trademark to be associated with alcoholic | 12:05:22 |
| 4 | beverages. | 12:05:26 |
| 5 | Q. (By Mr. Sommers) And that position | 12:05:39 |
| 6 | notwithstanding, am I correct that your client has never | 12:05:43 |
| 7 | sought cancellation of Miller's registration for Life is | 12:05:51 |
| 8 | Good for beer? | 12:05:55 |
| 9 | A. I don't believe that my client ever began any | 12:05:56 |
| 10 | proceedings to seek the cancellation of Miller's Life is | 12:06:00 |
| 11 | Good registration. | 12:06:04 |
| 12 | Q. Are you aware of any factual reason why? | 12:06:07 |
| 13 | A. No. | 12:06:10 |
| 14 | Q. To your knowledge, Mr. Kenney, did the deletion of | 12:06:31 |
| 15 | the class concerning beverages result in the successful | 12:06:39 |
| 16 | removal of the refusal to registration that's memorialized | 12:06:47 |
| 17 | on Exhibit 52? | 12:06:58 |
| 18 | A. I believe it did. | 12:07:00 |
| 19 | Q. Mr. Kenney, aside from specific designated goods, | 12:07:27 |
| 20 | does your client own a registration for just the phrase | 12:07:34 |
| 21 | "life is good"? | 12:07:39 |
| 22 | A. I'm not sure I understand the question. | 12:07:46 |

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700          800-336-6646          410-684-2550

95

```
 1    Q.   Well, does Life is Good own a trademark          12:07:50

 2 registration for the phrase "life is good" itself without  12:07:55

 3 regard to any specific goods?                            12:08:03

 4    A.   I believe all of the U.S. registration --        12:08:08

 5 trademark registrations that Life is Good, Inc. owns for  12:08:12

 6 "life is good" are for particular classes listed in the   12:08:17

 7 registration.                                            12:08:23

 8    Q.   And there's not a registration just for the words 12:08:23

 9 that does not otherwise have some goods attached to it?   12:08:29

10    A.   I believe that's accurate.                       12:08:34

11    Q.   Would you be the person that would be most       12:08:36

12 knowledgeable about that?                                12:08:40

13    A.   Probably.                                        12:08:42

14    Q.   To your knowledge, does your client claim        12:08:57

15 trademark rights in the words "life is good" in gross?    12:09:06

16    A.   Do we claim them in gross?                       12:09:13

17    Q.   Yes.                                             12:09:17

18    A.   I don't believe so.                              12:09:17

19    Q.   Has your client, to your knowledge, ever claimed 12:09:18

20 that it owns proprietary rights to the ordinary meaning in 12:09:27

21 the English language of the words "life is good"?         12:09:35

22    A.   I don't think so.                                12:09:45
```

20115
FieldRptr

```
 1    Q.    So would I be correct that -- let me strike that.    12:10:07

 2 So would I be correct that your client does not claim any    12:10:14

 3 proprietary rights to the words "life is good" as used as    12:10:22

 4 part of ordinary English?                                    12:10:35

 5    A.    I guess I'm not -- I guess I'm not understanding    12:10:39

 6 what "ordinary English" means.                               12:10:43

 7    Q.    Perhaps -- point well taken.  Let me ask again.    12:10:45

 8    A.    Thank you.                                          12:10:50

 9    Q.    Am I correct that your client does not claim       12:10:51

10 proprietary rights to the words "life is good" as those     12:10:57

11 words are used in the English language in a nontrademark    12:11:04

12 manner?                                                      12:11:13

13    A.    I don't believe that my client does make that      12:11:14

14 claim.  I guess I should qualify that.  To the extent that  12:11:28

15 someone, a third party, uses it in a way they believe is in 12:11:43

16 some common way or nontrademark way that my client may      12:11:51

17 believe, regardless of how it's used, that it is likely to  12:11:56

18 cause confusion, then -- I don't know if that's claiming    12:12:00

19 proprietary, but I think my client would be concerned about 12:12:04

20 that.                                                        12:12:08

21    Q.    I'm not sure I understand.  Could you explain for  12:12:09

22 me.                                                          12:12:11
```

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700          800-336-6646          410-684-2550

