UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIFE IS GOOD, INC., <br>     Plaintiff <br><br> v. <br><br> LG ELECTRONICS U.S.A., INC. <br> and LG INFOCOMM U.S.A., INC. <br>     Defendants | ) <br> ) <br> ) <br> )    C.A. No. 04-11290-WGY <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S TRADEMARK DILUTION CLAIM

Plaintiff Life is good, Inc. ("Life is good") opposes Defendants LG Electronics U.S.A., Inc. and LG MobileComm U.S.A., Inc. ("LG") motion for summary judgment on Life is good's trademark dilution claim under the Massachusetts Anti-Dilution Act, M.G.L., ch. 110B, § 12.

### INTRODUCTION

Life is good has asserted claims against LG for trademark infringement, false designation of origin, trademark dilution, violations of M.G.L. ch. 93A, and unfair competition. All of Life is good's claims against LG arise out of LG's adoption and use of the "Life's good" mark in connection with LG's promotion and sale of its various products.

LG has moved for summary judgment on only one of the claims against it, namely the trademark dilution claim under M.G.L. ch. 110B, §12. As detailed below, in addition to its procedural infirmities, LG's motion should be denied because there are genuine issues of material fact concerning (i) whether plaintiff's "Life is good" mark is distinctive and entitled to protection under the Massachusetts Anti-Dilution Act, and (ii) whether LG's use of "Life's Good" dilutes the distinctive quality of the Life is good mark.

BOS1594608.1

## FACTS

Life is good incorporates by reference its Local Rule 56.1 Statement and the Affidavits of Albert Jacobs, Thomas Kenney and Deborah Woodbury.

## ARGUMENT

**I.     LG's Motion Should be Denied for Failure to Comply with Local Rule 56.1.**

As an initial matter, LG's motion should be denied because LG has not submitted "a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried. . . ." D. Mass. L.R. 56.1. LG has merely included a discursive recitation of facts in a section of its memorandum of law captioned "Statement of Undisputed Facts." LG's discursive recitation impedes Life is good's ability to controvert each particular assertion of material fact as required by the Local Rule. "Failure [of the moving party] to include such a statement constitutes grounds for denial of the motion." D. Mass. L.R. 56.1. For this reason alone, LG's motion should be denied.

**II.    Genuine Issues of Material Fact Exist as to Whether the "Life is good" Mark is Distinctive and Entitled to Protection and as to whether the "Life's Good" Mark Dilutes the "Life is good" Mark.**

**A.     There is a Genuine Issue of Material Fact as to Whether the "Life is good" Mark is Distinctive and Entitled to Protection Under the Massachusetts Anti-Dilution Act.**

The Massachusetts Anti-Dilution Act provides: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law . . . shall be ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Mass. Gen. Laws ch. 110B, § 12. Contrary to LG's assertion and contrary to the cases LG relies on under the Federal Trademark Dilution Act ("FTDA"), there is no heightened level

of distinctiveness required by the Massachusetts Anti-Dilution Act.[1] Rather, the Act merely requires that level of distinctiveness necessary for a mark "registered under this chapter" to be protectible or for a mark to be "valid at common law." Mass. Gen. Laws ch. 110B, § 12.

Much like the Lanham Act, Massachusetts common law protects marks that are either inherently distinctive or are descriptive and have acquired distinctiveness by developing a secondary meaning indicating the origin of the product. *See Planned Parenthood Fed'n, Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 485-86 (1986) (citations omitted); 14C HOWARD J. ALPERIN & LAWRENCE D. SHUBOW, MASSACHUSETTS PRACTICE: SUMMARY OF BASIC LAW § 29.173 (3d ed. 1996); RESTATEMENT (THIRD) OF UNFAIR COMPETITION §§ 13-14 (1995). Trademarks that are fanciful (i.e., coined), arbitrary (having no inherent meaning associated with the product), or suggestive of qualities of the product are deemed inherently distinctive and protectible without more. *See I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 39 (1998) (citations omitted). Registration of a trademark establishes its presumptive protectibility. Mass. Gen. Laws ch. 110B, § 4.

