UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIFE IS GOOD, INC., | ) | |
|      Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 04-11290-WGY |
| | ) | |
| LG ELECTRONICS U.S.A., INC. | ) | |
| and LG ELECTRONICS MOBILECOMM | ) | |
| U.S.A., INC. | ) | |
|      Defendants | ) | |

**JOINT PRE-TRIAL MEMORANDUM**

Pursuant to the Court's Procedural Order of July 7, 2006, the plaintiff, Life is good, Inc. ("Life is good"), and the defendants, LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. (collectively "LG"), submit this Joint Pre-Trial Memorandum in connection with the Pre-Trial Conference set for July 21, 2006.

I.    <u>Summary of Evidence</u>

    A.    <u>Plaintiff</u>

    1.    <u>The Plaintiff and its "Life is good" Trademark</u>

Life is good is a Massachusetts corporation in the business of designing, manufacturing, distributing and selling a wide array of products, including t-shirts, hats, sweatshirts, shorts, socks, pajamas, baby and children's clothing, flying discs, bumper stickers, coffee mugs, water bottles, pet products, bags, furniture, coolers, and cellphone charms. In 1994, Life is good's

predecessor, Jacobs Gallery, developed the trademark "Life is good" as well as the logo mark "Jake," which is depicted as follows:



Since 1994, the plaintiff has continuously and pervasively utilized its "Life is good" trademark within this district and throughout the United States on its products, on hang tags, displays, boxes, packaging and labels, at its website (www.lifeisgood.com) and in catalogs and other places.  The plaintiff uses its "Life is good" trademark on every product it sells, typically on a hang tag or label.  Life is good sells its products under the "Life is good" trademark throughout the United States, in numerous foreign countries, and at more than 280 outlets in Massachusetts.

Life is good has generated substantial sales of products under the "Life is good" brand and trademark.  Since 1998, Life is good has sold more than $150 million in products bearing the "Life is good" mark, including $7.5 million of such products in the Commonwealth between 2001-2005.  Additionally, since 1998 Life is good has incurred more than $4 million in advertising and marketing its goods under the "Life is good" mark.  These advertising and marketing efforts include catalogs, packaging and labels, point of purchase displays, Life is good's website, and attendance at trade shows.

Further, Life is good has held charitable festivals (a backyard/watermelon festival in summer and a pumpkin festival in autumn) in Boston since 2004.  More than 185,000 people have attended these festivals in Boston.  Life is good has incurred more than $542,000 in out-of-pocket expenses holding these festivals.  The festivals in Boston have generated more than $661,000 for charities.  The festivals have been featured in such media outlets as WBOS radio,

2

Fox Net Sports, WCVB TV Channel 5, Boston.com, the Improper Bostonian, and the Tab Newspapers. Albert Jacobs, Life is good's president, was interviewed on WBZ radio the morning of this year's Watermelon Festival, July 8, 2006.

Life is good and its "Life is good" brand products have been the subject of numerous newspaper and magazine articles in Massachusetts and elsewhere.

Life is good has registered five (5) "Life is good" trademarks with the U.S.P.T.O. for various goods. One registration, covering "Sportswear, namely T-shirts, sweatshirts, shirts, hats, pants, and shorts," has become incontestable pursuant to 15 U.S.C. § 1065. In addition, Life is good has registered six (6) "Life is good" trademarks with the Massachusetts Secretary of State.

Life is good has taken substantial steps to protect its rights in its "Life is good" marks by challenging third-party uses of similar marks that may cause a likelihood of confusion or dilute the distinctiveness of the "Life is good" marks. Life is good and its counsel have sent dozens of cease and desist letters or otherwise pursued third-parties who have adopted designations similar to "Life is good." The vast majority of these third-parties have ceased their use after being contacted by Life is good or its counsel.

    2.    <u>Defendants' Use of "Life's Good"</u>

In 2003, LG began using the "Life's good" trademark in connection with its electronics and home appliance products. Although LG maintains that it did not base the "Life's good" mark on the plaintiff's "Life is good" trademark, the defendants cannot explain the circumstances surrounding the selection of the "Life's good" mark.

The defendants assert that they use "Life's good" as a "tagline" to advertise their products and do not use "Life is good" as a trademark. Life is good will offer evidence showing that, in

fact, the defendants do use "Life's good" as a trademark.

The defendants have also taken the position that they do not use "Life's good" as a contraction for "Life is good," but as a possessive such as "Life's good phones." Life is good will offer evidence challenging that assertion.

The defendants' products are sold by at least 125 retailers in Massachusetts. The defendants spend $100 million per year in advertising, and the majority of their advertisements contain "Life's Good." A portion of that substantial advertising reaches Massachusetts consumers. Defendants also use their "Life's Good" mark on a variety of promotional goods, some of which are offered for sale, including products that compete directly with Life is good, such as t-shirts, hats, water bottles, coffee mugs, etc.

Life is good will offer evidence bearing on the factors that courts typically consider in trademark infringement matters. For example, Life is good will offer substantial evidence of instances of actual confusion arising from the defendants' use of "Life's good." Life is good will also offer the testimony of an expert witness who conducted a survey concerning the likelihood of confusion between the two marks. Life is good will introduce evidence in support of its claims for attorney's fees under 15. U.S.C. §1117 and M.G.L. c. 93A.

3.    LG's Counterclaims

With respect to LG's counterclaims, Life is good will offer evidence at trial that it has properly applied for and received five (5) registrations for the "Life is good" mark for various goods from the U.S.P.T.O. Where Life is good has filed an application for "Life is good" on a use basis, Life is good has used the mark in commerce on all of the goods listed in the application as of the date of filing of the application. Where Life is good has filed an application

for "Life is good" on an intent to use basis, Life is good has used the mark in commerce on all of

the goods listed on the notice of allowance as of the date of filing of the statement of use. At all

times, Life is good acted in good faith in its dealings with the U.S.P.T.O. and at no time had any

intent to defraud and/or deceive the U.S.P.T.O and/or the consuming public.

Life is good began using the ® symbol in connection with its "Life is good" trademark

after the mark was registered by the U.S.P.T.O. for clothing in 1996. Prior to receiving that first

registration, Life is good utilized the "TM" symbol in connection with its "Life is good" mark.

Life is good understood that it was entitled to use the ® symbol once it had obtained a federal

registration for "Life is good." At all times, Life is good has acted in good faith and at no time

had any intent to defraud and/or deceive the U.S.P.T.O. and/or the consuming public.

B.     <u>Defendant</u>

1.     <u>Plaintiff's Counts II, III, IV, and V:  Trademark Infringement, False Designation
       of Origin, Unfair or Deceptive Practices, and Unfair Competition</u>

These four causes of action are governed by the same legal standard:  "likelihood of

confusion."  Defendants intend to offer the following evidence on the eight factors employed by

courts in this Circuit to assess the "likelihood of confusion":

A.     *Strength/Weakness of "Life is good." as a Trademark*

Defendants will present evidence that "Life is good." is a common expression with

ordinary meaning frequently used by others. Defendants' evidence includes testimony,

documents, and examples of third-party uses of "life is good" and other similar slogans or

expressions on products and in advertising; the expert testimony of Dr. Ronald Butters

(Defendants' linguistics expert); and the exhibits accompanying Dr. Butters' report.

Defendants will also present evidence that Plaintiff's owners selected "Life is good." to convey its inherent optimistic message, and have used it as an expression to adorn its products. Defendants' evidence includes testimony, newspaper articles, advertising materials, and products demonstrating Plaintiff's use of "Life is good." as an expression.  Defendants' evidence also includes U.S. Patent and Trademark Office records and expert testimony by Mr. Rany Simms (former Administrative Law Judge for the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board) showing that Plaintiff was refused a trademark registration for "Life is good." as used on the fronts of Plaintiff's products on the ground that consumers would view those words primarily as a slogan conveying a message, and not as a trademark identifying Plaintiff or its products.

Defendants will also present evidence that consumers understand "Life is good." as a common expression.  Defendants' evidence includes documents showing the low level of consumer recognition of "Life is good." as a trademark and the extent of Plaintiff's sales, advertising, and market share, including Plaintiff's financial documents and market research; testimony by Mr. Robert Reitter (Defendants' survey expert) that consumers attribute no more trademark significance to Plaintiff's use of "Life is good." on the fronts of its t-shirts than they do with the admittedly generic saying "We are #1" on the front of t-shirts; testimony by Dr. Maureen Morrin (Defendants' marketing expert) that "Life is good." has not achieved any significant, let alone high, level of brand awareness in the marketplace; testimony by Mr. Robert Klein (Plaintiff's survey expert) that consumer awareness of "Life is good." is "relatively low" and that his survey pretest showed "little awareness of Life is good. or association with any products"; and exhibits to those expert reports.

B.     *Similarity/Difference in the Parties' Marks*

Defendants will present evidence that "Life is good." and "Life's Good" are inherently different and convey different meanings and commercial impressions.  Defendants' evidence includes representative examples of the parties' advertising and promotional materials; the expert testimony of Dr. Butters; the exhibits accompanying Dr. Butter's expert report; documents and testimony by the parties' corporate representatives about the manner in which Plaintiff uses "Life is good." and Defendants use "Life's Good"; and newspaper articles and other media coverage of the parties, their products, and their advertising.

Defendants will also present evidence that they use their "Life's Good" corporate tagline in close proximity to the "LG" house mark and the "LG" logo (), that Defendants' "LG" logo and "LG" house mark have achieved widespread public recognition, and that Defendants' use of the "LG" house mark and "LG" logo and Plaintiff's use of its "Jake" logo () (in its various forms) avoid rather than cause any confusion between the parties and their products. Defendants' evidence includes representative examples of the parties' uses of the "Jake" logo, the "LG" logo, and the "LG" house mark on their products and in their advertising and promotional materials; expert testimony by Dr. Maureen Morrin (Defendants' marketing expert) and Mr. Robert Klein (Plaintiff's survey expert) regarding the strength and consumer recognition of the "LG" brand; the exhibits accompanying Dr. Morrin's expert report; documents showing public awareness of and brand rankings for the "LG" house mark and brand; and evidence of Defendants' advertising and sales using the "LG" house mark.

7

Defendants will also present evidence that on several occasions, the U.S. Patent and Trademark Office has approved applications to register the "LG" logo ( ), the combined "LG" logo and "LG" mark (" "), or the "Jake" logo ( ), based on its determination that there is no likelihood of confusion between the "Jake" logo and either the "LG" logo or the combined "LG" logo and "LG" mark.  Defendants will also present evidence that Plaintiff has not opposed the registration of the "LG" logo ( ) or the combined "LG" logo and "LG" house mark (" ") by LG Corporation (the company that owns Defendants' Korean parent company), even for such clothing products as shoes, suits, trousers, sweaters, hosiery, hats, caps, and belts.

