## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIFE IS GOOD, INC., <br><br>     Plaintiff, <br><br>   v. <br><br> LG ELECTRONICS U.S.A., INC., and <br> LG ELECTRONICS MOBILECOMM U.S.A., <br> INC., (formerly LG INFOCOMM U.S.A., INC.) <br><br>     Defendants. | Civil Action No. 04 11290 WGY <br><br> Hon. William G. Young |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE
## TO STRIKE THE SURVEY OF PLAINTIFF'S EXPERT ROBERT KLEIN

Lawrence R. Robins
Jonathan M. Gelchinsky
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
55 Cambridge Parkway
Cambridge, Massachusetts  02142

Mark Sommers
Douglas A. Rettew
Timothy A. Lemper
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, DC  20001

Counsel for Defendants
LG Electronics U.S.A., Inc. and
LG Electronics MobileComm U.S.A., Inc.

## TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.    RELEVANT FACTUAL BACKGROUND ................................................................ 2

       A.     The Design of the Klein Survey ............................................................... 2

       B.     The Execution of the Klein Survey .......................................................... 5

              1.     The Exhibit Rotation and Compensation Problems ................................... 5

              2.     The Bad Skip Pattern Problems ........................................................ 6

              3.     The Falsification Problem ............................................................. 7

              4.     The Validation Problems ............................................................... 7

              5.     The Unprecedented Nature of the Errors in the Klein Survey ................. 7

III.   ARGUMENT ............................................................................................... 8

       A.     The Standard of Admissibility for Expert Testimony ........................................... 8

       B.     The Standard of Admissibility for Trademark Confusion Survey Evidence .......... 8

       C.     The Klein Survey Is So Flawed that Its Results Are Irrelevant, Unreliable, and
              Should Be Excluded Under Rule 702 .................................................................. 9

              1.     The Klein Survey Was an Artificial Guessing Game Divorced from
                     Marketplace Realities ............................................................... 10

              2.     The Klein Survey Had No Defined Universe ........................................... 14

              3.     The Execution of the Klein Survey Was Plagued With Numerous
                     Errors in Multiple Locations ........................................................ 17

       D.     The Klein Survey Should be Excluded Under Fed. R. Evid. 401, 402, and 403 .. 18

IV.    CONCLUSION ............................................................................................. 19

V.     LOCAL RULE 7.1 CERTIFICATION ................................................................ 19

# TABLE OF AUTHORITIES

## CASES

Am. Footwear Corp. v. General Footwear Co.,
609 F.2d 655 (2d Cir. 1979) ....................................................... 11

American Luggage Works, Inc. v. U.S. Trunk Co.,
158 F. Supp. 50 (D. Mass. 1957) ......................................... 11, 13, 15

Amstar Corp. v. Domino's Pizza, Inc.,
615 F.2d 252 (5th Cir. 1980), cert. denied, 449 U.S. 899 (1980) .................... 14

Arche, Inc. v. Azaleia, U.S.A., Inc.,
882 F. Supp. 334 (S.D.N.Y. 1995) ...................................... 9, 16, 17

Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,
533 F. Supp. 75 (S.D. Fla. 1981) ................................................. 17

Calamari Fisheries v. Village Catch,
698 F. Supp. 994 (D. Mass. 1988) ............................................... 11

Daubert v. Merrill Dow Pharmaceuticals,
509 U.S. 579 (1993)................................................................ 8

DeCosta v. Viacom Int'l, Inc.,
981 F.2d 602 (1st Cir. 1992) .................................................... 14

Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.,
1999 U.S. App. LEXIS 19942 (4th Cir. Aug. 20, 1999)................................ 15

Dreyfus Fund, Inc. v. Royal Bank of Canada,
525 F. Supp. 1108 (S.D.N.Y. 1981)............................................... 17

Jaret Int'l, Inc. v. Promotion in Motion, Inc.,
826 F. Supp. 69 (E.D.N.Y. 1993) ............................................... 12

Juicy Couture, Inc. v. L'Oreal USA, Inc.,
2006 U.S. Dist. LEXIS 20787 (S.D.N.Y. Apr. 19, 2006).............................. 11

Kumho Tire v. Carmichael,
526 U.S. 137 (1999)................................................................ 8

M2 Software, Inc. v. Madacy Entm't,
421 F.3d 1073 (9th Cir. 2005) ..................................................... 9

Mennen Co. v. Gillette Co.,
565 F. Supp. 648 (S.D.N.Y. 1983) ............................................... 12

NFL Properties, Inc. v. ProStyle, Inc.,
57 F. Supp. 2d 665 (E.D. Wis. 1999).............................................. 12

Paco Sport, Ltd. v. Paco Rabanne Parfums,
86 F. Supp. 2d 305 (S.D.N.Y. 2000).............................................. 14

Pilot Corp. v. Fisher Price, Inc.,
    344 F. Supp. 2d 349 (D. Conn. 2004) ................................................... 11, 12