1 do know that that's been a source of notice of third-party    12:23:12

2 uses of "life is good."                                        12:23:18

3    Q.    How long has that been in place?                      12:23:20

4    A.    I don't know.                                         12:23:22

5    Q.    When is the first time you had knowledge that that    12:23:26

6 was a practice?                                                12:23:28

7    A.    Probably been a few years, at least two years, I      12:23:34

8 think, and that's an estimate.  I apologize.  I don't          12:23:46

9 recall the specifics of the situation.                         12:23:49

10   Q.    Prior to filing any applications for the Life is      12:24:00

11 Good mark on behalf of our client, have you ever conducted    12:24:05

12 a trademark search to see if that trademark was available     12:24:09

13 for registration?                                             12:24:12

14   A.    I don't recall doing that.                            12:24:17

15   Q.    Do you know if your client did that?                  12:24:19

16   A.    Again, John Jacobs mentioned in his deposition        12:24:24

17 that he believed he did that after the first application       12:24:27

18 was filed.  Other than that testimony, I'm not aware of any    12:24:30

19 other searches.                                               12:24:35

20   Q.    Mr. Kenney, in connection with the enforcement        12:25:19

21 efforts on behalf of your client, have you engaged in any     12:25:26

22 marketing studies, research, or surveys to determine the      12:25:37

103

```
 1 public recognition of your client's trademark Life is Good?    12:25:49

 2    A.    I have not.                                             12:25:54

 3    Q.    Are you aware of any others doing so?                   12:25:56

 4    A.    In connection with enforcement, no.                     12:26:01

 5    Q.    In connection with any other activities?                12:26:04

 6    A.    Not that I'm aware of other than in connection          12:26:10

 7 with this litigation.                                            12:26:13

 8    Q.    And what specifically are you aware of?                 12:26:14

 9    A.    My understanding is that a firm has been engaged        12:26:18

10 or will be engaged to conduct a survey.                         12:26:25

11    Q.    And what firm is that?                                  12:26:28

12    A.    I don't remember the name of the firm.                 12:26:31

13    Q.    And what is the purpose of engaging the firm?           12:26:35

14              MR. KIRBY:  Well, I think you're now                12:26:38

15          going beyond the scope of the deposition                12:26:40

16          notice, Mark.  I mean, now you're really                12:26:42

17          going into this litigation.                             12:26:45

18              MR. SOMMERS:  But it is an                          12:26:48

19          enforcement matter and the witness is                   12:26:53

20          volunteering.                                           12:26:56

21              THE WITNESS:  Well, because I was                   12:26:56

22          asked.                                                  12:26:57
```

| 1 | Q. | When was the presurvey done? | 12:32:45 |
|---|---|---|---|
| 2 | A. | Two weeks sounds about right.  That's my estimate. | 12:32:50 |

3              MR. SOMMERS:  If I could have marked          12:33:41

4              as Exhibit 53 a document bearing the date      12:33:46

5              January 31.                                    12:33:49

6                    (Exhibit 53, Rolex Correspondence,

7              marked for identification.)                    12:34:03

8      Q.    (By Mr. Sommers)  Mr. Kenney, could you describe   12:34:03

9 for me what Exhibit 53 is.                                  12:34:07

10     A.    The first page is a letter from an attorney who's   12:34:10

11 identifying himself as a firm representing Rolex.   The     12:34:17

12 remainder of it appears to be a letter that I sent to      12:34:23

13 Rolex.                                                     12:34:30

14     Q.    Has there been any correspondence since January 31   12:34:31

15 between yourself and this firm?                            12:34:36

16     A.    I believe so.                                    12:34:39

17     Q.    And what's that?                                 12:34:41

18     A.    I believe there was a letter indicating that Rolex   12:34:43

19 was stopping or shortly stopping the use of the           12:34:55

20 advertisement in magazines.                               12:34:59

21     Q.    To your knowledge, would that document have been   12:35:05

22 produced to us?                                            12:35:07

1 any research to determine the degree of consumer          12:40:47

2 recognition of its trademark Life is Good?                12:40:52

3    A.    Other than the survey that I previously testified  12:40:54

4 about, not that I'm aware of.                             12:40:58

5    Q.    And that survey is being conducted as we speak?   12:41:01

6    A.    Hopefully.                                        12:41:04

7          MR. SOMMERS:  If I could have marked              12:41:25

8          as Exhibit 54 a document dated September          12:41:27

9          12.                                               12:41:45

10         MR. KIRBY:  Off the record.                       12:41:46

11         (Discussion off the record.)                      12:42:01

12         (Exhibit 54, Avia Correspondence,

13         marked for identification.)