The "Life is good" mark is registered under Chapter 110B. Affidavit of Thomas Kenney ("Kenney Aff."), ¶5. Such registrations are "prima-facie evidence of the registrant's exclusive right to use the registered mark in this commonwealth on goods or serviced specified in the registration. . . ." Mass. Gen. Laws ch. 110B, § 4. Life is good also has five separate

---

[1] In footnote 9 of its Memorandum, LG purports to quote a decision in this jurisdiction as saying "The standards for dilution under Massachusetts law are very similar to those under the FTDA." However, LG has lopped off the first part of the sentence which in totality reads "Both parties concede that the standards for dilution under Massachusetts law are very similar to those under the FTDA." *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 137 (D. Mass. 1999), *aff'd*, 232 F.3d 1 (1st Cir. 2000). A comparison of the plain language of these statutes reveals that they are very different and have very different requirements. *Compare* Mass. Gen. Laws ch. 110B, § 12 *with* 15 U.S.C. § 1125(c). As just one example, there is no fame requirement under the Massachusetts statute. As set forth herein, LG has mischaracterized the standards under the Massachusetts Anti-Dilution Act, which are not consistent with cases under the federal act.

registrations for the "Life is good" mark with the USPTO, one of which has become incontestable under 15 U.S.C. § 1115. Kenney Aff., ¶¶3-4. As such, the "Life is good" mark is registered and plainly valid at common law.

Contrary to LG's argument, there is no heightened standard of distinctiveness for protection under the Massachusetts Anti-Dilution Act. This point was settled by the SJC long ago. In *Skil Corp. v. Barnet*, 337 Mass. 485 (1958), the SJC reviewed the legislative history of the predecessor version to the statute (then codified at Mass. Gen. Laws ch. 110, § 7A) and noted that the Legislature rejected a remedy that would be available only to marks that were "unique," "coined," or otherwise "peculiar." Specifically, the SJC summarized the House Documents relating to the statute as follows:

> See 1947 House Doc. Nos. 656 and 1865, the latter of which would have prohibited the use 'for the first time, as a business name, trade mark, or label . . . [of] any unique symbol or coined or peculiar word or words,' used and recorded in Massachusetts by others, without the consent of the owner. 1847 Senate Bill No. 528 changed the language to the substantially broader form now found in § 7A.

*Id.* at 489 n.1 (citations omitted; brackets and elipses in original). The SJC went on to hold: "Although Skil as a mark is not as easy to protect as a more unique one, its secondary meaning can be protected to an appropriately limited extent." *Id.* at 494 (citation omitted).

Nearly a decade later, in *Great Scott Food Market, Inc. v. Sunderland Wonder Inc.*, 348 Mass. 320 (1965), the SJC followed *Skil* to hold that there is no heightened level of distinctiveness required for protection under the Massachusetts Anti-Dilution Act:

> The defendant's contention that the name 'Big G' is not sufficiently unique to warrant protection is without merit. . . . That relief under the statute is not dependent on uniqueness of name is supported by the statutory history of § 7A. See *Skil Corp. v. Barnet*, 337 Mass. 485, 489, n.1.

4

*Great Scott*, 348 Mass. at 324 (citation omitted). *See also Food Fair Stores, Inc. v. Food Fair, Inc.*, 177 F.2d 177, 185 (1st Cir. 1949) (holding that "Food Fair" had acquired secondary meaning and was therefore protectible under the Massachusetts Anti-Dilution Act); *Mass. Mut. Life Ins. Co. v. Mass. Life Ins. Co.*, 356 Mass. 287, 294 (1969) (holding that "Massachusetts Mutual Life Insurance Company" was protectible from dilution by "Massachusetts Life Insurance Company"). Indeed, one of the classic dilution cases involved the common name "Tiffany's," which has acquired secondary meaning in the jewelry business. *See Tiffany & Co. v. Boston Club, Inc.*, 231 F. Supp. 836 (D. Mass. 1964). Other courts applying similar anti-dilution statutes have held that suggestive marks are protectible. *See, e.g., Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165, 1168 (11th Cir. 1982); *Golden Door, Inc. v. Odisho*, 437 F. Supp. 956, 964, 966 (N.D. Cal. 1977), *aff'd*, 646 F.2d 347 (9th Cir. 1980).