Defendants will also present evidence that the U.S. Patent and Trademark Office did not cite any of Plaintiff's registrations and applications for "Life is good." as an obstacle to LG Corporation's application to register the combined "LG" logo and "Life's Good" tagline, depicted as follows:



Defendants' evidence includes testimony by Mr. Rany Simms (former Administrative Law Judge for the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board) regarding the Trademark Office's examination process; file histories of these applications from the records of the U.S. Patent and Trademark Office; and testimony by Plaintiff's corporate representatives.

### C.    Similarity/Difference in the Parties' Goods

Defendants will present evidence of the parties' products (appliances, electronics, and cell phones in the case of Defendants; and T-shirts, clothing, and related accessories in the case of

Plaintiff), which are dissimilar, unrelated, and do not compete.  Defendants' evidence includes

testimony by Plaintiff's and Defendants' corporate representatives; Plaintiff's admission that the

parties do not compete and their products are not related, and that Defendants' use of "Life's

Good" in connection with Defendants' "expensive hard goods such as televisions, computers,

and cellphones [sic] runs directly counter to the whimsical and non-corporate image that Plaintiff

has developed in connection with its relatively inexpensive soft goods"; and examples of the

parties' products and product materials.

Defendants will present evidence that their promotional items are given away to promote

their appliances, electronics, and cell phones, and are not commercial products of Defendants.

Defendants' evidence includes testimony by Plaintiff's and Defendants' corporate representatives

regarding the corporate practice of using promotional items; admissions in the parties' pleadings;

and examples of Defendants' and third parties' promotional items.

### D.    *Similarity/Difference in the Parties' Channels of Trade*

Defendants will present evidence that Plaintiff's clothing and accessories are distributed

and sold through different retail outlets than Defendants' digital appliances, consumer

electronics, and cell phones.  Defendants' evidence includes testimony by the parties' corporate

representatives, representative examples from the parties' customer lists, and representative

samples of the parties' marketing materials.

### E.    *Similarity/Difference in the Parties' Advertising Methods*

Defendants will present evidence that the parties engage in different advertising methods

and strategies.  Specifically, Defendants will present evidence that Plaintiff advertises on its

Internet website, through mail-order catalogs, in trade publications, at sports and recreation trade shows, at sponsored charitable events, and through "viral" word-of-mouth advertising. Defendants will also present evidence that Plaintiff has no plans to engage in traditional forms of advertising, such as magazines, radio, and television.

Defendants will present evidence that they engage in advertising and promotion of their products through national television, magazine, and newspaper campaigns; on billboards, brochures and other print media; on the Internet; at consumer electronics trade shows; through sponsorship of various promotional events; and on a variety of promotional items.

Defendants' evidence includes testimony by the parties' corporate representatives; representative examples of the parties' advertising and marketing materials; and documents such as media plans, advertising budgets, and newspaper articles identifying or describing the parties' advertising methods and strategies.

> F.      *Similarity/Difference in Prospective Purchasers of the Parties'*
>         *Products, and the Degree of Purchasing Care Consumers Are*
>         *Likely to Exercise*

Defendants will present evidence that Plaintiff's products emphasize the value of simplicity while Defendants' products emphasize the benefits of sophisticated technology, and thus appeal to different types of consumers and needs.  Defendants will also present evidence that consumers take the time to research and consider Defendants' products, which are not inexpensive, before purchasing them.  Defendants' evidence includes documents (such as price sheets, product materials, market research) and testimony by the parties' corporate representatives describing the parties' products and the target customers for those products.

### G. *Presence or Absence of Actual Confusion*

Defendants will present evidence that they have used their "Life's Good" corporate tagline in the United States for more than two-and-a-half years, and there has been ample opportunity for people to be confused between the parties and their respective uses of "Life is good." and "Life's Good" during that time, and that Defendants' comprehensive search failed to uncover a single instance of confusion. Defendants will also present expert testimony by Mr. Robert Reitter and the results of his survey showing a statistically insignificant net confusion rate of only 2.1%, leading him to conclude that there is no appreciable likelihood of confusion. Defendants will also present evidence that Plaintiff's sales have increased since Defendants began using their "Life's Good" tagline, and that Defendants are not aware of any misdirected sales or returns between the parties (i.e., no instances where a person bought a product from one party believing that it came from the other party, or returned one party's product to the other party).

If Defendants' motion in limine to exclude Plaintiff's alleged confusion evidence is not granted, Defendants will present evidence that Plaintiff's evidence of alleged confusion does not demonstrate trademark-related consumer confusion; that much of Plaintiff's evidence demonstrates that people are not confused; and that Plaintiff's evidence is de minimis.

Defendants' evidence includes documents and testimony demonstrating both parties' advertising, sales, and concurrent use of the "Life is good." slogan and the "Life's Good" corporate tagline; evidence of the public's exposure to Defendants' use of the "Life's Good" tagline; testimony about the absence of any evidence of confusion despite Defendants'

11

comprehensive search; and expert testimony and documents about the Reitter survey and its results.

### H.    *Defendants' Intent in Adopting "Life's Good"*

Defendants will present evidence that "Life's Good" was first used in Australia by a subsidiary of Defendants' Korean parent corporation; that "Life's Good" was selected as a global corporate tagline by Defendants' parent corporation in 2003 in Korea for use by its subsidiaries worldwide; that Defendants' parent corporation selects and clears global corporate taglines and then instructs its subsidiaries to begin using them; that Defendants began using the "Life's Good" tagline in late 2003 and early 2004 on instructions from their parent corporation; and that Defendants were not aware of Plaintiff or its use of "Life is good." at the time they began using the "Life's Good" corporate tagline.

Defendants will also present evidence that they did not begin use of the "Life's Good" corporate tagline to exploit any goodwill associated with Plaintiff's or its use of "Life is good.", including evidence that Defendants' "LG" name and mark is one of the top 100 most valuable brands in the world.

Defendants' evidence includes documents and testimony by Defendants' corporate representatives regarding the adoption and use of the "Life's Good" tagline by Defendants, and Defendants' lack of knowledge about Plaintiff or its use of "Life is good." at the time Defendants began using the "Life's Good" corporate tagline; testimony by Plaintiff's corporate representatives that Plaintiff has no evidence to indicate that Defendants' began using the "Life's Good" tagline for the purpose of trading off of Plaintiff's goodwill or the selling power of its use

12

of "Life is good."; and testimony by the parties' corporate representatives that the parties do not

compete.

   2.    <u>Plaintiff's Count I:  Trademark Dilution</u>

Defendants will present evidence demonstrating that Plaintiff cannot prove either of the

two elements (distinctiveness/fame and likelihood of dilution) required to prove trademark

dilution:

   *A.    Distinctiveness (i.e., Fame) of "Life is good." as a Trademark*

Defendants will present evidence that "Life is good." is a weak trademark because it is a

common expression with ordinary meaning, and it is frequently used by third parties (including

in Massachusetts).  Defendants' evidence includes testimony by Dr. Maureen Morrin

(Defendants' marketing expert) that "Life is good." lacks the fame that dilution presupposes;

testimony by Mr. Robert Klein (Plaintiff's survey expert) that "Life is good." is not famous for

dilution purposes; exhibits accompanying their expert reports; and documents and testimony

related to third-party uses of "life is good" and similar slogans.

   *B.    No Likelihood of Dilution*

Defendants will present evidence establishing that there is no likelihood of dilution under

either theory of injury—"dilution by confusion" or "dilution by blurring"—advanced by Plaintiff.

 Defendants will rely on their evidence, detailed above, demonstrating that there is no likelihood

of confusion.  Defendants will also rely on their evidence, detailed above, demonstrating that

"Life is good." is not likely to be "blurred" because it is neither a strong nor unique trademark,

including evidence that it is not—and has never been—used to identify, or understood to mean, only one company and its products.

        3.     <u>Defendants' Affirmative Defense:  Laches</u>

Defendants will present evidence that they have made prominent and widespread use of the "LG" logo ( ) for more than a decade; that during that time Plaintiff did not object to Defendants' use; and that (as detailed above) Plaintiff did not object to LG Corporation's numerous applications to register the "LG" logo or the combined "LG" logo and "LG" house mark ( ) when they were published for opposition.  Defendants' evidence includes documents and testimony by Defendants' corporate representatives regarding their adoption and continuous and widespread use of the "LG" logo; and testimony by Plaintiff's corporate representatives (detailed above) that Plaintiff does not view the "LG" logo as an infringement of Plaintiff's "Jake" logo.

        4.     <u>Defendants' Affirmative Defenses:  Plaintiff's Failure to Police Third-Party Trademark Use, and Misuse of Its Registrations</u>

Defendants will present evidence that Plaintiff has known about, but has not taken action to stop, the use of "life is good" or similar phrases by third parties on products and in advertising in the same or similar manner in which Plaintiff claims trademark rights.  Defendants' evidence includes documents and testimony regarding such third-party uses, including prior advertising campaigns and federal trademark registrations; Plaintiff's knowledge of such third-party uses; and Plaintiff's enforcement efforts.

Defendants will also present evidence that Plaintiff has misused its trademark registrations to demand that others stop making descriptive, fair use of "life is good" and similar phrases *as expressions*, in an attempt to inequitably expropriate the inherent appeal of "life is good" and prevent others from using that common expression in any commercial context. Defendants' evidence includes documents and testimony regarding such fair uses, Trademark Office refusals, Plaintiff's enforcement efforts, and the scope of the trademark rights that Plaintiff claims.

5.    <u>Defendants' Affirmative Defenses:  Unclean Hands and Misuse of the Statutory Registration Symbol ("®")</u>

Defendants will present evidence that Plaintiff has used the statutory registration symbol ("®") in public materials to indicate that "Life is good." was or is registered for products for which it was or is not registered, and that Plaintiff continued its pattern of misuse of the ® symbol after being warned by the PTO that such use was improper.

Defendants will also present evidence that Plaintiff knew or should have known that it did not own a federal registration for "Life is good." for the products mismarked with the ® symbol at the time it used that symbol in connection with those products; that Plaintiff knew or should have known that it could not use the ® symbol in connection with goods for which it did not own a registration; and that Plaintiff failed to take any corrective steps to cease its use of the ® symbol in connection with goods for which it did not own a registration.

Defendants' evidence includes U.S. Patent and Trademark Office records, testimony by Plaintiff's corporate representatives, testimony by Mr. Rany Simms (former Administrative Law

Judge for the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board), and

documents showing Plaintiff's misuse of the ® symbol.

      6.     <u>Defendants' Affirmative Defenses:  Lack of Protectability and Ornamental Use of "Life is good."</u>

As detailed above, Defendants will present evidence that Plaintiff has used and continues

to use the phrase "Life is good." as ornamentation to adorn its products.  (<u>See</u>

"Strength/Weakness of Plaintiff's Mark, <u>supra</u>.)

      7.     <u>Defendants' Counterclaim Count I:  Cancellation and Refusal of Plaintiff's Registrations and Applications for Fraud on the U.S. Trademark Office</u>

Defendants will present evidence that Plaintiff made fraudulent statements to the U.S.