Pump, Inc. v. Collins Mgmt., Inc.,
    746 F. Supp. 1159 (D. Mass. 1990) ........................................................... 14

Scott Fetzer Co. v. House of Vacuums, Inc.,
    381 F.3d 477 (5th Cir. 2004) ...................................................................... 8

Simon Prop. Group L.P. v. mySimon, Inc.,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ................................................... 9, 18

Starter Corp. v. Converse, Inc.,
    170 F.3d 286 (2d Cir. 1999) ...................................................................... 19

Stop & Shop Supermarket Co. v. Big Y Foods, Inc.,
    943 F. Supp. 120 (D. Mass. 1996) .............................................................. 11

Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,
    559 F. Supp. 1189 (E.D.N.Y. 1983) ........................................................... 17

Troublé v. Wet Seal, Inc.,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001) ................................................ 10, 11, 16

Weight Watchers Int'l, Inc. v. Stouffer Corp.,
    744 F. Supp. 1259 (S.D.N.Y. 1990) ........................................................... 15

Winning Ways, Inc. v. Holloway Sportswear, Inc.,
    913 F. Supp. 1454 (D. Kan. 1996) ............................................................. 16

## OTHER AUTHORITIES

Federal Judicial Center, Manual For Complex Litigation § 11.493 (4th ed. 2004) ...................... 9

## RULES

Fed. R. Evid. 401 .................................................................................................... 18

Fed. R. Evid. 402 .................................................................................................... 18

Fed. R. Evid. 403 .................................................................................................... 18

Fed. R. Evid. 702 ...................................................................................................... 8

## TREATISES

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
    (4th ed. 2006) ................................................................................. passim

Louis Altman, Callmann on Unfair Competition, Trademarks and Monopolies
    (4th ed. 2003) ....................................................................................... 10

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Life is good, Inc. retained Mr. Robert Klein to conduct a consumer survey, which Plaintiff offers to support its claim that an appreciable number of reasonable consumers are likely to confuse Plaintiff's use of "Life is good." for T-shirts, clothing, and accessories with Defendants' use of "Life's Good" as the corporate tagline for their sophisticated electronic products, including digital appliances, flat-screen and plasma televisions, DVDs/VCRs, computer equipment, and cellular telephones.

The Klein survey should be excluded because it suffers from several fundamental flaws and fails to comply with accepted principles designed to guarantee the trustworthiness of survey evidence in trademark cases.  The survey's infirmities render its conclusions meaningless to the issues in this case.

First, the Klein survey violates the basic requirement that a survey replicate marketplace realities.  Respondents were shown two sheets of papers, each with a dimensionally distorted blow up of Plaintiff's or Defendants' logo.  The logos were shown without any context as to their use:  Plaintiff's logo was not shown as used on its T-shirts or apparel, and Defendants' logo was not shown as used in advertisements or promotions for their consumer electronics.  Respondents were never told anything about how the logos are actually used, including how they appear or the products with which they are used.  For all respondents knew, the logos could have been used on the exact same product.  As such, the Klein survey amounts to nothing more than an artificial guessing game.

Without marketplace context, the results of the Klein survey are irrelevant, as this Court must determine the likelihood of confusion by considering the conditions under which, and the products with which, the parties' marks are used.  For this reason, this Court and other courts have excluded surveys that do not show marks as used by the parties, even in cases where the

survey made at least some (albeit insufficient) effort to replicate the marketplace (something Mr. Klein did not attempt to do in his survey).

Second, the Klein survey opened participation to all adults above the age of 18 (mirroring only general census data), ignoring the requirement that a survey be limited to purchasers and prospective purchasers of the types of products sold by the parties. Mr. Klein admitted in his deposition that he did not know whether any of the respondents in his survey had purchased or intended to purchase any of the types of products made by the parties.

Third, in addition to these design flaws, something went seriously wrong in the execution of the Klein survey, resulting in systematic errors that render the results unreliable and untrustworthy. A total *123* interviews—more than 20% of the original sample size—had to be discarded because of a variety of errors. In one instance, interviews from an entire location (Ft. Lauderdale, Florida) had to be excluded. In another, an interviewer in San Francisco was found to have apparently falsified results. Other interviewer errors occurred in multiple locations. Mr. Klein attributed these numerous and far reaching problems to "a really bad job of laying out the [survey's] questionnaire." The magnitude of the resulting errors is unprecedented. In his 35 years of experience, Mr. Klein *has never seen or even heard of this many errors in a survey*. Nor has Defendants' expert Dr. Maureen Morrin. As she explains, these errors likely account for the statistically significant variations between markets that appeared in the survey's results.

Any one of these flaws alone is enough to warrant exclusion of the survey. Taken together, they compel exclusion.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    The Design of the Klein Survey

Plaintiff hired Mr. Robert Klein of Applied Marketing Science, Inc. to conduct a survey to measure the likelihood "that consumers who see [Defendants'] LG trademark in conjunction

with the slogan 'Life's Good' will be confused and believe that [Plaintiff] and [Defendants] are either the same company or are affiliated in some way" and to provide a report of the survey and its results (the "Klein Survey" and "Klein Report").  (Lemper Decl. Ex. 1, Klein Report 2).