14         MR. SOMMERS:  I have been corrected                12:42:02

15         by my very observant counsel in this matter        12:42:04

16         and been advised that Exhibit 54 is dated          12:42:06

17         September 12, 2001, for which I thank you.         12:42:08

18    Q.    (By Mr. Sommers)  Mr. Kenney, if you could        12:42:13

19 identify Exhibit 54 for me.                               12:42:15

20    A.    Okay.  The first three pages are -- consist of a  12:42:16

21 letter sent to Robert Pierce from attorneys for, I believe,  12:42:29

22 it's Avia Corporation.  The next two pages are a letter    12:42:34

1 that Mr. Pierce sent back to Mr. Painter, who was the          12:42:49

2 author of the first letter -- I don't know I may have them      12:42:54

3 backward -- and then the remaining pages are a three-page       12:42:58

4 letter dated September 5, 2001 that Mr. Pierce sent to          12:43:08

5 Mr. Painter.                                                    12:43:14

6      Q.    Mr. Kenney, what was the particular use that Avia    12:43:16

7 was making?                                                     12:43:19

8      A.    My understanding -- I have a hard time remembering   12:43:26

9 the specific one -- but my understanding was it was some        12:43:37

10 type of advertising or promotional activity that Avia was      12:43:41

11 undertaking in connection with a show, a consumer show or      12:43:47

12 some type of business show, in which it was using the          12:43:57

13 phrase "life is good" but I don't remember the specifics of    12:44:03

14 it.                                                            12:44:07

15      Q.    Would I be correct that -- well, let me strike      12:44:11

16 that.   What is your understanding of the disposition of       12:44:22

17 this matter?                                                   12:44:27

18      A.    My understanding is that -- my best recollection    12:44:28

19 of it is that Avia agreed to stop using "life is good" in      12:44:35

20 connection with its promotional efforts.   That's my memory.   12:44:40

21      Q.    Are you aware of whether Avia acknowledged your     12:44:47

22 client had any validity in this claim or not?                  12:44:52

1 not?                                                          12:46:20

2    A.    I believe they do.                                   12:46:21

3    Q.    Regardless of what they feel about the merits of     12:46:25

4 the plaintiff's claim or not?                                 12:46:28

5    A.    I believe they take issues of cost and time and      12:46:29

6 expenditure of time into account certainly.                   12:46:38

7           MR. SOMMERS:  If I could have marked                12:46:41

8           as the next exhibit, 55, an August --               12:46:43

9           bearing the date August 26, 2004 on the             12:46:49

10          front page.                                         12:46:53

11          (Exhibit 55, Natural Life

12          Collections, Inc. Correspondence, marked

13          for identification.)                                12:47:14

14   Q.    (By Mr. Sommers)  Mr. Kenney, could you describe     12:47:15

15 for me what Exhibit 55 is.                                   12:47:17

16   A.    Yes.  The first three pages are a letter to me       12:47:19

17 from an attorney for Natural Life Collections, Inc.,         12:47:28

18 appears to have an attachment to it.  The next pages appear  12:47:33

19 to be a letter that I sent to Natural Life.  I think         12:47:46

20 there's an attachment there.  The next page is a letter      12:47:53

21 that Karen Oliver from Life is Good sent to Mr. Young, the   12:48:05

22 attorney for Natural Life.                                   12:48:09

115

```
 1          The next page is an e-mail within Life is Good      12:48:13

 2 about Natural Life.  Then there's a page -- looks like a      12:48:19

 3 page from a website, and there's another e-mail within Life   12:48:27

 4 is Good regarding Natural Life and then a couple more          12:48:34