In LG's purportedly comprehensive summary of cases decided under the Massachusetts Anti-Dilution Act, LG inexplicably fails to even mention *Skil* or *Great Scott*—the two decisions by the Court of highest authority with respect to this state law question that speak directly to the first ground for LG's motion. LG cites to a 1957 First Circuit decision for the proposition that "[t]he First Circuit rejects the view that the Act applies 'no matter how weak the plaintiff's mark may be' to protect 'whatever distinctive quality the plaintiff's mark may have.'" Dfdts' Memorandum p. 12 (quoting *Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 544 (1st Cir. 1957)). However, *Esquire* pre-dates *Great Scott*, in which the court of highest jurisdiction in Massachusetts held that the Massachusetts Anti-Dilution Act adopts precisely the rule rejected in *Esquire* and does not require any heightened showing of distinctiveness. In other words, just as the plain language of the statute says, a mark need only be "registered or valid at common law" to be entitled to protection. Mass. Gen. Laws ch. 110B, § 12. *Esquire* no longer controls, and

*Great Scott* must be followed as the controlling precedent of the court of highest jurisdiction over questions of Massachusetts law.

Similarly inexplicable is LG's failure to address the fact that the First Circuit has since followed *Great Scott* to hold that lack of distinctiveness is not a proper ground for summary judgment on a blurring claim under the Massachusetts Anti-Dilution Act. *See Pignons S.A. v. Polaroid Corp.*, 657 F.2d 482, 494 (1st Cir. 1981). In *Pignons*, the district court granted summary judgment dismissing the plaintiff's dilution claim because the district court was "unconvinced plaintiff's mark has any particular distinctiveness." *Id.* (quoting district court's decision). On appeal, however, the First Circuit held: "We would be unable to sustain summary judgment on this ground." *Id.* In holding that distinctiveness was not a proper summary judgment issue on a dilution claim, the First Circuit cited, among other cases, *Great Scott* and *Skil* and held that evidence of strength even limited to the audience for the goods sold by the plaintiff was sufficient to create a genuine issue of material fact.

> Viewed in the light most favorable to Pignons, we cannot say at this preliminary stage that this evidence could not support a finding that among purchasers of sophisticated cameras, Pignons' mark 'is a strong mark well known to the public, used frequently as a synonym for quality of a very high degree.' *Tiffany & Co. v. The Boston Club, Inc.*, 231 F. Supp. 836, 842-43 (D. Mass. 1964). We conclude that Pignons has raised a genuine issue of fact as to whether the mark 'Alpa' is sufficiently distinctive to warrant protection under Mass. Gen. Laws Ann. c. 110B, § 12. Compare *Food Fair Stores, Inc. v. Food Fair, Inc.*, 83 F. Supp. 445 (D. Mass. 1948), aff'd, 177 F.2d 177 (1st Cir. 1949); *Great Scott Food Market, Inc. v. Sunderland Wonder, Inc.*, 203 N.E.2d 376, 348 Mass. 320 (1965); *Skil Corp. v. Barnet*, 150 N.E.2d 551, 557, 337 Mass. 485, 494 (1958).

*Id.* Thus, the First Circuit has made clear that it now follows the *Great Scott* reasoning ignored by LG and not the outmoded *Esquire* reasoning relied upon by LG. LG's effort to tease a heightened distinctiveness requirement suitable for summary judgment out of the *Esquire* case

6

and various district court cases (some of which pre-date *Pignons* and others of which do not award summary judgment based on lack of distinctiveness) must be rejected. *Great Scott* is controlling.

Because Life is good has six registrations under Chapter 110B for the "Life is good" mark, there is necessarily a genuine issue of material fact as to their distinctiveness by virtue of Section 4. The federal registrations similarly provide evidence of the distinctiveness of the "Life is good" mark -- particularly, with respect to Reg. No. 2,025,737, which is incontestable. 15 U.S.C. § 1115. Even without the evidentiary value of the registrations, however, there is at least a genuine issue of material fact on whether the "Life is good" mark is "valid at common law." Mass. Gen. Laws ch. 110B, § 12. Indeed, that there is at least a fact issue on the distinctiveness of the "Life is good" mark is apparent from the fact that LG has not moved for summary judgment on Life is good's claim for trademark infringement. As the *Pignons* decision makes clear, the distinctiveness of a mark is a question of fact that is not properly resolved on summary judgment. *Cf. Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) ("The classification of a mark is a factual question.") (citation omitted).

> **B.** There is a Genuine Issue of Material Fact as to Whether LG's Use Dilutes the Distinctive Quality of the Life is good Mark.