Patent and Trademark Office in its applications to register "Life is good." and the "Jake" logo

and in applications to renew those registrations and have them deemed incontestable.

Defendants will present evidence that Plaintiff made fraudulent statement about its first

use of "life is good." as a trademark in its applications.  Defendants will also present evidence

that Plaintiff falsely stated that at the time it filed application Serial Nos. 75/066,995 and

75/939,492, it was using "Life is good." as a trademark on the goods listed in those applications,

when in fact it was not.  Defendants will present evidence that, based on these false statements,

Plaintiff's application Serial Nos. 75/066,995 and 75/939,492 matured into Reg. Nos. 2,025,737

and 2,481,887, respectively.

Defendants will present evidence that Plaintiff made fraudulent statement about its first

use and continued use of the "Jake" logo as a trademark in its applications to register, renew, and

attain incontestable status for that design mark. Defendants will also present evidence that Plaintiff falsely stated that at the time it filed application Serial No. 75/125,177 it was using the "Jake" logo as a trademark on the goods listed in that application, when in fact it was not. Defendants will present evidence that, based on these false statements, Plaintiff's application Serial No. 75/125,177 matured into Reg. No. 2,055,452.

Defendants will also present evidence that Plaintiff falsely stated in its affidavit of use and incontestability for Reg. No. 2,055,452 that it was still using the design mark as registered as a trademark for shirts, sweatshirts, shirts, hats, pants, and shorts as of the April 7, 2003 filing date of its affidavit, and had been continuously using the design mark as registered as a trademark for the preceding five years, when in fact it was not. Defendants will present evidence that, based on these false statements, Plaintiff's Reg. No. 2,055,452 was renewed and attained incontestable status.

Defendants will present evidence that Plaintiff knew or should have known that the statements detailed above were false.

Defendants' evidence includes U.S. Patent and Trademark Office records; documents (e.g., product catalogs and marketing materials) showing Plaintiff's use of "Life is good." and the "Jake" logo at relevant times; and testimony and exhibits from the depositions of Plaintiff's corporate representatives and agents.

       7.     <u>Defendants' Counterclaim Count II: Cancellation and Refusal of Plaintiff's Registrations and Applications for Functionality and Lack of Protectability</u>

Defendants will present evidence that the phrase "life is good" is a commonly used saying that is functional as a message and/or is so highly descriptive that it is not protectable as a trademark; and that, even if the phrase "life is good" is considered protectable, Plaintiff cannot establish secondary meaning in that phrase for any application or registration that has not attained incontestable status.

Defendants will rely on their evidence, detailed above, demonstrating that "Life is good." is at best a weak trademark and that Plaintiff has used it in an ornamental matter to adorn its products.

        8.     Damages and Monetary Relief:  Defendants' Claim for Reasonable Attorneys' Fees

Because Plaintiff has dismissed its claims for monetary relief in this case, Defendants will not present evidence as to damages.  However, Defendants will present evidence of the exceptional nature of this case—including Plaintiff's overreaching and abuse of its trademark registrations—in support of Defendants' prayer to recover their reasonable attorneys' fees under 15 U.S.C. § 1117.  Defendants will rely on the evidence detailed above.

## II.    Statement of Undisputed Facts

Each side submits that the following facts are undisputed, each reserving the right to object to the other's designations.

    A.    Plaintiff's Statement of Undisputed Material Facts

1.    Plaintiff-Counterclaim Defendant Life Is Good, Inc. is a Massachusetts corporation with a principal place of business in Boston, Massachusetts.  (Compl. 1).

2.      Plaintiff is the successor-in-interest to Jacobs Gallery, a partnership comprised of Albert Jacobs and John Jacobs.  (Am. Answer 8; Pl.'s Answer to Def.'s Am. Countercl. 1).

3.      Defendant-Counterclaim Plaintiff LG Electronics U.S.A., Inc. ("LGE") is a Delaware corporation with a principal place of business in Englewood Cliffs, New Jersey. (Compl. 1; Am. Answer 8).

4.      Defendant and Counterclaim-Plaintiff LG Electronics MobileComm U.S.A., Inc. ("LGI") is a California corporation with a principal place of business in San Diego, California. (Compl. 1; Am. Answer 9).

5.      Defendant LGE is a wholly owned subsidiary of LG Electronics, of Seoul, Korea. (Compl. 4; Am. Answer 3).

6.      On March 4, 1996, Jacobs Gallery filed application Serial No. 75/066,995 to register the mark LIFE IS GOOD in Class 25 for "[s]portswear, namely T-shirts, sweatshirts, shirts, hats, pants, and shorts."  On December 24, 1996, application Serial No. 75/066,995 matured into registration number 2,025,737 (the "'737 registration") issued by the United States Patent and Trademark Office ("PTO") to Jacobs Gallery.  On February 25, 1998, Jacobs Gallery assigned its entire interest in the '737 registration to Plaintiff.  On April 6, 2002, the PTO accepted Life is good's section 8 and 15 affidavit for the '737 registration, which has thus become incontestable pursuant to 15 U.S.C. § 1065.  (Compl. 2-3; Answer 2; Am. Answer 9).

7.      On June 25, 1996, Jacobs Gallery filed application Serial No. 75/125,177 to register a design mark known as the "Jake Symbol" in Class 25 for "sportswear, namely T-shirts, sweatshirts, shirts, hats, pants, and shorts."  On April 22, 1997, application Serial No. 75/125,177 matured into registration number 2,055,452 (the "'452 registration") issued by the PTO to Jacobs

Gallery.  On February 25, 1998, Jacobs Gallery assigned its entire interest in the '452 registration to Plaintiff.  On April 7, 2003, Plaintiff filed an affidavit of use and incontestability for the Jake Symbol.  The PTO accepted Life is good's section 8 and 15 affidavit for the '452 registration, which has thus become incontestable pursuant to 15 U.S.C. § 1065.  (Compl. 3; Answer 3; Am. Answer 9-10).

8.      On October 2, 2001, Plaintiff filed Application No. 76/319,447 on an intent-to-use basis.  On October 22, 2003, Plaintiff requested that Application No. 76/319,447 be divided; the PTO granted that request, placing the goods already in use in commerce into newly created "child" Application No. 76/976,269.  Application No. 76/976,269 matured to registration on March 23, 2004 under Registration No. 2,826,245, for toys, clothing, bed blankets, towels, backpacks, luggage, and animal leashes and collars.  On April 22, 2004, Plaintiff requested that Application 76/319,447 be divided again; the PTO granted that request, placing the goods already in use in commerce into newly created "child" Application No. 76/976,717, for "pet bowls for eating and drinking."  Application No. 76/319,447 is still pending.  (Answer 2-3; Am. Answer 12; Pl.'s Answer to Countercl. 3-4).

9.      On December 8, 2001, Plaintiff filed application Serial No. 76/347,362 to register the mark LIFE IS GOOD for "recreational products, namely flying plastic discs" and "ceramic mugs"  On March 4, 2003, application Serial No. 76/347,362 matured into registration number 2,692,561 (the "'561 registration").  (Compl. 3; Answer 2-3; Am. Answer 12).

10.     On August 28, 2001, the PTO issued Registration Number 2,481,887 in Class 16 for plaintiff's trademark LIFE IS GOOD, for "printed matter, namely posters, greeting cards,

stationery, and bumper stickers" (filed as application Serial No. 75/939,492).  (Compl. 3; Answer

2-3; Am. Answer 12).

　　　　11.　　　Jacobs Gallery first used LIFE IS GOOD and the Jake Logo on or about

September of 1994.  (Pl.'s Answer to Def.'s Am. Countercl. 2).

　　　　12.　　　LGE sells various electronic goods throughout the United States, including

computers and computer peripherals, televisions, audio/video equipment, and home appliances.

(Compl. 4; Am. Answer 4).

　　　　13.　　　LGI sells cell phones and related telecommunications products throughout the

United States.  (Compl. 4; Am. Answer 4).

　　　　14.　　　LG has used the phrase "Life's Good" in connection with various advertisements,

websites, and products in the United States."  (Compl. 4; Am. Answer 4).

　　　　15.　　　The phrase "Life's Good" appears at the top and bottom of the home page for the

"lge.com" operated by LG's Korean parent corporation.  The phrase "Life is Good with LG

Electronics" previously appeared on the "lge.com" website.  (Compl. 4; Am. Answer 4).

　　　　16.　　　LG gives away t-shirts bearing the phrase "Life's Good."  (Compl. 4-5; Am.

Answer 4).

　　　　17.　　　LG is using the phrase "Life's Good" on advertisements.  (Compl. 5; Am. Answer

4).

　　　　18.　　　"LIFE'S GOOD" is not a registered trademark of LGE in the United States.

(Compl. 5; Am. Answer 4).

　　　　19.　　　LG uses the LG Logo with the phrase "Life's Good" in connection with various

advertisements for LG's goods.  (Compl. 5; Am. Answer 5).

20.     The words "Life's Good may be a contraction of the words "Life is good."

(Def.'s First Set of Objections and Resps. To Pl.'s First Set of Reqs. For Admis. 3).

21.     Defendants did not conduct and/or have conducted on their behalf a U.S.

trademark search of the words "Life's Good," before they first started using "Life's Good" in the

United States.  (Def.'s First Set of Objections and Resps. to Pl.'s First Set of Reqs. for Admis. 3).

22.     Defendants did not conduct and/or have conducted on their behalf a U.S.

trademark search of the words "Life is good," before they first started using "Life's Good" in the

United States.  (Def.'s First Set of Objections and Resps. to Pl.'s First Set of Reqs. for Admis. 4).

23.     Defendants have used the words "Life's Good" in advertising.  (Def.'s First Set of

Objections and Resps. to Pl.'s First Set of Reqs. for Admis. 15).

24.     Defendants  have used the words "Life's Good" in advertising.  (Def.'s First Set

of Objections and Resps. To Pl.'s First Set of Requests for Admis. 15).

    B.    Defendants' Statement of Undisputed Facts

        The Parties

        1.    LG Electronics U.S.A., Inc. sells various electronic goods throughout the
            United States, including computers and computer peripherals, televisions,
            audio/video equipment, and home appliances.  (Defs. Answer ¶ 16.)

        2.    LG Electronics MobileComm U.S.A., Inc. sells cell phones and related
            telecommunications products throughout the United States.  (Defs.
            Answer ¶ 17.)

        Plaintiff's Use of "Life is good."

3.  Plaintiff uses "Life is good." on its products, hangtags, displays, boxes, packaging and labels, at charitable festivals that it sponsors, on its website, and in catalogs as shown below.  (Pl. L.R. 56.1 Statement, Sec. II, ¶ 3.)

**Life is good.**

4.  Plaintiff did not coin the phrase "Life is good."  (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 38.)

5.  The phrase "Life is good" was an expression before Plaintiff's founders adopted and began using "Life Is Good" as a name and mark.  (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 40.)