Mr. Klein first conducted a "pretest" to explore people's awareness of various slogans, including "Life is good.", and to test ways of showing people products.  (Lemper Decl. Ex. 2, Klein Dep. 89:10-90:4.)  Respondents were asked what they associated with certain slogans, then were presented with the parties' logos, one at a time, and asked their belief about the relationship between the logos.  (Lemper Decl. Ex. 3, Klein Dep. Ex 83.)  They were then debriefed about their knowledge of the parties, their products, and their logos; and about their reactions to the logos side by side, to just the words "Life is good" and "Life's Good," and to the controls.  (Id.)

The survey ultimately used by Mr. Klein differed markedly from the pretest.[1]  In the Klein survey, respondents were approached while walking through one of nine shopping malls across the United States, and were asked a series of "screener" questions.  (Lemper Decl. Ex. 1, Klein Report 3-4.)  They were offered five dollars as an incentive to participate in the survey.  (Id. at 4.)  To qualify, respondents had to be 18 or older and not employed by an advertising agency, a market research company, or a store at the mall.  (Id. at 4 & Appx. 4.)  Respondents were *never* asked if they had bought or intended to buy the types of products sold by the parties.

Qualified respondents were grouped into either a "test cell" or a "control cell" and were taken to a separate interview area where the survey was administered.  (Id.)  After being asked a series of "warm up" questions, respondents in the test cell were shown the following renderings of the parties' logos, each in color and blown up on a sheet of paper without any indication of the

---

[1]  Because the pretest was designed differently than the Klein Survey and did not suffer the same flaws, Defendants do not challenge the admissibility of the pretest results.

type of products with which each logo is used:

     

(Id. at 3-4 & Appx. 2, 5.)  Respondents in the control cell were shown the same images, except

that the words "Life's Good" in Defendants' logo were replaced with the words "Lucky Gold."

(Id. at 4 & Appx. 2.)[2]

Respondents were told to look at the first "image" as long as they wished.  (Id. at 4.)

When they were done, they were told to return the sheet of paper to the interviewer and were

given a second sheet of paper with the second image, which they were again told to look at as

long as they wished.  (Id.)  Respondents were never given any indication of the products with

which the logos are used.  After they returned the second sheet of paper to the interviewer, the

respondents were asked the following question:

> Thinking about what you just viewed, do you believe that what you
> saw first and what you saw second come from the same company,
> different companies or do you not know or have no opinion.

(Id.)  Respondents who answered "same company" were asked:  "Why do you say that?"  (Id.)

Respondents who did *not* answer "same company" were asked a series of follow-up

questions to determine if they were or were not confused:

---

[2]  In a survey where marks are presented to measure confusion, proper controls are crucial to
account for systematic biases and random "background noise" (i.e., stray responses caused by
guessing and miscomprehension).  5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
Competition, § 32:187 (4th ed. 2006).  As Professor McCarthy explains, because "there will
always be some interviewees who are bored, hurried or just plain contrary," their responses
"must be filtered out through control questions."  Id.  As such, the results from the control cell
are subtracted from the test cell, as was done by Mr. Klein and by Defendants' survey expert,
Mr. Robert Reitter.

Which of the following statements best describes what you believe about what you viewed?

- What you saw first and what you saw second come from companies that <u>have</u> a business affiliation or connection.

- What you saw first and what you saw second come from companies that <u>do not have</u> a business affiliation or connection.

      or

- You don't know or have no opinion.

(Lemper Decl. Ex. 1, Klein Report 5.)

At *no* time during the interviews were respondents told the type of products for which the logos are used, i.e., that Plaintiff's logo is used in connection with T-shirts and apparel and that Defendants' logo is used by a company selling appliances, consumer electronics, and cell phones.

Mr. Klein reviewed the survey responses and totaled the percentage of respondents from the test and control cells that believed the images came from the "same company" or "companies that have a business connection or association." (<u>Id.</u> at 6.) That number was 27.3% in the test cell and 9.3% in the control cell. (<u>Id.</u>) Subtracting the percentage in the control cell from the test cell, Mr. Klein arrived at a confusion rate of 18%. (<u>Id.</u>) Based on these results, Mr. Klein concluded that "a substantial number of individuals are likely to be confused by [Defendants'] continued use of the slogan 'Life's Good' and to believe that [Plaintiff] and [Defendants] are either the same company or have a business affiliation or connection." (<u>Id.</u> at 7.)

B.    The Execution of the Klein Survey

Numerous problems arose with the execution of the Klein Survey. As a result, questionnaires from 123 respondents had to be discarded.

1.    The Exhibit Rotation and Compensation Problems

At the mall where the survey was conducted in Florida, there was a "significant deviation from the prescribed interview protocol." (Lemper Decl. Ex. 1, Klein Report 5.) Mr. Klein

testified that questionnaires from interviews in Florida were excluded due to "exhibit rotation errors," although he had no knowledge of the nature of the errors and no memory of hearing about them before his deposition.  (Lemper Decl. Ex. 2, Klein Dep. 188:2-15.)