 5 e-mails regarding Natural Life.                                12:48:41

 6     Q.   And the whole group of documents that comprise        12:48:43

 7 Exhibit 55 concern the use of "life is good" by Natural        12:48:48

 8 Life Collections?                                              12:48:55

 9     A.   Yes.                                                  12:48:55

10     Q.   Mr. Kenney, to your knowledge, have any further       12:48:58

11 communications occurred between the parties since August       12:49:03

12 26, 2004?                                                      12:49:07

13     A.   Yes.                                                  12:49:08

14     Q.   And what's that?                                      12:49:08

15     A.   Ms. Oliver's letter of October 19, 2005.             12:49:10

16     Q.   Okay.  And who's Ms. Oliver?                          12:49:15

17     A.   She is an attorney that works for Life is Good.      12:49:18

18     Q.   Has there been any contact for -- with the           12:49:28

19 attorneys representing Natural Life with you, meaning Life     12:49:34

20 is Good or its representatives, since August 26, 2004?         12:49:41

21     A.   You mean other than Ms. Oliver's letter?             12:49:45

22     Q.   I'm referring to whether Natural Life has had any    12:49:48
```

1 what has happened with respect to this issue since then.     12:56:05

2    Q.   Do you know the reason why nearly fourteen months     12:56:08

3 passed before Ms. Oliver contacted this company?     12:56:17

4    A.   I don't.     12:56:19

5    Q.   Do you see on page 2 of that document that Natural     12:56:30

6 Life claims that it commenced use of the "life is good"     12:56:35

7 phrase in 1995?     12:56:40

8    A.   I do see that.     12:56:42

9    Q.   Would that fact have any bearing on your position     12:56:44

10 in connection with this matter?     12:56:48

11    A.   I believe so because I believe Ms. Oliver has     12:56:52

12 requested information about that in her letter.     12:56:57

13    Q.   And why would that be relevant?     12:56:58

14    A.   In my mind, the extent of use by Natural Life     12:57:05

15 could be relevant to a determination of whether or not     12:57:14

16 their use is an infringement.     12:57:20

17    Q.   How is it relevant?     12:57:24

18    A.   Well, they're claiming that they used it first;     12:57:27

19 that they're the senior user of the mug or the -- of the     12:57:32

20 phrase.     12:57:37

21    Q.   And what would that mean?     12:57:37

22    A.   Well, if they're the senior user, then they would     12:57:39

20115
FieldRptr

124

```
 1 infringing.                                               13:01:29

 2    Q.   So if they have a priority of use, is it your     13:01:29

 3 client's contention that it would not infringe its rights? 13:01:36

 4    A.   No.                                               13:01:41

 5              MR. SOMMERS:   Could I have marked as         13:01:59

 6         the next exhibit a letter dated -- the            13:02:00

 7         first page, a letter, being dated December        13:02:05

 8         13, 2002.                                         13:02:09

 9              (Exhibit 56, Hallmark Correspondence,

10         marked for identification.)

11    Q.   (By Mr. Sommers)   Before I turn to that,         13:02:25

12 Mr. Kenney, am I correct that Natural Life has refused to  13:02:28

13 cease its use of "life is good"?                          13:02:34

14    A.   At this point, that's my understanding.           13:02:36

15    Q.   Do you know are they still using this in the      13:02:40

16 marketplace?                                              13:02:45

17    A.   As far as I know, yes.                            13:02:45

18    Q.   If I could have you tell me what Exhibit 56 is.   13:02:48

19    A.   The first page is a letter from an attorney for  13:02:54

20 Hallmark Cards to me.  The second page is a two-page letter 13:02:59

21 that I sent to Hallmark Cards with an attachment --       13:03:07

22 actually, a couple of attachments.  I don't know if they're 13:03:14
```