There is likewise a genuine issue of material fact on whether LG's use of "Life's Good" dilutes the distinctive quality of "Life is good" by actual or potential customer confusion or by diminishing the uniqueness and individuality of the "Life is good" mark.

There are three ways to prove likelihood of dilution and, hence, three ways to raise a genuine issue of material fact on likelihood of dilution:

> In order to raise a fact issue on likelihood of dilution, [the plaintiff] must produce sufficient evidence to support a finding of either (a) injury to the value of the mark caused by actual or potential

7

> customer confusion, (b) injury resulting from use of the mark in a way that detracts from, draws on, or otherwise appropriates the goodwill and reputation associated with plaintiff's mark, or [c] diminution in the uniqueness and individuality of plaintiff's mark.

*Astra*, 718 F.2d at 1209.

Life is good does not intend to offer evidence under prong (b). However, there is a genuine issue of material fact under prong (a) (likelihood of dilution due to potential customer confusion) and prong (c) (diminution in the distinctive quality of the "Life is good" mark).

### 1. Potential Customer Confusion.

It is readily apparent that there is a genuine issue of material fact as to potential customer confusion. Indeed, as noted above, it is telling that LG has not moved for summary judgment on Life is good's trademark infringement claim under the Lanham Act, which is based on the likelihood of consumer confusion. *See Equine Techs.*, 68 F.3d at 546 ("The determination as to whether a likelihood of confusion exists is a question of fact. . . .") (citation omitted). And the confusion standard under the Massachusetts Anti-Dilution Act is far lower than the standard under the Lanham Act.

Unlike the Lanham Act, under which direct competition between the parties is ordinarily correlated to likelihood of confusion, *see, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 212, 818 (1st Cir. 1987), the Massachusetts Anti-Dilution Act makes injury to business reputation or dilution actionable "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Mass. Gen. Laws. Ch. 110B, § 12. Thus, potential customer confusion can be established even where the parties do not compete and even where the potential confusion is not over the source of the respective parties' goods. In this regard, the Massachusetts Anti-Dilution Act resembles the Anti-Cybersquatting Consumer Protection Act, which imposes liability for registering, trafficking in, or using a

domain name that is "confusingly similar to [a] mark" but instructs that the likelihood of confusion determination is to be made "without regard to the goods or services of the parties. . . ." 15 U.S.C. § 1125(d)(1)(A).

Cases awarding relief under the Massachusetts Anti-Dilution Act illustrate the breadth of its scope. For example, in *Great Scott*, the SJC upheld relief under the statute where the parties operated in wholly separate territories and did not compete. However, because consumers were exposed to both marks, the SJC upheld a finding of likely dilution.

> There was testimony that people from Worcester traveled through the Providence area. It is not improbable that they became acquainted with the name 'Big G' and knew of the plaintiff's method of doing business and that upon their return to Worcester they would see the defendant's store and shop there in the belief that it was one of the plaintiff's stores. . . . The statute upon which the plaintiff relies has expressly withdrawn 'competition between the parties' and 'confusion as to the source of goods or services' as prerequisites to injunctive relief.

*Great Scott*, 348 Mass. 324-25 (citations omitted).

Also instructive is *Libby, McNeill & Libby v. Libby*, 103 F. Supp. 968 (D. Mass. 1952). In *Libby, McNeill & Libby*, the plaintiff used the name "Libby's" as a trademark for a meat packing business. The defendant opened up a super market under the name "Libby's Super Market." *Id.* at 969. Notwithstanding the differences in the parties' businesses, the court found "that the general public might be led to believe that Libby, McNeill & Libby was the owner or operator of defendants' super market or that there was some connection between the two concerns." *Id.* at 970. The court explained:

> I have found that the use of the word 'Libby's' by these defendants tends to confuse the public and probably leads many to believe that this super market is in some way related to the plaintiff corporation. The distinctive quality of the Libby name is thus diluted by these defendants' use of it with their super market.