6.  The phrase "Life is good" has meaning to certain members of the public other than as an identifier of Plaintiff.  (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 41.)

7.  The phrase "Life is good" had meaning to certain members of the public other than as an identifier of Plaintiff before Plaintiff's founders adopted and began using "Life is good" as a name and mark.  (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 42.)

8.  Plaintiff has used the words "Life is good" in a non-trademark manner. (Pl. Resp. to Defs. Second Set of Req. for Admis. ¶ 15.)

9.  Plaintiff does not own proprietary rights in the ordinary inherent meaning of the words "Life is good."  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 5.)

10.    Plaintiff uses phrases or sayings other than "Life is good." on its products.
 (Pl. L.R. 56.1 Statement, Sec. I, ¶ 6.)

11.    As used by Plaintiff, "Life is good." communicates an optimistic message
that resonates with consumers.   (Pl. L.R. 56.1 Statement, Sec. I, ¶ 7.)

12.    Plaintiff is "selling a message and that is optimism."  (A. Jacobs Dep. at
68.)

13.    Plaintiff's "Life is good." "slogan is not about being in a fancy sports car,
smoking a cigar.  It's about maintaining a spirit of optimism when maybe
not everything is going all that well."  (A. Jacobs Dep. at 144-5; J. Jacobs
Dep. at 42.)

Defendants' Use of "Life's Good and Its LG Logo

14.    Defendants use the LG Logo with the phrase "Life's Good" in connection
with various advertisements, websites, and products in the United States as
shown below.  (Defs. Answer ¶ 18.)



The Parties' Goods

15.    Plaintiff's products currently include t-shirts, hats, sweatshirts, shorts,
socks, pajamas, baby and children's clothing, flying discs, coffee mugs,

water bottles, pet products, bags, coolers, and cell phone charms.  (Pl. L.R. 56.1 Statement, Sec. II, ¶ 1.)

16.    Defendants sells various electronics, including computers and computer peripherals, televisions, audio/video equipment, home appliances, and cell phones and related telecommunications products.  (Defs. Answer ¶ 16-17.)

17.    Defendants' use of "Life's Good" in connection with such expensive hard goods as televisions, computers, and cell phones is completely different from Plaintiff's whimsical and non-corporate image that it has developed in connection with its relatively inexpensive soft goods.  (Defs. Answer ¶ 27.)

18.    Plaintiff's products are not similar to many of the products sold by Defendants.  (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 24.)

19.    Plaintiff's products are not similar to Defendants' digital appliances.  (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 26.)

20.    Plaintiff's products are not similar to Defendants' consumer electronics. (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 28.)

21.    Plaintiff's products are not similar to Defendants' telephones.  (Pl. Resp. to Defs. First Set of Req. for Admis. ¶  30.)

22.    Plaintiff's products are not similar to:

a.    cellular telephones
b.    video telephones
c.    electric dishwashers
d.    electric vacuum cleaners
e.    electric food blenders

      f.       air conditioners
      g.      clothes washing machines
      h.      LCD (Liquid Crystal Display) televisions
      i.       plasma screens
      j.       satellite receivers
      k.      computers
      l.       computer monitors
      m.     Personal Digital Assistants
      n.      DVD (Digital Versatile Disc) players
      o.      CD-ROM drives
      p.      compact disc players
      q.      video cassette recorders
      r.       MP3 (MPEG-1 audio layer 3 files) players
      s.       PC (personal computer) cameras
      t.       digital voice recorders

(Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 32.)

23.    Plaintiff's products are not related to many of the products Defendants sell.  (Pl Supplemental Resp. to Defs. First Set of Req. for Admis. ¶ 25.)

24.    Plaintiff's products are not related to Defendants' digital appliances.  (Pl Supplemental Resp. to Defs. First Set of Req. for Admis. ¶ 27.)

25.    Plaintiff's products are not related to Defendants' consumer electronics.  (Pl Supplemental Resp. to Defs. First Set of Req. for Admis. ¶ 29.)

26.    Plaintiff's products are not related to Defendants' telephones.  (Pl Supplemental Resp. to Defs. First Set of Req. for Admis. ¶ 31.)

27.    Plaintiff's products are not related to:

      a.      cellular telephones
      b.      video telephones
      c.      electric dishwashers
      d.      electric vacuum cleaners
      e.      electric food blenders
      f.       air conditioners
      g.      clothes washing machines
      h.      LCD (Liquid Crystal Display) televisions

i. plasma screens
j. satellite receivers
k. computers
l. computer monitors
m. Personal Digital Assistants
n. DVD (Digital Versatile Disc) players
o. CD-ROM drives
p. compact disc players
q. video cassette recorders
r. MP3 (MPEG-1 audio layer 3 files) players
s. PC (personal computer) cameras
t. digital voice recorders

(Pl. Supplemental Resp. to Defs. First Set of Req. for Admis. ¶ 33.)

28. It is a common practice for companies to utilize clothing and accessories to promote their products. (A. Jacobs Dep. at 125.)

29. T-shirts, accessories, pens, portfolios, note pads, laptop cases, glasses, and baseball caps may be used as promotional items. (A. Jacobs Dep. at 134-35.)

The Parties' Channels of Advertising

30. Plaintiff is not aware of any publication in which both Plaintiff and Defendants have placed advertisements in the same issue or edition. (Pl. Resp. to Defs. First Set of Req. for Admis. ¶ 21.)

Third-Party Use of "Life is good."

31. Third parties have used the phrase "Life is good" in a commercial setting. (Pl. L.R. 56.1 Statement, Sec. I, ¶ 2.)

32. Miller Brewing Company previously used "Life is good" in a national television advertising campaign and, from 1995 to 2003, owned federal trademark registrations for the marks "Life is good" and "We've got

27

Miller Lite.  We're in Texas.  Life is Good."  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 3.)

33.    The Hershey Company has used the phrase "Life's Good Between Reese's Cups" and "Life Is Good  Between Reese's Cups" in a national advertising campaign.  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 3.)

34.    Ford previously used the phrase "Life is good."  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 3.)

35.    Wal-Mart previously used the phrase "Life is good."  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 3.)

36.    The American Red Cross previously used the phrase "Life is good."  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 3.)

37.    Forbes has used "The Good Life" for a consumer magazine since 1996 and has owned a federal registration for that mark since 2004.  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 3.)

38.    Sears has used "Good Life.  Great Price." in national television and radio advertising since 2003, and owns a federal registration for that mark.  (Pl. L.R. 56.1 Statement, Sec. I, ¶ 3.)

Plaintiff's Trademark Applications and Registrations

39.    Plaintiff is the successor-in-interest to Jacobs Gallery.  (Pl. Answer to Defs. Countercl. ¶ 6.)

40.    Plaintiff is the owner of all of the LIFE IS GOOD and Jake Logo federal

registrations at issue in this lawsuit, notwithstanding that the Certificates

of Registration identify Praesidian Capital Partners as the record owner.

<u>Registration No. 2,025,737</u>

41.    On March 4, 1996, Jacobs Gallery filed application Serial No. 75/066,995

to register the mark LIFE IS GOOD in Class 25 for "sportswear, namely, t-

shirts, sweatshirts, shirts, hats, pants, and shorts."  (Pl. Answer to Defs.

Countercl. ¶ 9.)

42.    In support of application Serial No. 75/066,995, Jacobs Gallery submitted

a sworn statement pursuant to 18 U.S.C. § 1001 that the mark LIFE IS

GOOD was being used for the goods identified in the application, with a

claimed first use date of June 1, 1994.  (Pl. Answer to Defs. Countercl.

¶ 10.)

43.    Jacobs Gallery began using LIFE IS GOOD on or about September 1994.

(Pl. Answer to Defs. Countercl. ¶ 11.)

44.    Jacobs Gallery's application Serial No. 75/066,995 matured into Reg. No.

2,025,737.  (Pl.  Answer to Defs. Countercl. ¶ 13.)

45.    On February 25, 1998, Jacobs Gallery assigned its entire interest in Reg.

No. 2,025,737 to Plaintiff.  (Pl.  Answer to Defs. Countercl. ¶ 14.)

<u>Registration No. 2,055,452</u>

46.    On June 25, 1996, Jacobs Gallery filed application Serial No. 75/125,177

to register a design mark in Class 25 for "sportswear, namely, t-shirts,

sweatshirts, shirts, hats, pants, and shorts." That design is known as the "Jake Logo." The design submitted for registration appeared as shown below. (Pl. Answer to Defs. Countercl. ¶ 15.)



47.    In support of application Serial No. 75/125,177, Jacobs Gallery submitted a sworn statement pursuant to 18 U.S.C. § 1001 that the Jake Logo was being used for the goods identified in the application, with a claimed first use date of June 1, 1994. (Pl. Answer to Defs. Countercl. ¶ 16.)

48.    Jacobs Gallery began using LIFE IS GOOD on or about September 1994. (Pl. Answer to Defs. Countercl. ¶ 17.)

49.    Jacobs Gallery's application Serial No. 75/125,177 matured into Reg. No. 2,055,452. (Pl. Answer to Defs. Countercl. ¶ 19.)

50.    On February 25, 1998, Jacobs Gallery assigned its entire interest in Reg. No. 2,055,452 to Plaintiff. (Pl. Answer to Defs. Countercl. ¶ 20.)

51.    On April 7, 2003, Plaintiff filed an affidavit of use and incontestability claiming that it was currently using the design depicted in Reg. No. 2,055,452 and had continuously used that design during the preceding five years. (Pl. Answer to Defs. Countercl. ¶ 21.)

Registration No. 2,481,887

30

52.     On March 9, 2000, Plaintiff filed application Serial No. 75/939,492 to

register the mark LIFE IS GOOD in Class 16 for "printed matter, namely

posters, greeting cards, stationary, and bumper stickers."  (Pl. Answer to

Defs. Countercl. ¶ 23.)

53.     In support of application Serial No. 75/939,492, Plaintiff submitted a

sworn statement pursuant to 18 U.S.C. § 1001 that the mark LIFE IS

GOOD was being used for the goods identified in the application, with a

claimed first use date of June 1, 1994.  (Pl. Answer to Defs. Countercl. ¶

24.)

54.     Jacobs Gallery began using LIFE IS GOOD on or about September 1994.

(Pl. Answer to Defs. Countercl. ¶ 25.)

55.     Plaintiff's application Serial No. 75/939,492 matured into Reg. No.

2,481,887.  (Pl. Answer to Defs. Countercl. ¶ 27.)

LIGI's Misuse of the Statutory ® Symbol

Application No. 75/939,492

56.     On March 7, 2000, Plaintiff filed trademark Application No. 75/939,492,

submitting specimens of use that bore the statutory ® symbol and included

an affirmative claim that the applied for mark was a "registered trademark[

] of Life Is Good, Inc."  (Pl. Answer to Defs. Countercl. ¶ 29.)