In addition, there were errors in the manner in which respondents were compensated. When people were called back during the validation process, they indicated that they did not receive $5 for participating in the survey and were told that they had to come back for the payment.  (Lemper Decl. Ex. 2, Klein Dep. 183:2-16.)  The interviewing facility claimed they never received a check from Mr. Klein to pay respondents and that they did not have ample funds to cover the payments.  (Id. at 186: 9-17.)

The Florida interviews had to be discarded because it was clear that the interviewers did not follow directions.  The errors made Mr. Klein reluctant to rely on any of those interviews. As he explained:  "I mean, if they couldn't do that part right, we simply discarded all those questionnaires without reviewing them, although you have copies of them. . . .  We don't know what happened there.  But it was just such a screwy thing to happen that we felt better about throwing away the interviews than, you know, accepting what was at least, I'd say, a significant deviation from the protocol we specified."  (Id. at 183:14-15, 186:12-17.)

## 2.    The Bad Skip Pattern Problems

In several markets, interviewers failed to follow instructions regarding skip patterns.  (Id. 189:18-190:19.)  For example, if a respondent answered Question 3 by stating "different companies," the interviewer was instructed to skip to Question 4.  (Id.)  A "bad skip pattern" occurred when the interviewer disregarded this instruction and continued with the next question (e.g., Question 3A).  (Id.)  Because bad skip patterns evidenced the interviewers' failure to follow instructions, questionnaires with this error had to be discarded.  (Id.)

### 3.      The Falsification Problem

In San Francisco, 10 interviews had to be discarded because an interviewer "apparently falsified nine out of ten of the first interviews she did."  (Id. at 183:17-184:1.)  When contacted for validation, people claimed that they were never interviewed.  (Id. at 184:2-184:7.)

### 4.      The Validation Problems

In addition to the 10 falsified interviews in San Francisco, four additional interviews had to be excluded because they failed the validation procedure.  Those four interviews were from different locations (two interviews from Chicago, one from Dallas, and one from Des Moines). (Lemper Decl. Ex. 2, Klein Dep. 184:11-185:5.)

### 5.      The Unprecedented Nature of the Errors in the Klein Survey

In all, the errors in the survey—interviewer errors, validation failures, bad skip patterns, questionable interviews, site error—led Mr. Klein to discard 123 questionnaires, which represents over 20% of the total sample size.  (Lemper Decl. Ex. 5, Morrin Dep. 209:4-21, 213:12-214:10; Lemper Decl. Ex. 4, Morrin Report 13.)  Mr. Klein testified that he has never seen or heard of a survey with this many errors:

> Q.  Have you ever had this many problems in a survey?
>
> A.  No.
>
> Q.  Have you ever heard of there being this many problems in a survey?
>
> A.  No.

(Lemper Decl. Ex. 2, Klein Dep. 185:6-11.)  Like Klein, Defendants' expert, Dr. Maureen Morrin, has also never seen a survey where so many respondents were omitted based on errors. (Lemper Decl. Ex. 5, Morrin Dep. 214:11-16; Lemper Decl. Ex. 4, Morrin Report 13.)  When pressed to explain all of these errors, Mr. Klein noted that they likely resulted from a poorly designed survey questionnaire:

> We did a really bad job of laying out the questionnaire. I mean, it
> should have been much clearer to the interviewers that – where they
> went at each – at each stage. . . . It was – it was laid out in a way that
> was confusing to interviewers, and they – when they weren't able to
> follow the instructions, we didn't feel we could include those results
> that didn't follow the instructions, regardless of what the results were.

(Lemper Decl. Ex. 2, Klein Dep. 199:14-200:3.)

Potentially the result of these numerous and widespread errors, the Klein Survey's results

showed statistically significant fluctuations between markets. For example, the survey showed a

net confusion rate of 41.5% in Denver, but –2.1% in Chicago. (Lemper Decl. Ex. 4, Morrin

Report 13-14.)

## III.    ARGUMENT

### A.    The Standard of Admissibility for Expert Testimony

Under Federal Rule of Evidence 702 and the Supreme Court's decisions in <u>Daubert v.</u>

<u>Merrill Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), and <u>Kumho Tire v. Carmichael</u>, 526 U.S.

137 (1999), opinion testimony by a qualified expert is admissible if it will assist the trier of fact

to understand the evidence or determine a fact in issue, and if (1) the testimony is based on

sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the

witness applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

### B.    The Standard of Admissibility for Trademark Confusion Survey Evidence

Although technical deficiencies often go to a trademark confusion survey's weight and

not its admissibility,[3] surveys should be excluded from evidence where—as in this case—the

survey's flaws, including the failure to follow accepted principles,[4] are so great that the results

---

[3]    <u>See</u> <u>Scott Fetzer Co. v. House of Vacuums, Inc.</u>, 381 F.3d 477, 488 (5th Cir. 2004).