1 necessarily attached to the card but I mean attached to the    13:03:20

2 letter that I sent, but there are attachments which appear    13:03:24

3 to be greeting cards.    13:03:27

4    Q.    Mr. Kenney, has there been any further    13:03:36

5 correspondence between you or your client and Hallmark    13:03:40

6 since December 13, 2002?    13:03:45

7    A.    Not that I'm aware of.    13:03:50

8    Q.    And what is the reason that you or your client    13:03:52

9 have not followed up with this matter?    13:03:54

10            MR. KIRBY:  Let me caution the    13:03:56

11            witness that to the extent the answer to    13:03:58

12            the question would divulge the substance of    13:04:00

13            attorney-client communications, you should    13:04:04

14            not provide such testimony.    13:04:06

15            THE WITNESS:  I don't think I can    13:04:11

16            comment on why my client necessarily hasn't    13:04:13

17            followed up, but the reason that nothing    13:04:17

18            further has come from my office has been    13:04:19

19            the result of discussions that my office    13:04:23

20            has had with my client.    13:04:27

21    Q.    (By Mr. Sommers)  Is it fair to conclude that you    13:04:32

22 and your client are not following up with this matter any    13:04:38

1   Q.   Is it also accurate to summarize that Hallmark    13:06:36

2 believed that your client's claim was ill-founded and would    13:06:43

3 not continue -- sorry.  Let me strike that.  Is it also    13:06:48

4 fair to summarize that Hallmark disagreed with your    13:06:53

5 client's claims of infringement and refused to stop?    13:06:56

6   A.   That's certainly the position that they expressed    13:07:01

7 in the letter, yes.    13:07:04

8   Q.   Could you describe for me the context of use of    13:07:17

9 "life is good" by Hallmark as depicted on Exhibit 56.    13:07:23

10   A.   Appear to be a couple things that are, I guess,    13:07:28

11 greeting cards.  The first one is it's a greeting card that    13:07:32

12 looks like a chocolate chip cookie or some type of cookie    13:07:39

13 and on the inside it says, "Life is good.  Happy Birthday."    13:07:43

14 The second one is an another greeting card.  I think "life"    13:07:46

15 didn't get printed out, but it does say, "Life is good," on    13:07:52

16 the outside; and then when you open it up, it says, "Happy    13:07:56

17 Graduation."    13:08:00

18   Q.   Did you have an understanding at the time that you    13:08:06

19 wrote your December 2, 2002 letter to Hallmark as to    13:08:11

20 whether Hallmark was using the words "life is good" as    13:08:19

21 ordinary English words or as a trademark?    13:08:25

22   A.   I don't recall what -- whether or not I had an    13:08:29

| | | |
|---|---|---|
| 1 | Q. Mr. Kenney, I see that on the first page of | 13:09:54 |
| 2 | Exhibit 56 that it says, the marks -- strike that. | 13:09:59 |
| 3 | Mr. Kenney, I see on the first page of Exhibit 56 that | 13:10:02 |
| 4 | Hallmark informs you that it used the "life is good" phrase | 13:10:08 |
| 5 | on its greeting cards since 1989. Do you see that? | 13:10:12 |
| 6 | A. I do. | 13:10:16 |
| 7 | Q. Did that factor -- did that fact factor in to | 13:10:16 |
| 8 | whether or not your client took no further steps upon | 13:10:20 |
| 9 | receiving the December 13, 2000 [sic] letter from Hallmark? | 13:10:29 |
| 10 | A. I don't think I can answer that without divulging | 13:10:33 |
| 11 | my communications with my client. | 13:10:36 |
| 12 | Q. Would it have been a fact relevant to your | 13:10:38 |
| 13 | consideration? | 13:10:41 |
| 14 | A. I think so. | 13:10:42 |
| 15 | Q. Was it a fact relevant to your consideration? | 13:10:43 |
| 16 | A. My memory is that it was. | 13:10:46 |
| 17 | MR. KIRBY: How we doing for time, | 13:10:56 |
| 18 | Mark? | 13:11:00 |
| 19 | MR. SOMMERS: Probably make it if we | 13:11:01 |
| 20 | push, but I'd like to -- we can go off the | 13:11:02 |
| 21 | record. | 13:11:05 |
| 22 | THE VIDEOGRAPHER: The time is 1:10. | 13:11:05 |