9

*Id.* Regarding the absence of competition between the parties, the court held: "in view of [the Massachusetts Anti-Dilution Act], the Court is no longer taxed with the necessity of finding direct competition." *Id.*

In the case at bar, there is at least a genuine issue of material fact over potential customer confusion under this standard. The two marks -- "Life is good" and "Life's Good" -- are virtually identical. As detailed in the Affidavit of Albert Jacobs ("Jacobs Aff."), Life is good has been using the "Life is good" trademark on its products since 1994. Jacobs Aff., ¶4. Products bearing the mark are sold throughout Massachusetts, generating revenues (from Massachusetts sales alone) of more than $7 million since 2001. Id., ¶¶5-6. Life is good has also received substantial publicity relating to its mark. Kenney Aff., Exh.A; Jacobs Aff., ¶7. And there is no dispute that LG is using the "Life's good" mark across Massachusetts, in many of the same malls or shopping districts where Life is good products are also available. See Kenney Aff., ¶¶13-14. Accordingly, many of the same consumers are likely to be exposed to both marks. See Kenney Aff., ¶14.

LG makes much of its practice of displaying the "Life's Good" mark in conjunction with the "LG" mark and the "LG logo." Because the "Life's Good" mark is the dominant message in this collection of marks and because these other marks do not communicate a differentiating message (each of these other marks incorporates the initials "LG" which can be seen as an abbreviation for "Life's Good"), they are insufficient to avoid potential customer confusion.

Indeed, the SJC rejected just such an argument in *Great Scott*. In that case, the parties were each using the mark "Big G." The SJC noted that "[t]he defendant seeks to attach its use of the name 'Big G' to the name 'Gould,' which is the surname of the defendant owners. . . ." *Great Scott*, 348 Mass. at 324. The SJC held that this argument was "predicated on a free ride on a vehicle paid for and built by the plaintiff." *Id.* (citations and internal quotation marks omitted).

10

Much like the letters "LG"—as merely letters or as incorporated into a logo—play off the "Life's Good" mark, so too did the name "Gould" play off the "Big G" mark.

By contrast, the SJC has allowed the use of another mark as a differentiator to prevent likely dilution—but only where the other mark is placed in a preeminent position and does not play off the diluting mark. For example, in *Skil*, the plaintiff's mark was "Skil Saw," and the defendant's "Skill Built" mark was found likely to dilute the plaintiff's mark. *Skil*, 337 Mass. at 486-87, 494-95. Given the highly descriptive nature of the "Skill Built" mark and the fact that those descriptive qualities related to the defendant's tool business, the SJC held that the defendant could cure its likely dilution of the plaintiff's "Skil" mark by the "use as a prefix . . . and with equal emphasis, [of] some other distinctive word such as his own name or the name of the town where his business is conducted, for example, 'Barnet Skill Built Thermometer.'" *Id.* at 495.

Accordingly, LG's additional marks are not sufficiently differentiating to avoid likely dilution. In any event, as a comparison of the *Great Scott* and *Skil* cases reveals, whether an additional mark may serve as a differentiator that avoids likely dilution is a fact-intensive question that is not properly resolved on summary judgment.

## 2. Diminution in Distinctiveness.

Alternatively, LG's use of "Life's Good" will diminish the distinctive quality of the "Life is good" mark by causing consumers to form multiple associations with this mark, thereby watering it down and eroding its selling power.

"Dilution . . . is a cancer which, if allowed to spread, will *slowly* destroy the advertising value of a mark." 4 LOUIS ALTMAN, CALLMAN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 22:13, 22-141 to 22-142 (4th ed. 2004) (emphasis in original). As explained by

11

one court:

> Where tradename owners have created a favorable association between their name and their product, they possess a valuable marketing tool. This aura of recognition enhances the value of plaintiff's name. Subsequent use of the name with a nonrelated product broadens the associations linking name and product in the minds of consumers of plaintiff's product and diminishes the specific association plaintiff seeks to foster.

*Wedgewood Homes, Inc. v. Lund*, 659 P.2d 377, 382 (Or. 1983).

The First Circuit has articulated this prong of dilution under the Massachusetts statute as "diminution in the uniqueness and individuality of the plaintiff's mark resulting from the defendant's use of a similar mark." *Pignons*, 657 F.2d at 495 (citations omitted). If the word "unique" in the *Pignons* formulation is taken to mean "sole" or "one of a kind," then the only marks that are truly unique would be coined or made up words like "Kodak." However, "unique" has a more flexible and relative meaning. As explained by one leading dictionary:

> Many authors of usage guides, editors, teachers, and others feel strongly that such 'absolute' words as . . . UNIQUE cannot be compared because of their 'meaning': a word that denotes an absolute condition cannot be described as denoting more or less than that absolute condition. However, all such words have undergone semantic development and are used in a number of senses, some of which can be compared by words like *more, very, most, absolutely, somewhat,* and *totally* and some of which cannot.
>
> . . . . By the mid-19th century UNIQUE had developed a wider meaning, 'not typical, unusual,' and it is in this wider sense that it is compared: *The foliate on the late-blooming plants is more unique than that on the earlier varieties.* The comparison of so-called absolutes in senses that are not absolute is standard in all varieties of speech and writing.