57.     In office actions dated August 17, 2000 and December 18, 2000, the PTO

indicated that Plaintiff's specimen showed the ® symbol, but that the

PTO's records did not show that the mark was registered and that Plaintiff

may use the ® symbol only for the specific goods recited in the

registration.   (Pl. Answer to Defs. Countercl. ¶ 29.)

58.     Plaintiff submitted specimens of use in connection with Application No.

75/939,492 that used the ® symbol for goods for which "Life is good."

was not registered.  (Kenny Dep. at 76.)

59.     Application No. 75/939,492 matured to registration on August 28, 2001

under Registration No. 2,481,887.  (Pl. Answer to Defs. Countercl. ¶ 29.)

<u>Application No. 76/319,447</u>

60.     On October 2, 2001, Plaintiff filed Application No. 76/319,447 on an

intent-to-use basis.  (Pl. Answer to Defs. Countercl. ¶ 30.)

61.     On October 22, 2003, Plaintiff filed a Statement of Use, submitting

specimens of use that bore the ® symbol.  (Pl. Answer to Defs. Countercl.

¶ 30.)

62.     On October 22, 2003, Plaintiff requested that Application No. 76/319,447

be divided; the PTO granted that request and placed the goods in use in

commerce into newly created "child" Application No. 76/976,269.  (Pl.

Answer to Defs. Countercl. ¶ 30.)

63.     On April 22, 2004, Plaintiff filed a Statement of Use for the "parent"

application (Application No. 76/319,447), submitting specimens of use

that bore the ® symbol.  (Pl. Answer to Defs. Countercl. ¶ 30.)

64.     Plaintiff requested that Application No. 76/319,447 be divided again; the

PTO granted that request and placed the goods in use in commerce into

newly created "child" Application No. 76/976,717.  (Pl. Answer to Defs. Countercl. ¶ 30.)

65.  Application No. 76/976,269 matured to registration on March 23, 2004 under Registration No. 2,826,245.  (Pl. Answer to Defs. Countercl. ¶ 30.)

66.  Application No. 76/319,447 is still pending.  (Pl. Answer to Defs. Countercl. ¶ 30.).

<u>Application No. 76/347,362</u>

67.  On December 8, 2001, Plaintiff filed trademark Application No. 76/347,362, submitting specimens of use that bore the ® symbol.  (Pl. Answer to Defs. Countercl. ¶ 31.)

68.  In an office action dated March 11, 2002, the PTO indicated that Plaintiff's specimen showed the ® symbol, but that the PTO's records did not show that the mark was registered and that Plaintiff may use the ® symbol only for the specific goods recited in the registration.  (Pl. Answer to Defs. Countercl. ¶ 31.)

69.  Plaintiff submitted specimens of use in connection with Application No. 76/347,362 that used the ® symbol for goods for which "Life is good." was not registered.  (Kenny Dep. at 76.)

70.  Application No. 76/347,362 matured to registration on March 4, 2003 under Registration No. 2,692,561.  (Pl. Answer to Defs. Countercl. ¶ 31.)

<u>Plaintiff's Use of the ® Symbol on Its Products</u>

71.    Plaintiff uses "Life is good." with the ® symbol on all of its products.  (J. Jacobs Dep. at 106.)

Defendants' Intent

72.    Plaintiff has no facts to indicate that Defendants' adopted the words "Life's Good" to trade on the goodwill of Plaintiff.  (A. Jacobs Dep. at 174-5.)

73.    Plaintiff has no facts to indicate that Defendants' adopted the words "Life's Good" to trade on the selling power of Plaintiff's use of "Life's good."  (A. Jacobs Dep. at 175-6.)

74.    Plaintiff has no facts to indicate that Defendants' adopted the words "Life's Good" to trade on Plaintiff's "Life's good." brand.  (A. Jacobs Dep. at 176.)

Actual Confusion

75.    Plaintiff does not know of any misdirected orders for Defendants' products.  (A. Jacobs Dep. at 45.)

76.    Plaintiff does not know of any misdirected returns of Defendants' products.  (A. Jacobs Dep. at 45.)

77.    Plaintiff does not know of receiving any complaints about Defendants' products.  (A. Jacobs Dep. at 45.)

78.    Plaintiff does not know of receiving any comments expressing dissatisfaction with Defendants' products.  (A. Jacobs Dep. at 179.)

Lack of Harm

79.    Plaintiff is not aware of any lost customers, sales, or business as a result of Defendants' use of "Life's Good," "Life is Good," and/or the LG Logo. (Pl. Resp. to Defs. First Set of Interrogs. ¶ 13.)

80.    Plaintiff is not aware of any economic loss or monetary damages suffered because of Defendants' use of "Life's Good."   (A. Jacobs Dep. at 178-9.)

81.    Plaintiff has no facts to indicate that Defendants' use of "Life's Good" has caused any devaluation of Plaintiff's corporate earnings or assets.  (A. Jacobs Dep. at 182.)

82.    Plaintiff has no facts to indicate that Defendants' use of "Life's Good" has diluted the strength or distinctiveness of Plaintiff's alleged "Life is good." mark.  (A. Jacobs Dep. at 255.)

83.    Plaintiff does not view Defendants as direct competitors. (A. Jacobs Dep. at 52.)

Defendants' LG Logo

84.    Defendant's LG Logo and Plaintiff's Jake Logo are not very similar.  (J. Jacobs Dep. at 68.)

85.    Plaintiff does not consider Defendants' LG Logo, or any portion of the LG Logo, to infringe it rights.  (A. Jacobs Dep. at 58-60.)

Plaintiff's Survey

86.    Plaintiff's survey expert testified that "awareness of 'Life is good.' is relatively low."   (Klein Dep. at 42.)

87.     Plaintiff's survey expert testified that "Life is good." is not famous for purposes of dilution.  (Klein Dep. at 43.)

88.     Plaintiff's survey expert testified that his pretest showed that "awareness of 'Life is good.' as a trademark was relatively low, [and] that awareness of 'LG' was relatively high as a . . . company that most people associated with cell phones."  (Klein Dep. at 90.)

89.     Plaintiff's survey expert testified that his pretest showed there was "little awareness of 'Life is good.' or association with any products."  (Klein Dep. 107.)

III.     <u>Contested Issues of Fact</u>

A.     <u>Life is good's Issues</u>

1.     Whether LG's use of "Life's Good" is likely to cause confusion as to origin, sponsorship, affiliation, or other connection with Life is good because of Life is good's "Life is good" mark (from the perspective of both potential purchasers of LG's products and potential purchasers of Life is good's products), including:

a.     The degree of similarity of the parties' marks.

b.     The degree of similarity of the parties' goods.

c.     The relationship between the parties' channels of trade.

d.     The relationship between the parties' advertising.

e.     The classes of prospective purchasers.

f.     Whether there has been actual confusion.

g.     LG's intent in adopting its mark.

h.     The strength of the "Life is good" mark.

36

     i.     The likelihood that either party will bridge the gap between the parties by using the mark on products closer to the other's area of commerce.

     j.     The likelihood that potential consumers for the respective parties will perceive one of them to have entered the area of business of the other by reason of the nature of the parties' businesses.

2.     Whether LG's use of "Life's Good" is likely to dilute the distinctive quality of the "Life is good" mark, including:

     a.     Whether the "Life is good" mark is distinctive.

     b.     Whether LG's use of "Life's Good" is likely to diminish the uniqueness and individuality of the "Life is good" mark.

     c.     Whether LG's use of "Life's Good" is likely to injure the value of the "Life is good" mark through actual or potential consumer confusion, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the parties' goods.

3.     Whether LG's use of "Life's Good" in the face of Life is good's prior use of its "Life is good" mark constitutes an unfair or deceptive act or practice.

B.     <u>LG's Issues</u>

1.     Whether there is a likelihood of confusion between the Plaintiff's use of "Life is good." for clothing and accessories on the one hand, and Defendants' use of "Life's Good" as a corporate tagline with its LG Logo in connection with Defendants' electronics, appliances, and cell phones on the other hand.

2.     Whether Plaintiff's "Life is good." mark is similar to Defendants' LG Logo with Defendants' "Life's Good" corporate tagline.

3.     Whether the prospective purchasers of the parties' products are the same.

37

4.    Whether the parties' channels of trade are the same.

5.    Whether consumers exercise care and deliberation in purchasing either of the parties' products.

6.    Whether "Life is good." is a strong trademark.

7.    Whether Plaintiff has any evidence of actual confusion.

8.    Whether Plaintiff has any evidence of dilution.

9.    Whether Plaintiff committed fraud on the U.S. Patent and Trademark Office during the prosecution and/or maintenance of its trademark applications and/or registrations as a result of its sworn statements regard the first use of "Life is good." and the goods for which "Life is good." is used.

10.    Whether Plaintiff misused the statutory ® symbol in its advertising and on its products.

11.    Whether Plaintiff abandoned its "Life is good" mark by not enforcing its alleged rights in the mark against third parties.

12.    Whether Plaintiff inequitably enforced its alleged trademark rights against fair uses of "Life's good" by third parties.

13.    The extent of third-party use of "Life's good."

IV.    <u>Jurisdictional Questions</u>

None.

V.    <u>Questions Raised by Pending Motions</u>

The parties anticipate filing various motions in limine.

A.    <u>Plaintiff's Anticipated Motions</u>

1.    Motion to Exclude Testimony of Expert Witness Rany Simms.

2.    Motion to Exclude Testimony of Expert Witness Robert Reitter.

3.    Motion to Exclude Testimony of Expert Witness Maureen Morrin (in part).

4.    Motion to Exclude Testimony of Expert Witness Ronald Butters (tentative).

5.    Motion to Exclude Evidence Concerning Plaintiff's Use of the Registration Symbol ®.

6.    Motion to Exclude Evidence Concerning Prosecution History of Plaintiff's Registered Trademarks (in part).

7.    Motion to Exclude Evidence Concerning Prosecution History of LG's Trademark.

B.    <u>Defendants' Anticipated Motions</u>

Defendants intend to file three motions in limine.  The titles of the motions and the

questions raised by the motions are as follows:

1.    **Defendants' Motion In Limine to Strike Plaintiff's Survey Expert Robert Klein.**  Whether Mr. Klein's survey should be excluded on the grounds that errors in the survey's design and execution render its results (and Mr. Klein's report and testimony based on those results) untrustworthy, unreliable, irrelevant, and far more prejudicial than probative.

2.    **Defendants' Motion In Limine to Strike Plaintiff's Alleged Evidence of Actual Confusion.**  Whether Plaintiff's alleged evidence of actual

confusion should be excluded on the grounds that is inadmissible hearsay within hearsay, fails to show trademark-relevant consumer confusion, and is so vague and ambiguous that it has little or no probative value, which is substantially outweighed by the risk of unduly prejudicing Defendants, confusing the issues, misleading the jury, unnecessarily delaying the trial, and wasting the Court's and the parties' time and resources.