[4]    The Manual for Complex Litigation lists seven factors courts should consider in assessing
the adequacy of a survey's foundation and reliability:  (1) Was the population properly chosen
and defined? (2) Was the sample chosen representative of that population? (3) Was the data

(continued on next page)

are not trustworthy or reliable.  One district court explained:

> The court need not and should not respond reflexively to every criticism by saying it merely "goes to the weight" of the survey rather than to its admissibility.  If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial.

Simon Prop. Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000)

(excluding survey results under Rule 702 because they "have little or no probative value on the

questions relevant to the case," and under Rule 403 because "the results are likely to create

unfair prejudice, confuse the issues, waste time, and mislead the jury"); see Arche, Inc. v.

Azaleia, U.S.A., Inc., 882 F. Supp. 334, 336 (S.D.N.Y. 1995) ("While methodological defects in

surveys usually go to the weight rather than the admissibility of the evidence, there comes a

point where the probative value of the survey is exceeded substantially by its prejudicial effect

and potential for confusion and waste of time.").[5]

### C.    The Klein Survey Is So Flawed that Its Results Are Irrelevant, Unreliable, and Should Be Excluded Under Rule 702

As demonstrated below and detailed in the attached report of Dr. Maureen Morrin,[6] the

Klein Survey fails to comply with the basic rules of consumer research, such that it is "neither a

---

(continued from previous page)
gathered accurately reported? (4) Was the data analyzed in accordance with accepted statistical principles? (5) Were the questions asked clear and not leading? (6) was the survey conducted by qualified persons following proper interview procedures? and (7)  Was the process conducted so as to ensure objectivity?  Federal Judicial Center, Manual For Complex Litigation § 11.493 (4th ed. 2004).  As detailed in this motion, the Klein Survey fails to satisfy several of these factors.

[5]  See also M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1087 (9th Cir. 2005) (affirming exclusion of survey that was not conducted according to generally accepted survey principles, among other errors); Scott Fetzer, 381 F.3d at 488 (holding that "serious flaws in a survey will make any reliance on that survey unreasonable")

[6]  Associate Professor of marketing and consumer behavior at Rutgers University Business School.  (Lemper Decl. Ex. 4, Morrin Report 3 & Appx. 1.)

valid nor reliable measure of the likelihood of confusion, if any, in the marketplace." (Lemper Decl. Ex. 4, Morrin Report 15.)  For purposes of this motion, Defendants focus on three particularly glaring flaws, any one of which warrants exclusion of the Klein Survey.  Taken together, they compel exclusion.

First, the Klein Survey was so artificial and so devoid of market context that its results are not relevant to the issues in this case.  Instead of testing whether consumers would confuse the parties' logos as actually used in connection with their products and businesses, the survey studied consumers' reactions to enlarged logos shown only on white sheets of paper.

Second, the Klein Survey used an improper universe.  Instead of targeting purchasers and prospective purchasers of the types of products sold by the parties, the survey included everyone over the age of 18.

Third, the Klein Survey was riddled with numerous and widespread errors in execution, which Mr. Klein attributed to poor survey design.

Each of these errors is discussed in detail below.

### 1.    The Klein Survey Was an Artificial Guessing Game Divorced from Marketplace Realities

To be valid, a survey must come as close as possible to replicating the manner in which people encounter the parties' trademarks in the marketplace.  As Professor McCarthy explains:

> [A] survey is designed to prove the state of mind of a prospective purchaser.  Therefore, the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.

5 McCarthy § 32:163; see Louis Altman, Callmann on Unfair Competition, Trademarks and Monopolies § 31:67 (4th ed. 2003) (explaining that survey conditions must approximate market conditions to be probative of confusion in the marketplace); Troublé v. Wet Seal, Inc., 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) (explaining that "a survey must use a stimulus that, at a

minimum, tests for confusion by roughly simulating marketplace conditions").

This rule is grounded in the fundamental trademark principle that in assessing the likelihood of confusion, marks must be examined as they are presented to consumers, including in connection with the goods with which they are used: "It is not realistic to decide likelihood of confusion by comparing the two marks naked and divorced from surrounding trade dress, since this is not the way the buyers view the goods in the market." 3 McCarthy at § 23:60. This Court has further explained that marks should not be examined in a side-by-side vacuum in assessing the likelihood of confusion:

> Furthermore, similarity is not an isolated concept, to be observed in a vacuum where the two potentially similar marks are looked at side-by-side in the likelihood of confusion assessment; rather, they should consider the totality of the circumstances surrounding the use of the marks: Similarity of the marks must be considered in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods or services.

Stop & Shop Supermarket Co. v. Big Y Foods, Inc., 943 F. Supp. 120, 124 (D. Mass. 1996) (citing Calamari Fisheries v. Village Catch, Inc., 698 F. Supp. 994, 1009 (D. Mass. 1988) (quotations omitted).