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646          410-684-2550

20115
FieldRptr

130

| | | |
|---|---|---|
| 1 | We are off the record. | 13:11:07 |
| 2 | (Discussion off the record.) | 13:17:41 |
| 3 | (A brief recess was taken.) | 13:17:47 |
| 4 | THE VIDEOGRAPHER: The time is 1:17 | 13:18:01 |
| 5 | p.m. This is the beginning of Cassette | 13:18:03 |
| 6 | Number 3. We are on the record. | 13:18:06 |
| 7 | MR. SOMMERS: If I could have marked | 13:18:24 |
| 8 | as the next exhibit, 57, a multipage | 13:18:25 |
| 9 | document, the first page being a letter | 13:18:31 |
| 10 | dated April 1, 2004. | 13:18:34 |
| 11 | (Exhibit 57, Benton Silkscreening | |
| 12 | Correspondence, marked for identification.) | 13:18:57 |
| 13 | Q. (By Mr. Sommers) Mr. Kenney, could you identify | 13:18:58 |
| 14 | Exhibit 57 for me. | 13:19:03 |
| 15 | A. Yes. The first two pages consist of a letter from | 13:19:04 |
| 16 | Sam Reed to a company called Benton screen -- | 13:19:11 |
| 17 | Silkscreening. Sorry. There's an attachment, something | 13:19:20 |
| 18 | from the American Red Cross. I guess it's from their | 13:19:23 |
| 19 | website. And there's a second page from the website with | 13:19:29 |
| 20 | some handwritten contact information. It looks like a, I | 13:19:32 |
| 21 | guess, a fax confirmation sheet. | 13:19:37 |
| 22 | Q. Mr. Kenney, do you know the disposition of this | 13:19:40 |

131

1 matter?                                                   13:19:43

2    A.    I believe that Ms. Oliver, Karen Oliver, has     13:19:43

3 spoken to Benton screen -- Silkscreening recently about   13:19:58

4 this issue and has been told that they no longer print    13:20:04

5 these shirts for the American Red Cross, although it      13:20:13

6 appears that the American Red Cross still does distribute  13:20:19

7 at least some of these shirts.                            13:20:27

8    Q.    Is there any other correspondence exchanged      13:20:31

9 between the parties regarding this?                       13:20:34

10    A.    I'm not aware of any other correspondence.      13:20:36

11    Q.    If I could have you turn to the third page of   13:20:39

12 Exhibit 57 --                                            13:20:43

13    A.    Yes.                                            13:20:44

14    Q.    -- and can you describe for me the context in   13:20:44

15 which the words "life is good" is being made.            13:20:49

16    A.    I think this is a design that's on a T-shirt for 13:20:54

17 the American Red Cross and "life is good" is included in  13:21:00

18 the T-shirt design.                                      13:21:08

19    Q.    Is it your client's understanding that "life is 13:21:12

20 good" is being used as a brand name in this context?     13:21:16

21    A.    I don't know what my client's understanding is. 13:21:20

22    Q.    Well, do you have an understanding?             13:21:26

1 earlier today, as words having a meaning other than as the   13:23:19

2 trademark of your client?   13:23:27

3   A.   Yes.   13:23:29

4   Q.   And would that be the meaning that you attribute   13:23:29

5 to these words?   13:23:32

6   A.   I don't know.  I haven't formed an opinion as to   13:23:35

7 what the meaning is in this context.   13:23:44

8   Q.   But we do know that it's not in trademark use?   13:23:46

9   A.   I don't believe it is.   13:23:50

10   Q.   You believe this is a trademark use?   13:23:51

11       MR. KIRBY:  He said, he doesn't   13:23:54

12       believe --   13:23:56

13       THE WITNESS:  I said I don't believe   13:23:56

14       so.  I'm sorry, Mark.   13:23:58

15       MR. SOMMERS:  Thank you.   13:24:02

16   Q.   (By Mr. Sommers)  Do you know why your client   13:24:03

17 challenged that use?   13:24:08

18   A.   I don't.   13:24:08

19       MR. SOMMERS:  If I could have the   13:24:13

20       next document marked as Exhibit 58, a   13:24:19

21       letter dated December 30, 2004.   13:24:24

22       (Exhibit 58, Wisconsin Department of

134

```
1          Tourism Correspondence, marked for
2          identification.)                              13:24:48
3      Q.   (By Mr. Sommers)  Mr. Kenney, if you could    13:24:48
4 describe for me what Exhibit 58 is.                     13:24:51
5      A.   Exhibit 58 is a two-page letter from Roger Stein,   13:24:55
6 who's an attorney who provided services for Life is Good,   13:25:00
7 Inc., to the Wisconsin Department of Tourism.           13:25:05
8      Q.   And what is the subject matter of the exhibit?   13:25:08
9      A.   The Wisconsin Department -- as I understand it,   13:25:13
10 the Wisconsin Department of Tourism was going to be     13:25:17
11 starting a tourism marketing campaign and was considering   13:25:20
12 using the designation "life is good" in connection with   13:25:29
13 that campaign.                                          13:25:32
14     Q.   Do you have an understanding what else happened?   13:25:33
15     A.   I believe that there was a meeting between     13:25:38
16 representatives of Life is Good and representatives of the   13:25:43
17 Department of Tourism of Wisconsin to discuss the issue.  I   13:25:45
18 believe there was some other letters exchanged.         13:25:51
19     Q.   In addition to Exhibit 58?                     13:25:54
20     A.   Yes.                                           13:25:56
21     Q.   Do you know what the disposition of this matter   13:25:56
22 was?                                                    13:25:59
```