STUART B. FLEXNER & LEONORE C. HAUCK, RANDOM HOUSE UNABRIDGED DICTIONARY 2074 (2d ed. 1993) (emphasis in original).

As discussed above, the SJC has rejected the argument that protection under the

Massachusetts Anti-Dilution Act is limited to marks that are coined or unique in this narrow sense, and the SJC has explained how the Legislature considered and rejected just such a requirement. *See Great Scott*, 348 Mass. at 324; *Skil*, 337 Mass. at 489 n.1. Rather, the statute protects against "dilution of the distinctive quality of a mark . . . valid at common law . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Mass. Gen. Laws ch. 110B, § 12. Thus, the SJC has held that the statute protects the relative uniqueness of a mark. *See Skil*, 337 Mass. at 494 ("Although Skil as a mark is not as easy to protect as a more unique one, its secondary meaning can be protected to an appropriately limited extent.").

While "Life is good" is not a coined phrase, it is highly distinctive as a trademark for the goods with which it is used. Life is good is plainly not descriptive or suggestive of t-shirts, hats and the like. Life is good has been using the trademark continuously since 1994. Jacobs Aff., ¶4. Life is good has numerous federal and state trademark registrations, two of which (one for "Life is good" and one for Jake) have become incontestable pursuant to 15 U.S.C. §1065. Kenney Aff., ¶¶ 3-5. Life is good uses the trademark on all of its products. Jacobs Aff., ¶4. Since 1998, Life is good has sold more than $150 million in products that bear the mark. *Id.* ¶6. Life is good's product catalog provides a good illustration of Life is good's uses of its distinctive mark. Jacobs Aff., Exh. A. That distinctiveness is confirmed by media coverage of the company (and its mark) and consumer reaction to the Life is good brand and mark. Kenney Aff., Exh. A; Jacobs Aff., ¶¶8, 10.

LG points to certain third party uses of the term "Life is good"—including third party registrations. "The probative value of third-party trademarks depends entirely upon their usage." *Palm Bay Imports., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369,

13

1373 (Fed. Cir. 2005) (citation omitted). For third party use to be entitled to any weight, there must be "evidence of the consuming public's awareness" of such third party uses and of "the extent of third party uses." *Palm Bay*, 396 F.3d at 1373 (citations and internal quotations and brackets omitted). As explained by one court: "While it is impossible to exhaustively list the factors that affect the probative value of third-party uses, a fact-finder generally might consider: 1) how many are actual uses in commerce as opposed to registrations or listings; 2) the geographic location of such uses; 3) whether the third-parties use the mark in a line of business similar to plaintiff's; 4) the size of the third-party business or organization using the mark; 5) whether the uses have been abandoned or are active; 6) the extent to which the third party promotes or advertises their mark; and 7) the extent to which consumers recognize or are exposed to the third-party marks." *New Century Fin., Inc. v. New Century Fin. Corp.*, No. C-04-437, 2005 U.S. Dist. LEXIS 41192, *19 (S.D. Tex. Oct. 4, 2005); *see also Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1173-74 (2d Cir. 1976); *Playboy Enters., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1032 (9th Cir. 2004) (considering such factors on dilution claim). Here, LG has merely recited the purported third party uses without laying any of the foundation needed to assess the probative value -- if any -- of such uses. In addition, the fact intensive nature of this inquiry makes it inappropriate for resolution at summary judgment. *See New Century*, 2005 U.S. Dist. LEXIS 41192, at *20-21; *Playboy Enters.*, 354 F.3d at 1032.