3. **Defendants' Motion In Limine to Exclude Argument and Evidence of Defendants' Alleged "Bad Faith" Intent.** Whether Plaintiff should be excluded from presenting argument or evidence of Defendants' alleged "bad faith" intent in adopting their "Life's Good" corporate tagline on the grounds that (i) there is no evidence in the record to show "bad faith" under the applicable legal standard, and (ii) the risk of unduly prejudicing Defendants, confusing the issues, misleading the jury, and wasting the Court's and the parties' time and resources substantially outweighs whatever probative value Plaintiff's alleged evidence of bad faith may have.

VI.    Issues of Law

A.    Life is good's Issues

1.    The standard for likelihood of confusion.

a.    In *Pignons S.A. v. Polaroid Corp.*, 657 F.2d 482 (1981), the First Circuit articulated a multi-factor test for determining likelihood of confusion in trademark infringement:

40

In assessing likelihood of confusion, courts have commonly looked to the following factors:  the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark.  *Id.* at 487 (citations omitted).

b.      The *Pignons* factors have since been applied repeatedly in this circuit. *See, e.g., I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 43 (1st Cir. 1998) (citations omitted).

c.      A number of other courts have recognized as a separate factor "the likelihood that either owner will bridge the gap, using the mark on products closer to the other's area of commerce."  *TCIP Holding Co. v. Haar Communications, Inc.*, 244 F.3d 88, 100 (2d Cir. 2001) (citation omitted).  *See also Shakespeare Co. v. Silstar Corp.*, 110 F.3d 234, 242 (4th Cir. 1997) (including in likelihood of confusion factors "the probability that the senior mark owner will 'bridge the gap' by entering the defendant's market"); *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1116 (6th Cir. 1996) (including in likelihood of confusion factors "the likelihood of expansion of product lines"); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) (including in likelihood of confusion factors "the likelihood of expansion of the product lines"); *Alpha Indus., Inc. v. Alpha Microsystems*, 220 U.S.P.Q. 67, 71 (TTAB 1983) (holding that "there must be such a relationship between the respective goods that persons encountering applicant's goods under [applicant's] mark . . . will mistakenly assume that the senior user has 'bridged the gap' and is the source of these different goods") (citation omitted).

d.      *See also*, *DeCosta v. Columbia Broadcasting Sys., Inc.*, 520 F.2d 499, 513 (1st Cir. 1975) (First Circuit listed several "guidelines" to be followed in determining whether there is a likelihood of confusion, including "the trend towards expansion in the respective trade or industry as to territory or line of merchandise.")  *Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996).  (The First Circuit has expressly held that its standard list of eight factors "is not intended to be either all-encompassing or exclusive").

e.      Courts have also recognized that the nature of one of the parties' business may reasonably lead consumers to believe that that party has expanded

41

into the other party's field of business upon encountering the trademark of the other. *E.g., CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 680 (7th Cir. 2002), (upholding the district court's finding that "the diverse nature of [the plaintiff's] business makes it likely that consumers might reasonably expect [the plaintiff] to expand its business to offer the same products and services offered by [the defendant]"), *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979) ("the absence of a present intent to bridge the gap is not determinative.  In a given case, sufficient likelihood of confusion may be established although likelihood of bridging the gap is not demonstrated. Because consumer confusion is the key, the assumptions of the typical consumer, whether or not they match reality, must be taken into account"); *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 482 (2d Cir 1996) (same); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) (lack of intent to expand not determinative because "[t]he Lanham Act extends trademark protection to related goods in order to guard against numerous evils in addition to restraints on the possible expansion of the senior user's market, including consumer confusion, tarnishment of the senior user's reputation, and unjust enrichment of the infringer"); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) (considering "other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market"); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 666 (5th Cir. 2000) (holding that, regardless of senior user's actual intent regarding its business:  "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely"); *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985) ("[T]he rights of the owner of a registered trademark are not limited to protection with respect to the specific goods stated on the certificate . . . but extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods."); *Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc.*, 648 F.2d 1335, 1337 (C.C.P.A. 1981) ("Lack of present intent to expand use of one's mark is not an overriding consideration" if it fails to influence "public reaction"); *Alpha Indus., Inc. v. Alpha Microsystems*, 220 U.S.P.Q. (BNA) 67, 71 (TTAB 1983) (considering whether there exists "such a relationship between the respective goods that persons encountering applicant's goods under the [senior] mark [] will mistakenly assume that the senior user has 'bridged the gap' and is the source of these different goods").

2.     The standard for proving likelihood of dilution.

a.     The Massachusetts Anti-Dilution Act provides:  "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law . . . shall be ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."  Mass. Gen. Laws ch. 110B, § 12.  Thus, in order for Life is good to prevail on this theory, Life is good must establish (i) that the "Life is good" mark is distinctive; and (ii) that LG's use of "Life is Good" is likely to dilute the distinctive quality of the "Life is good" mark.

b.     As the statutory language reflects, a mark need only be "distinctive" to the extent required for it to be "registered under this chapter" or "valid at common law."  Mass. Gen. Laws ch. 110B, § 12.  As set forth at length in Life is good's opposition to LG's motion for partial summary judgment, the SJC has repeatedly held that there is no heightened level of distinctiveness required for protection under the Massachusetts Anti-Dilution Act.  *See Skil Corp. v. Barnet*, 337 Mass. 485, 489 n.1 (1958) (reviewing legislative history and noting that Legislature rejected requirement that mark be "unique," "coined," or "peculiar" to be eligible for protection from dilution); *Great Scott Food Market, Inc. v. Sunderland Wonder Inc.*, 348 Mass. 320, 324 (1965) ("That relief under the statute is not dependent on uniqueness of name is supported by the statutory history. . . ."); *Mass. Mut. Life Ins. Co. v. Mass. Life Ins. Co.*, 356 Mass. 287, 294 (1969) (holding that "Massachusetts Mutual Life Insurance Company" was protectible from dilution by "Massachusetts Life Insurance Company"); *Food Fair Stores, Inc. v. Food Fair, Inc.*, 177 F.2d 177, 185 (1st Cir. 1949) (holding that "Food Fair" had acquired secondary meaning and was therefore protectible under the Massachusetts Anti-Dilution Act); *Tiffany & Co. v. Boston Club, Inc.*, 231 F. Supp. 836 (D. Mass. 1964) (holding common name "Tiffany's" entitled to protection under state dilution statute).  *See also Pignons S.A. v. Polaroid Corp.*, 657 F.2d 482, 494 (1st Cir. 1981) (citing *Food Fair*; *Great Scott*; and *Skil*).

c.     With respect to likelihood of dilution, there are three ways to prove this element of Life is good's dilution claim:

> (a) injury to the value of the mark caused by actual or potential customer confusion, (b) injury resulting from use of the mark in a way that detracts from, draws on, or otherwise appropriates the goodwill and reputation

43

associated with plaintiff's mark, or [c] diminution in the uniqueness and individuality of plaintiff's mark.

*Astra* Pharmaceutical *Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209 (1st Cir. 1983). Life is good does not intend to offer evidence under prong (b).

i.    With respect to prong (a), unlike the Lanham Act, under which direct competition between the parties is ordinarily correlated to likelihood of confusion, *see, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 212, 818 (1st Cir. 1987), the Massachusetts Anti-Dilution Act makes likelihood of dilution actionable "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Mass. Gen. Laws. Ch. 110B, § 12. Thus, potential customer confusion can be established even where the parties do not compete and even where the potential confusion is not over the source of the respective parties' goods. *Cf.* 15 U.S.C. § 1125(d)(1)(A) (imposes liability for registering, trafficking in, or using a domain name that is "confusingly similar to [a] mark" but instructs that the likelihood of confusion determination is to be made "without regard to the goods or services of the parties. . . ."). *See, e.g., Great Scott*, 348 Mass. 324-25 (finding likely dilution notwithstanding fact that parties were not in direct competition due to different territories of business) (citations omitted); *Libby, McNeill & Libby v. Libby*, 103 F. Supp. 968, 970 (D. Mass. 1952) (finding "that the general public might be led to believe that [plaintiff] was the owner or operator of defendants' super market or that there was some connection between the two concerns" even though defendant was in meat packing business and noting that Massachusetts Anti-Dilution Act does not require direct competition).

ii.   With respect to prong (c)[1], Life is good will show that LG's use of "Life's Good" will diminish the distinctive quality of the "Life is good" mark by causing consumers to form multiple associations with this mark, thereby gradually watering down the "Life is good" mark and eroding its selling power. *See* 4 LOUIS ALTMAN, CALLMAN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 22:13, 22-141 to 22-142 (4th ed. 2004) (emphasis in original) ("Dilution . . . is a cancer which, if allowed to spread, will ***slowly*** destroy the advertising value of a mark."); *Wedgewood*

---

[1] Prong (b) is irrelevant as Life is good is not pursuing a tarnishment theory.

*Homes, Inc. v. Lund*, 659 P.2d 377, 382 (Or. 1983) (holding that junior party's use of senior party's mark on products unrelated to those of senior party "broadens the associations linking name and product in the minds of consumers of plaintiff's product and diminishes the specific association plaintiff seeks to foster").

d.    The First Circuit has articulated this prong of dilution under the Massachusetts statute as "diminution in the uniqueness and individuality of the plaintiff's mark resulting from the defendant's use of a similar mark." *Pignons*, 657 F.2d at 495 (citations omitted). As discussed more fully in Life is good's summary judgment papers, the word "unique" in the *Pignons* formulation does not mean "sole" or "one of a kind"—which would result in limiting protection to marks that are coined or made up words like "Kodak." "Unique" has a more flexible and relative meaning.

i.    Many authors of usage guides, editors, teachers, and others feel strongly that such 'absolute' words as . . . UNIQUE cannot be compared because of their 'meaning': a word that denotes an absolute condition cannot be described as denoting more or less than that absolute condition. However, all such words have undergone semantic development and are used in a number of senses, some of which can be compared by words like *more*, *very*, *most*, *absolutely*, *somewhat*, and *totally* and some of which cannot.

. . . . By the mid-19[th] century UNIQUE had developed a wider meaning, 'not typical, unusual,' and it is in this wider sense that it is compared: *The foliate on the late-blooming plants is more unique than that on the earlier varieties*. The comparison of so-called absolutes in senses that are not absolute is standard in all varieties of speech and writing.

STUART B. FLEXNER & LEONORE C. *Hauck*, RANDOM HOUSE UNABRIDGED DICTIONARY 2074 (2d ed. 1993) (emphasis in original).

3.    Evidentiary Issues

See motions in limine identified above.