Following these fundamental principles, this Court and other courts have excluded surveys that, like the Klein Survey, do not replicate how marks are presented to consumers. See discussion below of American Luggage Works, Inc. v. U.S. Trunk Co., 158 F. Supp. 50 (D. Mass. 1957); Pilot Corp. v. Fisher Price, Inc., 344 F. Supp. 2d 349 (D. Conn. 2004); and Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 U.S. Dist. LEXIS 20787 (S.D.N.Y. Apr. 19, 2006).[7]

---

[7] See also Troublé, 179 F. Supp. 2d at 308 (excluding survey for improper stimulus, among other things, because "a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions . . . such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question"); Am. Footwear Corp. v. General Footwear Co., 609 F.2d 655, 660 (2d Cir. 1979) (affirming rejection of survey

(continued on next page)

Ironically, Mr. Klein himself has criticized surveys conducted by other experts that failed to replicate marketplace conditions.  (Lemper Decl. Ex. 2, Klein Dep. 27:4-29:4); see NFL Properties, Inc. v. ProStyle, Inc., 57 F. Supp. 2d 665, 669 (E.D. Wis. 1999) (faulting survey expert for making an error he previously criticized other experts for making).

    Like the Klein Survey, the survey in Pilot tested consumer reaction to the parties' logos by displaying them "on a sheet of paper, not on a package" without other terms typically used with the logos.  344 F. Supp. 2d at 352-53.  Even so, the survey in Pilot was arguably more reliable than the Klein Survey because it at least included written descriptions of the products identified by the parties' marks.  Still, the court found that the survey was merely "designed to determine whether the two labels at issue were, in the abstract, confusingly similar" because consumers were not shown any products.  Id. at 358.  The court held:  "That two logos may be confusing when viewed in isolation, does not show that their use on two separate products is also confusing."  Id.  The court also criticized the plaintiff's survey for failing to include other terms used with the parties' logos.[8]  Id.  Based on these flaws, the court held that the plaintiff's survey did not establish likelihood of confusion.  Id. at 358-59.

_____

(continued from previous page)
based on the "critical defect" that it did not replicate "actual marketing conditions" because it showed defendant's allegedly infringing poster outside of its normal environment); Mennen Co. v. Gillette Co., 565 F. Supp. 648, 652-53 (S.D.N.Y. 1983) (rejecting survey where "the exhibits used in the survey did not fairly represent the actual products or the symbols thereon"); Jaret Int'l, Inc. v. Promotion in Motion, Inc., 826 F. Supp. 69, 73-74 (E.D.N.Y. 1993) (holding that "by removing portions of the [parties'] marks [as they appear on packaging], the [plaintiff's] survey has the same methodological defect as the one cited in American Footwear" and, as such "the survey is inadmissible because of its unrepresentative sample and its untrustworthy methodology").

    [8]  The Pilot court did, however, find the defendant's survey by Robert Reitter, Defendants' expert in this case, to be more sound (despite its small sample size).  344 F. Supp. 2d at 359.

Similarly, the survey in <u>Juicy Couture</u> displayed the marks on index cards.  In that case, the court held that the failure to display the marks on their respective products made the survey "essentially . . . a word association test."  2006 U.S. Dist. LEXIS 20787, at * 77-79.  The court concluded that the survey "utterly failed" to reliably measure "any relevant issue" and had "no value on the issue of actual confusion."  <u>Id.</u>

Further, this Court's decision in <u>American Luggage</u> is often cited by courts and commentators for the principle that a survey must replicate marketplace conditions.  In that case, the survey was conducted by showing respondents photographs of the parties' suitcases to determine both the level of recognition of the plaintiff's bag design and the likelihood of confusion with the defendant's design.  158 F. Supp. at 51-52.  This Court found that the photographs "were not true representations of the bags" because "[t]wo of them entirely failed and one of them partially failed to show the manufacturer's name tags which [were] prominent in several places on the bags themselves."  <u>Id.</u> at 52-53.  The Court found these distortions "fatal" to the survey's results on the issue of confusion because the fact that the relevant purchasers (in that case, retail dealers) do not recognize (or confuse) unlabeled bags is not an indication that they would not recognize (or confuse) labeled bags.  <u>Id.</u> at 53.  Unlike <u>American Luggage</u>, Mr. Klein did not bother to show the marks as used on the parties' products, but rather only showed the marks on pieces of white paper.  This flaw alone warrants exclusion.

As in all of the above cases, the Klein Survey made no attempt to replicate real world conditions, as a reliable survey must, and in fact, strayed far from such conditions.  In the marketplace, people who purchase Plaintiff's T-Shirts and other products encounter a variety of whimsical expressions or messages, including "Life is good.," often presented separated from the "Jake" face logo used in the Klein Survey, with characters engaging in various leisure activities

and/or other images. Similarly, people see Defendants' corporate tagline in the context of advertisements and promotions for Defendants' appliances, electronics, and cell phones. By showing respondents the parties' logos only on white pieces of paper, the Klein Survey could not have constructed a more artificial and less realistic setting in which to question people about the marks at issue. As such, the results are irrelevant and unreliable.