135

1　A.　The Wisconsin Department of Tourism decided to　　13:26:00

2 adopt a different designation.　　13:26:03

3　Q.　What's that designation?　　13:26:05

4　A.　I believe it's either going to be or is "life's so　　13:26:07

5 good."　　13:26:14

6　Q.　And has that been resolved to the satisfaction of　　13:26:16

7 your client?　　13:26:20

8　A.　I don't know the answer to that.　　13:26:21

9　Q.　Who would I have to get the answer from?　　13:26:26

10　A.　I would assume from Burt Jacobs or John Jacobs.　　13:26:29

11　Q.　Do you know whether your client maintains any　　13:26:38

12 continuing objection?　　13:26:42

13　A.　I'm not aware of one.　　13:26:43

14　Q.　Do you know the context in which Wisconsin uses　　13:26:45

15 the words "life's so good"?　　13:27:07

16　A.　I don't.　　13:27:10

17　Q.　Who would be the individual who would know that?　　13:27:12

18　A.　At Life is Good?　　13:27:18

19　Q.　Yes.　　13:27:20

20　A.　It would be someone who was involved in that　　13:27:23

21 meeting, I assume, with the Wisconsin Department of　　13:27:29

22 Tourism, which, if my memory is correct, was Burt Jacobs　　13:27:33

1 and Roy Heffernan, but I'm not sure.  That's my memory of          13:27:38

2 who attended that meeting.                                         13:27:45

3      Q.   So, to your knowledge, no additional action has          13:27:50

4 been taken?                                                        13:27:55

5      A.   Once the "life's so good" designation was chosen,        13:27:59

6 that's accurate.                                                   13:28:06

7      Q.   Mr. Kenney, are you aware of a company named Top          13:28:43

8 Dog?                                                               13:28:47

9      A.   Yes.                                                     13:28:47

10     Q.   What can you tell me about them?                         13:28:48

11     A.   It's a company that, as I understand it, produces        13:28:50

12 some T-shirts.                                                    13:28:52

13     Q.   Anything else?                                           13:28:57

14     A.   Any other products you mean?                             13:29:00

15     Q.   No.  Is there anything else you can tell me about        13:29:02

16 them?                                                             13:29:04

17     A.   Yes.  We've had a -- well, Life is Good has had a        13:29:04

18 dispute with Top Dog regarding a T-shirt that it was             13:29:08

19 selling.                                                          13:29:11

20     Q.   What was the particular product at issue?               13:29:12

21     A.   It was a T-shirt, if I'm recalling the correct one       13:29:15

22 and I hope I am, that showed some type of dog -- I'm not          13:29:22

20115
FieldRptr

137

1  good with dog pedigrees or types -- and the -- said on the    13:29:27

2  T-shirt, "When you're the top dog, life is good."    13:29:37

3    Q.    Did your client contest that use?    13:29:46

4    A.    Yes.    13:29:50

5    Q.    And what was the grounds for contesting that use?    13:29:52

6    A.    I believe it was that use of "life is good" in    13:29:57

7  connection with the T-shirt was likely to cause confusion    13:30:03

8  with Life is Good's use.    13:30:07

9    Q.    Was there any other basis?    13:30:09

10    A.    I can't remember.    13:30:18

11    Q.    Mr. Kenney, in connection with your client's    13:30:33

12  enforcement efforts of its mark, has it ever made a    13:30:46

13  determination that a particular use was likely to blur the    13:31:05

14  distinctiveness of its Life is Good trademark?    13:31:18

15    A.    I can't recall if it has.    13:31:26

16    Q.    To your knowledge, has your client ever raised an    13:31:31

17  allegation that another party's use of the words "life is    13:31:39

18  good" resulted in a blurring of the distinctiveness of its    13:31:46

19  trademark?    13:31:55

20    A.    It may have.  I can't recall any specifics.    13:31:55

21    Q.    Do you have any recollection of making an    13:32:01

22  allegation of dilution by blurring?    13:32:08

143

```
 1            identification.)                              13:43:17