Moreover, a review of the third party uses cited by LG confirms that this evidence is of minimal probative value. For example, the Declaration of Jaclyn Kidwell (filed by LG) reports 39 uses of "Life is good" on various products found for sale on the internet in late 2004 and early 2005. Many of the uses cited in the Kidwell Declaration appear at Cafepress.com, which has been one of the subjects of Life is good's extensive enforcement activities. Kenney Aff., ¶¶6-7.

14

As of May 2006, 25 of the third party uses cited in the Kidwell Declaration, including 16 of the 19 uses appearing at Cafrepress.com., had ceased. <u>See</u> Affidavit of Deborah Woodbury ("Woodbury Aff."), ¶¶3-4. Of the 14 instances where "Life is good" apparently remains in use, it appears that seven of those so-called uses are in song or musical album titles -- plainly not trademark uses. Woodbury Aff., Exh. 33-39. There is no evidence demonstrating the nature and scope of use with respect to the remaining seven instances. And LG's reliance upon third party uses of Life is good by Miller Brewing, Hershey, Forbes and Sears is also misplaced. Miller's use, for example, was fleeting. Forbes and Sears do not use the phrase "Life is good." <u>See</u> Kenney Aff., ¶18. Hershey does not appear to use the phrase as a trademark.

Thus, the marks at issue in the case at bar are far more unique than the marks discussed in the cases relied upon by LG. *See Pignons*, 657 F.2d at 495 (holding that "Alpha" could not dilute "Alpa" because "Alpha" "is virtually a household word[,] the first letter of the Greek alphabet, an ingredient of many a college fraternity name and found on many a product label."); *ITT Corp. v. XTRA Corp.*, No. 84-505-MA, 1985 U.S. Dist. LEXIS 23332, *28-29, *39-40 (D. Mass. Jan. 17, 1985) (holding that mark "XTRA" as "the phonetic equivalent of the common English word 'extra'" and as a word commonly used to convey "praiseworthy features or qualities of a given product" was not entitled to dilution protection); *Church of the Larger Fellowship v. Conservation Law Found. of N.E., Inc.*, No. 80-183, 1983 U.S. Dist. LEXIS 15844, *3, *17, *19-20 (D. Mass. June 29, 1983) (holding that initials "CLF" were not entitled to dilution protection in light of use by "many others . . . spread across the country"); *Visa Serv., Inc. v. St. Street Bk. & Tr. Co.*, No. 77-3533-MA, 1980 U.S. Dist. LEXIS 11620 (D. Mass. May 12, 1980) (holding that trademark owner could not block use of word "Visa" in travel industry).

In any event, as discussed above, the distinctiveness and strength of a mark is a classic

issue of fact that is poorly suited to resolution on summary judgment.

Finally, with respect to LG's argument that the use of LG's house marks differentiates the "Life's Good" mark from the "Life is good" mark, for all of the reasons discussed above in connection with potential consumer confusion, for too many consumers LG's house marks consisting of the initials for "Life's Good" will not serve as differentiators. However, even if LG's house marks did provide meaningful differentiation for some consumers, this would not cure the blurring of associations that the anti-dilution law seeks to prevent. As explained by one leading commentator:

> In this author's opinion, the tendency to dilute is even ***greater*** when the defendant's use of the plaintiff's mark (or a near variant thereof) on the defendant's product is accompanied by a clear indication that that product originates with the defendant; because that indicates to the public in even clearer terms that the plaintiff's mark does not really belong to the plaintiff, that it either belongs to the defendant or is free for the entire industry to use. What more egregious example could there be of blurring the source identification of the plaintiff's mark?

4 CALLMAN ON UNFAIR COMPETITION, *supra*, § 22:13, at 22-193 (emphasis in original).

## CONCLUSION

For all of the reasons set forth above, LG's motion for summary judgment should be denied.

LIFE IS GOOD, INC.,
By its attorneys,

/s/
Robert L. Kirby, Jr. (BBO#550538)
Mark D. Robins (BBO#559933)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 021110
(617) 345-1000

Robert R. Pierce (BBO#549172)
Thomas E. Kenney (BBO#561590)
PIERCE & MANDELL, P.C.
11 Beacon Street, Suite 800
Boston, MA 02108
(617) 720-2444

June 1, 2006

## CERTIFICATE OF SERVICE

I, Robert L. Kirby, Jr., hereby certify that a true copy of the above document was served upon the attorneys of record for each other party electronically on June 1, 2006.

/s/
Robert L. Kirby, Jr.