B.    LG's Issues

1.    Plaintiff's Federal Trademark Infringement Claims

45

Whether Defendants' use of "Life's Good" as a corporate tagline used in the advertising and promotion of consumer electronics and appliances infringes Plaintiff's alleged trademark rights in "Life is good." for clothing, hats, and related accessories under Sections 32 or 43(a) of the Lanham Act, 15 U.S.C. § 1114, 1125(a). The test for trademark infringement under Section 32 and Section 43(a) is whether an appreciable number of ordinarily prudent purchasers are likely to be misled or confused as to the source of the goods in question,[2] as determined by weighing the following eight factors:[3] (1) the strength of the plaintiff's mark;[4] (2) the similarity of the marks;[5] (3) the similarity of the goods;[6] (4) the relationship between the parties' channels of trade; (5) the relationship between the parties' advertising; (6) the classes of prospective purchasers;[7] (7) evidence of actual confusion; and (8) the defendant's intent in adopting its mark.

---

[2] Pump, Inc. v. Collins Mgmt., Inc., 746 F. Supp. 1159, 1165 (D. Mass. 1990) (Young, J.); Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996); Pignons S. A. de Mecanique de Precision v. Polaroid Corp., 498 F. Supp. 805, 810 (D. Mass. 1980), aff'd 657 F.2d 482 (1st Cir. 1981).

[3] Pignons S.A. v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981). No one factor is necessarily determinative, and each should be considered. Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1204 (1st Cir. 1983).

[4] Where the mark is a common word or phrase, protection will necessarily be limited. ITT Corp. v. Xtra Corp., 1985 U.S. Dist. LEXIS 23332, at *30 (D. Mass. Jan. 17, 1985). As reasoned by this Court, "there is a strong policy that grants marks derived from common or descriptive terms particularly limited protection." Id.

[5] Where two otherwise similar marks are used in different contexts, and one mark is accompanied by a well-known house mark, the likelihood of confusion is generally minimized. Pump, 746 F. Supp. at 1167-68; Pignons, 657 F.2d at 487, 494-95 (citing cases); see also Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 503 (2d Cir. 1996) ("[A]n inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves… [T]he setting in which a designation is used affects its appearance and colors the impression conveyed by it") (internal quotations and citations omitted); Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 79 U.S.P.Q.2d 1138, 1141 (S.D.N.Y. 2005) (in examining the similarity of the marks, "the Court must also assess the terms in context, and consider the fashion in which a consumer is likely to encounter the terms").

[6] Significant differences between the types and prices of the parties' products guard against any likelihood of confusion. See Pignons, 498 F. Supp. at 811, n.8 (noting that "price differential itself has been acknowledged by the First Circuit as a factor to consider in determining the likelihood of confusion," and holding that substantial differences in the price, features, and appearance of the parties' cameras "serve to vitiate any confusion one might otherwise expect"). Moreover, a defendant's use of a mark on promotional items related to the plaintiff's goods does not make the parties' goods competitive. King of the Mt. Sports, Inc. v. Chrysler Corp., 968 F. Supp. 568, 574 (D. Colo. 1997) ("[T]he clothing on which defendants placed their logo was not sold; it was given away as promotional items, and, therefore, does not compete even in a broad sense with plaintiff's clothing.").

[7] This Court has recognized that "the likelihood of confusion diminishes where the ordinary consumer of a particular

Defendants contend there is no likelihood of confusion because of the commercial weakness of Plaintiff's mark; the differences between the parties' marks and the context of the commercial presentation of the marks; the dissimilarity and unrelated nature between the parties' goods; the differences between the channels of trade, advertising, and purchasers; the level of care exercised by purchasers of Defendants' admittedly expensive products; the absence of any actual confusion (or the presence of only de minimis confusion); and Defendants' good faith in adopting and using "Life's Good."

### 2.    Plaintiff's State Trademark Infringement Claims

Whether Defendants' use of "Life's Good" as a corporate tagline used in the advertising and promotion of consumer electronics infringes Plaintiff's alleged trademark rights in "Life is good." for clothing, hats, and related accessories under the Massachusetts Consumer Protection Act or Massachusetts common law.  The test for unfair competition under Massachusetts common law and for violation of Massachusetts' Consumer Protection Act, Mass. Laws Ann. ch. 93A, §2 & 11, is essentially the same as for trademark infringement under Lanham Act Section 43(a):  likelihood of confusion.[8]

### 3.    Plaintiff's Massachusetts Trademark Dilution Claim

---

product can be expected to exercise a greater degree of care in purchasing that product."  Pignons, 498 F. Supp. at 812.  This is particularly true in cases involving what the First Circuit describes as expensive, "single purchase" items.  Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 194 (1st Cir. 1980) ("The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine.").  There is less likelihood of confusion where goods are expensive and purchased after careful consideration.  Pignons, 657 F.2d at 489 (citing cases).

[8] Open Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 17 (1st Cir. 2002); Coca-Cola Co. v. Snow Crest Beverages, Inc., 162 F.2d 280, 283 (1st Cir. 1947); National Nonwovens, Inc. v. Consumer Prods. Enters., Inc., 397 F. Supp. 2d 245, 259 (D. Mass. 2005).

Whether Defendants' use of "Life's Good" dilutes Plaintiff's alleged rights in "Life is good." under the Massachusetts Anti-Dilution Act, M.G.L., ch. 110B, § 12. The test for dilution under the Massachusetts Anti-Dilution Act is (1) whether "Life is good." is "distinctive" as a trademark and (2) whether Defendant's use of "Life's Good" creates a "likelihood of dilution" of the distinctive quality of the Plaintiff's mark.[9] Issues of law on these two prongs are:

        (a)    <u>Distinctiveness</u>

Whether "Life is good." is distinctive *as a trademark* that identifies Plaintiff. Defendants contend that the Massachusetts Anti-Dilution Act protects only the strongest, most distinctive trademarks, namely, marks that have become synonymous with the plaintiff in the minds of consumers.[10] Defendants also contend that common expressions like "life is good" are inherently diluted as trademarks because the have their own common language meaning.[11] Defendants further contend that expressions like "life is good" that are frequently used by others are weak trademarks because they are associated with many users.[12] Defendants contend that

---

[9] <u>Pignons</u>, 657 F.2d at 493-94; <u>Astra</u>, 718 F.2d at 1209; <u>Visa Service, Inc. v. State Street Bank & Trust Co.</u>, 1980 U.S. Dist. LEXIS 11620, at *31 (D. Mass. 1980).

[10] <u>I.P. Lund Trading ApS v. Kohler Co.</u>, 163 F.3d 27, 47 (1st Cir. 1998); <u>ITT Corp. v. XTRA Corp.</u>, 1985 U.S. Dist. LEXIS 23332, at *40 (D. Mass. 1985) (Act protects only "the strongest" marks); <u>Visa Service</u>, 1980 U.S. Dist. LEXIS 11620, at *31; <u>Esquire, Inc. v. Esquire Slipper Mfg. Co.</u>, 243 F.2d 540, 544 (1st Cir. 1957) (Act does <u>not</u> apply "no matter how weak the plaintiff's mark may be" to protect "whatever distinctive quality the plaintiff's mark may have"). <u>See also</u> Transcript of June 15, 2006 Hearing on Defs.' Mot. for Summary Judgment 5:1-15; <u>Hasbro v. Clue Computing</u>, 66 F. Supp. 2d 117, 132-137 (D. Mass. 1999) (noting that the federal dilution standard requires proof that a mark is "famous"), <u>aff'd</u>, 232 F.3d 1 (1st Cir. 2000).

[11] <u>Esquire</u>, 243 F.2d at 543 (where a party adopts a common word or phrase as its trademark, it chooses a mark that is *already* diluted); <u>ITT</u>, 1985 U.S. Dist. LEXIS 23332, at *30 (same).

[12] <u>S.S. Kresge Co. v. United Factory Outlet, Inc.</u>, 598 F.2d 694, 697 (1st Cir. 1979) ("mart" is a weak trademark given evidence of third-party trademark and corporate registrations using that term); <u>Astra Pharm. Products, Inc. v. Beckman Instruments</u>, 1983 U.S. Dist. LEXIS 18289, at *11, 14 (D. Mass. 1983), <u>aff'd</u> 718 F.2d 1201 (1st Cir. 1983) (evidence of over 200 occurrences of the word "Astra" demonstrates that it "is far from a unique mark"); <u>Church of the Larger Fellowship</u>, 1983 U.S. Dist. LEXIS 15855, at *17, 20 ("Use by several other concerns . . . weakens the mark.").

Plaintiff's mark is not distinctive under this standard; and that, as such, Plaintiff cannot meet the first prong under the Massachusetts Anti-Dilution Act.

(b)    Likelihood of Dilution

Whether Defendants' use of "Life's Good" is likely to dilute the distinctive quality of "Life is good." *as a* trademark that identifies Plaintiff.  The First Circuit has recognized three situations that give rise to a likelihood of dilution, two of which Plaintiff asserts:  (1) dilution by "confusion"; and (2) dilution by "blurring."[13]

(i)    Likelihood of Dilution by "Blurring"

A claim of dilution by "blurring" is predicated on showing that a mark is so distinctive and unique that it identifies *one* and *only one* company.  "Blurring" occurs when the defendant's use of the plaintiff's mark "causes the public no longer to think *only* of the plaintiff's product" upon seeing the mark.14  Defendants contend that common phrases like "life is good" are inherently blurred as trademarks because they already have common ordinary meaning.[15]  The "supposed incremental harm" caused by a defendant's use of "a commonplace word, widely associated with many situations and products" is not cognizable under the Massachusetts Anti-Dilution Act.[16]  Defendants contend that "Life is good.", as a trademark, does not uniquely identify Plaintiff

---

[13] See Pignons, 657 F.2d at 494-495; Hasbro, 66 F. Supp. 2d at 134-136.

[14] Hasbro, 66 F. Supp. 2d at 134 (emphasis added); see Tiffany & Co. v. Boston Club, Inc., 231 F. Supp. 836, 844 (D. Mass. 1964) (blurring is the "erosion of the public's identification of [a] very strong mark with the plaintiff alone."); I.P. Lund, 163 F.3d at 48 (blurring is "the gradual whittling away" of the mark's ability to identify a single company as a result of others' use of the mark).

[15] Esquire, 243 F.2d at 543 (a party that adopts a common phrase with "built-in" commercial appeal as its trademark chooses a mark that is *already* diluted); Pignons, 657 F.2d at 495 (dilution is *inherent* in a trademark that is "a commonplace word, widely associated with many situations and products"); ITT, 1985 U.S. Dist. LEXIS 23332, at *31 (a party cannot "pluck a word with favorable connotations out of the general vocabulary and appropriate it to his exclusive use, no matter how much effort and money he may expend in the attempt"); Visa Service, 1980 U.S. Dist. LEXIS 11620, at *26 (same); ITT, 1985 U.S. Dist. LEXIS 23332, at *31 (same).

alone, that it is inherently "blurred," and that the incremental "blurring" it alleges as a result of Defendants' use of "Life's Good" is not cognizable under the established precedents.

     (i)  Likelihood of Dilution by "Confusion"

To establish "dilution by confusion," this Court uses the same analysis used to establish a likelihood of confusion under federal trademark infringement.[17]  Defendants contend that, under the authorities governing the Court's trademark infringement analysis discussed above, Defendants' use of "Life's Good" is not likely to cause confusion.