## 2.    The Klein Survey Had No Defined Universe

Selection of the universe to be studied is a crucial step in designing a survey. To generate relevant results, the survey must sample purchasers or likely purchasers of the types of products at issue. See Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir. 1980), cert. denied, 449 U.S. 899 (1980) ("The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services."); 5 McCarthy §32:159. In a *forward* confusion case,[9] the proper survey universe consists of purchasers and prospective customers of the types of goods or services sold by the *junior* user. Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 322 (S.D.N.Y. 2000); 5 McCarthy § 32:159 (citing cases). In a *reverse* confusion case, the proper survey universe consists of purchasers and prospective customers of the types of goods or services sold by the *senior* user. Id.

Mr. Klein purported to test for both forward and reverse confusion. (Lemper Decl. Ex. 2, Klein Dep. 76:11-77:15.) Accordingly, the proper universe consists of the purchasers and prospective purchasers of both parties' products—theme or "message" T-shirts and related products (Plaintiff's products), and appliances, electronics, and cell phones (Defendants'

---

[9] Forward confusion is where consumers believe the defendant's products come from the plaintiff. Reverse confusion is where consumers believe the plaintiff's products come from the defendant. See DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 607-08 (1st Cir. 1992) (Breyer, C.J.); Pump, Inc. v. Collins Mgmt., Inc., 746 F. Supp. 1159, 1166 (D. Mass. 1990) (Young, J.).

products).  But the Klein Survey's universe consisted of the entire general adult population.  Mr.

Klein made no attempt to limit participants to persons who have purchased, or are likely to

purchase, either of the parties' products.

The Klein Survey's universe consisted, by definition, of no universe at all.  Mr. Klein

opened participation in his survey to the general adult population on the implausible justification

that virtually every one in the United States is a potential purchaser of the parties' products.  Yet

Mr. Klein could not say for certain that the universe included those people.  He testified that he

did not know whether any of the people in his survey owned or intended to purchase any of the

types of products made by the parties.  (Ex. 2, Klein Dep. 129:21-131:16.)

Courts have rejected surveys like the Klein Survey where the universe consists of the

general public or an over-broad subset of it.  For example, in a case where Weight Watchers sued

for unauthorized use of its mark on LEAN CUISINE frozen diet entrees, the court found the

plaintiff's survey was over-inclusive because it included women aged 18 to 55 who had tried to

lose weight in the previous year and who had purchased a frozen food entree in the past six

months.  Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 1272 (S.D.N.Y.

1990).  The court noted that the universe should have been limited to women who had purchased

a *diet* frozen entree.  Id. ("[S]ome of the respondents may not have been in the market for diet

food of any kind, and the study universe therefore was too broad."); see American Luggage

Works, 158 F. Supp. at 52 (excluding survey results as evidence of confusion based, in part, on

the fact that "the universe included retail dealers who never carried plaintiff's bags, or

defendant's bags, or any other type of plastic bag"); Dick's Sporting Goods, Inc. v. Dick's

Clothing & Sporting Goods, Inc., 1999 U.S. App. LEXIS 19942, at *14-15 (4th Cir. Aug. 20,

1999) (holding it would be an abuse of discretion to admit a survey "when the sample is clearly

15

not representative of the universe it is intended to reflect"); Troublé, 179 F. Supp. 2d at 307-09 (excluding as irrelevant a survey that failed to test the universe of potential consumers); Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454, 1475 (D. Kan. 1996) (excluding as "inadmissible for the purpose of determining likelihood of confusion in any market, at any level" a survey that erroneously defined the market, did not interview an appropriate universe, and failed to account for noise in the results); Arche, 882 F.Supp. at 336 (excluding a survey that failed to test the proper universe, among other flaws); see also 5 McCarthy § 32:161 ("A universe may be improperly over-inclusive by encompassing a group of people that includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data.") (citing cases).

The definition of Plaintiff's survey universe as the general adult public provides no useful measure of the reactions of likely purchasers of the parties' products because many of the respondents presumably did not belong to the relevant consumer universe.[10]  To be eligible to answer Mr. Klein's questions, the only requirement was to be over 18 years of age and not employed by an advertising agency, a market research company, or a store at the particular mall where the respondent was surveyed.  Plaintiff's survey thus produced skewed and irrelevant results that shed no light on whether an appreciable number of relevant consumers are likely to be confused when encountering the parties' marks as they are actually used.  See 5 McCarthy at §32:159 ("Selection of the proper universe is a crucial step, for even if the proper questions are

---

[10]  Based on census data, Mr. Klein testified that the universe of potential respondents for his survey was more than 247 million people, which—using his 18% confusion rate—would predict confusion among a staggering 44 million people.  (Lemper Decl. Ex. 2, Klein Dep. 158:17-159:7.)  Despite an extensive search, however, Defendants have not identified a single instance of confusion.  See Declaration of Danny Awdeh in Support of Defs.' Mot. for Summary Judgment, Docket No. 49, ¶¶ 4-5 & Exs. 3-4 (describing Defendants' search for instances of confusion).

asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.")
This flaw renders meaningless any conclusions from the Klein Survey about the likelihood of
confusion among *relevant* consumers.  (Lemper Decl. Ex. 4, Morrin Report at 12.)