 2    Q.    (By Mr. Sommers)  Mr. Kenney, am I correct that  13:43:17

 3 your earlier testimony was that your client's Life is Good  13:43:44

 4 trademark is among the most famous trademarks in the U.S.?  13:43:50

 5    A.    I believe what I said is depending on how wide you  13:43:56

 6 defined "among the most famous," I think at some point it  13:44:00

 7 probably fits in there.                                   13:44:04

 8    Q.    How wide would that definition be?              13:44:06

 9    A.    I really couldn't say.                          13:44:09

10    Q.    If I -- could you explain -- let me strike that.  13:44:17

11 Can you describe for me what Exhibit 59 is.              13:44:22

12    A.    Yes.  It is an e-mail that was sent to Life is  13:44:26

13 Good.  I believe it was sent by one of Life is Good's     13:44:35

14 retailers.                                                13:44:52

15    Q.    And who was it sent to?                         13:44:53

16    A.    It was sent to someone at Life is Good and       13:44:55

17 forwarded as an attachment, and I don't remember who at   13:45:02

18 Life is Good received it.                                 13:45:06

19    Q.    And who is Mary?                                13:45:06

20    A.    Mary, I believe, is a retailer, an employee of one  13:45:09

21 of the retail stores that sells Life is Good.            13:45:13

22    Q.    Do you know when this document was prepared?    13:45:15
```

1    A.    It was recently, I believe within the past year.    13:45:22

2    Q.    If I could refer you to the second paragraph    13:45:26

3 there, it refers to a use of Ford of the words "life is    13:45:32

4 good." Do you see that?    13:45:37

5    A.    Yes.    13:45:38

6    Q.    And it appears that it's on the Chicago News every    13:45:39

7 night. Do you see that?    13:45:43

8    A.    That's what it says, yes.    13:45:45

9    Q.    What can you tell me about that particular use?    13:45:46

10    A.    Nothing beyond what's written here.    13:45:49

11    Q.    To your knowledge, has your client taken any    13:45:51

12 action against Ford?    13:45:57

13    A.    Not that I'm aware of.    13:45:58

14    Q.    To your knowledge, has your client looked into    13:46:00

15 this use?    13:46:03

16    A.    I'm not aware of what they've done to look into    13:46:03

17 it.    13:46:09

18    Q.    Do you know if they've undertaken any enforcement    13:46:09

19 efforts?    13:46:13

20    A.    I don't know.    13:46:14

21    Q.    I'd refer you to the second part of that that    13:46:16

22 discusses Wal-Mart using the phrase to advertise their    13:46:19

1 camping stuff.  Do you see that?                              13:46:24

2    A.   Yes.                                                  13:46:25

3    Q.   To your knowledge, has any enforcement actions        13:46:26

4 been taken by your clients against Wal-Mart?                  13:46:29

5    A.   I'm not aware of any.                                 13:46:32

6    Q.   Are you aware of any particular contact that has      13:46:34

7 been made by your client with Wal-Mart?                       13:46:38

8    A.   I'm not aware of any.                                 13:46:40

9    Q.   Are you aware of whether your client took any         13:46:42

10 steps to investigate that use?                               13:46:45

11    A.   I don't know the answer to that.                     13:46:47

12    Q.   Did you, on their behalf, undertake any              13:46:49

13 investigation?                                               13:46:52

14    A.   No.                                                  13:46:53

15    Q.   To your knowledge, did anybody undertake an          13:46:55

16 investigation on their behalf?                               13:46:58

17    A.   Not that I'm aware of.                               13:47:00

18    Q.   I see next the paragraph that talks about the        13:47:02

19 Wisconsin Tourism "life's so good" advertisement.  Do you    13:47:06

20 see that?                                                    13:47:11

21    A.   Yes.                                                 13:47:11

22    Q.   Would that be the same advertisement that we         13:47:12