   4.  Defendants' Affirmative Defenses and Counterclaims

    a.  Protectability of "Life is good."

   Whether Plaintiff's alleged "Life is good." mark is protectable as a trademark.

Defendants contend that "Life is good." is such a common phrase that it does not function as a trademark; that Plaintiff uses its alleged "Life is good." mark in an ornamental and/or functional manner to adorn its products and not as a trademark; and that, as such, Plaintiff's registrations for "Life is good." should be cancelled under 15 U.S.C. § 1064 and Plaintiff's applications to register "Life is good." should be refused.

    b.  Fraud on the PTO

   Whether Plaintiff committed fraud on the United States Patent and Trademark Office in prosecuting various trademark applications.  Defendants contend that Plaintiff committed fraud

---

[16] Pignons, 657 F.2d at 495.

[17] See Hasbro, 66 F.Supp.2d at 122; Infinity Broad. Corp. v. Great Boston Radio, 1993 U.S. Dist LEXIS 12284, *37 (D. Mass. 1993); Pignons, 657 F.2d at 489; Astra, 1983 U.S. Dist. LEXIS 18289, at *5; see also Black Dog Tavern Co. Inc. v. J. Peter Hall, 823 F.Supp. 48, 59 (D. Mass. 1993) (a finding of no likelihood of confusion precludes consideration of dilution by confusion); PPG Industries Inc., 620 F.Supp. at 606 (same); Church of the Larger

on the PTO by identifying incorrect first use dates in its applications to register "Life is good." and/or the Jake Logo and by stating that the marks were used on various goods, when they were not.  As such, Defendants contend that the registrations in question should be cancelled.[18]  The Trademark Office's test for determining whether fraud has been committed is whether a party knew *or should have known* that statements made to the Trademark Office were false.[19]

c.     Plaintiff's Unclean Hands Based on its Misuse of "®" Symbol

Whether Plaintiff misused the statutory trademark registration symbol "®" in public materials such that Plaintiff should now be barred from seeking equitable relief by virtue of its unclean hands.  Defendants contend that Plaintiff misused the "®" symbol to indicate that "Life is good." was or is registered for products for which Plaintiff did or does not have registrations and that, as such, Plaintiff has come into this Court with unclean hands and should be barred from obtaining injunctive relief.[20]

d.     Abandonment of "Life's good."

Whether Plaintiff abandoned its alleged "Life is good." mark by not policing the mark. Defendants contend that Plaintiff abandoned its alleged "Life is good." mark by not enforcing its

---

Fellowship, 1983 U.S. Dist. LEXIS 15855, at *19 (same).

[18] 15 U.S.C. § 1064(3) (providing that a trademark registration may be cancelled at any time if the registered mark was "obtained fraudulently").

[19] Medinol Ltd. v. Neuro Vasx Inc., 67 U.S.P.Q.2d 1205, 1208-10 (TTAB 2003) ("A trademark applicant commits fraud in procuring a registration when it makes material representations of fact in its declaration which it knows or should know to be false or misleading… If fraud can be shown in the procurement of a registration, the entire resulting registration is void… the appropriate inquiry is not into the registrant's subjective intent, but rather into the objective manifestations of that intent."); Universal Nutrition Corp. v. Carbolite Foods, Inc., 325 F. Supp. 2d 526, 531 (D.N.J. 2004) (adopting Medinol standard).

[20] Fox-Stanley Photo Prods., Inc. v. Otaguro, 339 F. Supp. 1293, 1295 (D. Mass. 1972) ("It is a familiar principle of equity that a party seeking injunctive relief must come into court with clean hands, and I rule that the illegal use of this trademark [registration symbol] by plaintiff by and of itself is a violation of the clean hands doctrine of such a serious magnitude as to disqualify plaintiff from obtaining injunctive relief in this court.").

51

alleged rights against similar uses of "Life is good." by numerous third parties and that, as such,

plaintiff's registrations should be cancelled under 15 U.S.C. § 1064.

> e.    Plaintiff's Unclean Hands Based on its Overzealous Enforcement Efforts to Prevent Third Parties' Lawful Fair Use of "Life is good" as a Common Expression

Whether Plaintiff has come into this Court with unclean hands by having overzealously

enforced its trademark registrations for "Life is good." against lawful non-trademark fair uses of

"life is good" as a message or expression.  Defendants contend that Plaintiff improperly enforced

its alleged "Life is good." mark against lawful fair uses, and/or ornamental or decorative uses of

"Life is good." or similar phrases and that, as such, the scope of Plaintiff's "trademark" rights

should be equitably restricted and any equitable injunctive relief denied.[21]

VII.    Amendments to Pleadings

None.

VIII.    Additional Matters

1.    Electronic presentation of evidence.

---

[21] Under the precedent of this circuit, a district court has wide discretion in deciding whether to bar recovery based upon a plaintiff's alleged "unclean hands."  K Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 912 (1st Cir. 1989)(citing Codex Corp. v. Milgo Elec. Corp., 717 F.2d 622, 633 (1st Cir. 1983)); see also  Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands."); see also 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:46 (4th ed. 2006) (explaining that courts have found unclean hands "when such standards as the following are violated: 'justice, good faith, uprightness, fairness and conscientiousness'; 'conscience, good faith or other equitable principle'; or 'public policy.'") (citations omitted).  The Supreme Court has explained that the doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  Precision Instrument Mfg. Co. v. Auto. Maint.

2.      Potential use of summaries per Fed. R. Evid. 1006.

3.      The Court's treatment of documents designated by the parties as "Confidential" or "Highly Confidential."

4.      Potential for interim commentary by counsel on the evidence.

5.      Use of demonstrative evidence.

6.      The parties stipulate that they will not object to the introduction of each others' trademark file histories as trial exhibits on the ground that the files histories are not certified.

7.      The parties stipulate that they will not object to the introduction of each others' documents as trial exhibits on grounds of lack of authenticity, but reserve the right to object to the introduction of each other's documents on other grounds.

8.      The parties stipulate that they have no objection to the deposition of any witness identified as a witness or potential witness not previously deposed.

9.      The parties will exchange demonstrative exhibits prior to their use of the exhibits at trial.

## IX.    Length of Trial

The parties estimate 10-12 days for the trial of this case.

## X.    Witnesses

### A.    Plaintiff's Witnesses

#### 1. Life is Good Employees

1. Albert Jacobs
2. John Jacobs
3. Roy Heffernan
4. Corrie Sorin
5. Richard Cremin
6. Shawn White
7. Kat McGurdy

---

Mach. Co., 324 U.S. 806 (1945).

    8. Michael Savourin

    9. Chad Tardugno

2. <u>Life is Good Affiliated Witnesses</u>

    1. Carol Scully

    2. Susan DeMarco

    3. Lisa Labarre

    4. Audrey Curtis

    5. Lisa Zahra

    6. Rick Super

    7. Sal, owner, Shaw's Country Store, Stowe, VT

    8. Gary Peck

    9. Kathleen White

    10. D. Page Bradham

3. <u>Third Parties</u>

    1. Lawrence McCray

    2. Carol Brown

    3. Dawn Gray

    4. Rick Horvatic

    5. Karen Lynch

    6. Janice Frank

    7. Daniel Pednault

    8. Michael Larson

    9. Steven B. Hoffman

    10. Alan Taschner

    11. Frempong Kankam

    12. David Bagatelle

    13. Daniel Eng

4. <u>LG Employees</u>

    1. Jason Lee

    2. John Taylor

    3. John Maron

    4. Mark Holman

    5. Niels Aillaud

    6. Cklio (Yunseob) Lee

5. <u>Counsel for Life is good</u>

1. Tom Kenney
2. Karen Oliver

6. <u>Expert</u>

1. Robert Klein

B.    <u>Defendant's Witnesses</u>

1.    John I. Taylor
      Vice President, Public Affairs & Communications
      LG Electronics USA, Inc.
      2000 Millbrook Drive
      Lincolnshire, Illinois 60069

      Purpose of testimony:  Factual

2.    Jason Lee
      Senior Marketing Director
      LG Electronics MobileComm U.S.A., Inc.
      10101 Old Grove Road
      San Diego, California  92131

      Purpose of testimony:  Factual

3.    Jon Maron
      LG Electronics MobileComm U.S.A., Inc.
      10101 Old Grove Road
      San Diego, California  92131

      Purpose of testimony:  Factual[22]

4.    Ronald R. Butters
      Department of English
      314 Allen Building
      Duke University
      Box 90015
      Durham, North Carolina  27708-0015

---

[22] Mr. Maron will testify if Mr. Lee is not available.

Purpose of testimony:  Expert

5.    Robert N. Reitter
Guideline Research Corporation
625 Avenue of the Americas
New York, New York  10011

Purpose of testimony:  Expert

6.    Maureen Morrin
Market Analytix, LLC
102 Summit Lane
Bala Cynwyd, Pennsylvania  19004

Purpose of testimony:  Expert

7.    Rany Simms
12138 Brantleigh Place
Fairfax Station, Virginia  22039-1203

Purpose of testimony:  Expert

8.    Albert A. Jacobs
Life is Good, Inc.
745 Boylston Street, Suite 400
Boston, Massachusetts  02116

Purpose of testimony:  Factual

9.    John Jacobs
Life is Good, Inc.
745 Boylston Street, Suite 400
Boston, Massachusetts  02116

Purpose of testimony:  Factual

10.    Robert L. Klein
Applied Marketing Science, Inc.
303 Wyman Stree, Suite 205
Waltham, Massachusetts  02451

Purpose of testimony:  Expert

11.     Thomas E. Kenney
        Pierce & Mandell, P.C.
        11 Beacon Street, Suite 800
        Boston, Massachusetts  02108

        Purpose of testimony:  Factual

12.     The person at Meredith who is most knowledgeable about the survey
        related to LIGI's book concept.

13.     The person at LIGI most knowledgeable about the survey.

14.     Mark Holman

15.     Niels Aillaud

16.     Finnegan Henderson paralegal

17.     Dana Nicoletti

18.     Susannah Klank and/or Dana Nicoletti

XI.    <u>Exhibits</u>

    A.    <u>Plaintiff's Exhibits</u>

        Attached as Exhibit A hereto.

    B.    <u>Defendant's Exhibits</u>

        Attached as Exhibit B hereto.

Respectfully submitted,

<u>/s/Robert L. Kirby, Jr.</u>
Robert L. Kirby, Jr. (BBO#550538)
Mark D. Robins (BBO#559933)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 021110
(617) 345-1000

Robert R. Pierce (BBO#549172)
Thomas E. Kenney (BBO#561590)
PIERCE & MANDELL, P.C.
11 Beacon Street, Suite 800
Boston, MA 02108
(617) 720-2444

<u>/s/ Mark Sommers</u>
Mark Sommers (MA BBO#545297)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, DC  20001
Telephone:  202-408-4000
Facsimile:  202-408-4400