### 3.    The Execution of the Klein Survey Was Plagued With Numerous Errors in Multiple Locations

Flaws in the execution of a survey are a basis for excluding its results and any expert
opinions based on those results.  See Arche, 882 F. Supp. at 335 (excluding survey where,
among other errors, interviewer failed to ask survey questions as written); Dreyfus Fund, Inc. v.
Royal Bank of Canada, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981) ("No weight can be given to
the Dreyfus study at this point, however, because its execution was seriously flawed."); Brooks
Shoe Mfg. Co. v. Suave Shoe Corp., 533 F. Supp. 75, 80 (S.D. Fla. 1981) (finding that "plaintiff
made so many errors in conducting the survey that their own expert said the survey results were
not numerically projectable").

The existence of multiple errors in a survey's execution can raise doubts about the
trustworthiness of the survey serious enough to compel its exclusion under Rule 702.  Toys "R"
Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F. Supp. 1189, 1203-05 (E.D.N.Y. 1983) (excluding
both survey results and expert opinion because, among other things, errors in the survey's
execution—e.g., interviewers failing to follow instructions, conducting interviews "contrary to
good practice," inaccurately recording responses, and failing to validate responses—raised
doubts about the trustworthiness of the survey serious enough to compel its exclusion).

As in Toys "R" Us, the numerous and widespread errors in the execution of the Klein
Survey compromise the trustworthiness and reliability of its results.  As detailed above, the Klein
Survey was subject to errors in multiple locations, including interviewer errors, validation
failures, bad skip patterns, questionable interviews, and site error, which led Mr. Klein to discard

survey responses totaling more than 20% of the total sample size. Mr. Klein testified that those errors were likely the result of a poorly designed survey questionnaire. Further, Mr. Klein admits that he *has never seen or even heard of a survey with this many errors*. Given the number and scope of errors, the Klein Survey's widely-fluctuating results are untrustworthy and unreliable. (See Lemper Decl. Ex. 5, Morrin Dep. at 213:12-214:10; Lemper Decl. Ex. 4, Morrin Report at 13-14.)

### D.    The Klein Survey Should be Excluded Under Fed. R. Evid. 401, 402, and 403

The Court should also exclude the Klein Survey under Fed. R. Evid. 401 and 402.[11]  As detailed above, the Klein Survey's artificial design and error-plagued execution make its results irrelevant to a determination of the likelihood of confusion, or any other issues in this case.

Additionally, the Klein Survey should be excluded under Fed. R. Evid. 403, which applies to expert testimony and provides that evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay or waste of time, among other grounds. Fed. R. Evid. 403; see Simon, 104 F. Supp. 2d at 1039 n.3 (excluding plaintiff's survey evidence on the ground that it was "likely to be complex and time-consuming" and "offers essentially nothing of real probative value," and stating that "Rule 403 was written for just this sort of case").

The prejudice to Defendants that would result from admitting into evidence this fatally flawed and scientifically unreliable survey and report, and the amount of trial time that will be wasted exposing these flaws and defects through cross examination and rebuttal expert

---

[11]  Fed. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 402 provides that "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402.

testimony, substantially outweighs whatever scant probative value the Court may take from the

Klein Survey.[12]  See Starter Corp. v. Converse, Inc., 170 F.3d 286, 296-97 (2d Cir. 1999)

(affirming district court's exclusion of flawed survey on the ground that it "was not relevant

because it did not test or demonstrate likelihood of consumer confusion" and "the slight

probative value was outweighed by its prejudicial effect under Rule 403").

## IV.    CONCLUSION

As detailed above, Mr. Klein's failure to follow basic tenants of survey design and the

errors in the execution of his survey deprive its results of any scientific or evidentiary weight,

and render it irrelevant and unreliable.  As such, the Klein Survey should be excluded.

## V.    LOCAL RULE 7.1 CERTIFICATION

In accordance with Local Rule 7.1(a)(2), Defendants have conferred with Plaintiff, and

have ascertained that Plaintiff will not stipulate to this motion.

<div style="margin-left:50%">

Respectfully submitted,

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.

</div>

Date:  August 25, 2006            /s/  Timothy A. Lemper_____

<div style="margin-left:50%">

Counsel for Defendants
LG Electronics U.S.A., Inc. and
LG Electronics MobileComm U.S.A., Inc.

</div>

---

[12]  If the Klein Survey is excluded, Defendants will not need to have their expert, Dr. Morrin, testify on the survey's defects (although she will testify on a separate subject, namely, the lack of fame of "Life is good." as a trademark for Plaintiff and its products).

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 25, 2006.

/s/  Timothy A. Lemper