LIFE IS GOOD, INC. V. LG ELECTRONICS U.S.A., INC
Civil Action No. 04 11290 WGY

DECLARATION OF TIMOTHY LEMPER IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE
TO STRIKE THE SURVEY OF PLAINTIFF'S EXPERT ROBERT KLEIN

# Exhibit 2

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3     - - - - - - - - - - - - - - - x

4     LIFE IS GOOD., INC.,

5            Plaintiff,          Civil Action

6     vs.                        No. 04-cv-11290-REK

7     LG ELECTRONICS, U.S.A., INC.,

8     LG ELECTRONICS MOBILECOMM

9     U.S.A., INC., (formerly          ⌐ORIGINAL

10    LG INFOCOMM U.S.A., INC.),

11           Defendants.

12    - - - - - - - - - - - - - - - x

13        DEPOSITION OF ROBERT KLEIN, a witness called by

14    and on behalf of the Defendants, taken pursuant to

15    the provisions of the Federal Rules of Civil

16    Procedure, before Dana Welch, a Registered

17    Professional Reporter and Notary Public in and

18    for the Commonwealth of Massachusetts, at the

19    offices of Finnegan, Henderson, Farabow, Garrett

20    & Dunner, LLP, 55 Cambridge Parkway, Suite 700,

21    Cambridge, Massachusetts, on Friday, January 24,

22    2006, commencing at 10:31 a.m.

1    Q.  And so you could be measuring the wrong

2    thing?

3    A.  I think that would be the argument.

4    Q.  How about Adidas, did you do a survey for

5    that case?

6    A.  No.

7    Q.  Was that a trademark case?

8    A.  Yes.

9    Q.  Did you deal with Michael Heilbronner at

10   Adidas in any way?

11   A.  Not that I know of.

12   Q.  And what did you do for Adidas?

13   A.  I provided a rebuttal report on behalf of

14   ES  Originals to a survey that had been conducted by

15   -- on behalf of Adidas.

16   Q.  Did you work with Lisa Perrone?

17   A.  The name is familiar, but I don't think she

18   was -- I don't recall her from that matter.

19   Q.  Whose survey did you rebut?

20   A.  I believe it was Gerald Ford's.

21        MR. KIRBY:  Not the President.

22        THE DEPONENT:  No.

710
ELD

1    BY MR. RETTEW:

2        Q.   From Ford, Bubala & Associates?

3        A.   Yes.

4        Q.   And briefly, what was the nature of your

5    critique?

6        A.   I felt that the product shown to people was

7    not shown in a -- as they would see it and encounter

8    it in the real world.  And I had some issues with

9    the control that was -- that was used in the case.

10       Q.   When you say the stimulus was not what

11   people would see in the real world, what

12   specifically did they use in that survey?

13       A.   They used a drawing from a shoe as seen

14   from kind of, if you were lying on the floor looking

15   at it sideways.  And the allegations of the case had

16   to do with initial interest, confusion where you

17   might see it -- someone wearing the shoe and ask

18   where did you buy that.

19       Q.   So what's wrong with showing a drawing?

20       A.   Well, in this particular matter, they were

21   claiming that people would see the shoe as someone

22   else were wearing it.  And so if that's the claim,

710
ELD

1    then why not show it that way.

2        Q.   So they should have shown the actual shoe?

3        A.   Or a picture of the shoe or a picture of a

4    model wearing a shoe.

5        Q.   And was this an Eveready format that Ford

6    did?

7        A.   Basically, yes.

8        Q.   What control did he use?

9        A.   He used an all-white shoe that -- that

10   removed both the offending stripes, as well as some

11   other identifying characteristics.  And I had some

12   problems with the fact that he took the other

13   identifying characteristics off as well.

14       Q.   What's wrong with that?

15       A.   Well, if you're alleging that there is --

16   that the infringing feature is the stripes on the

17   shoe, and you don't have any problem with the heel

18   patch, then to have a control that is missing both

19   the stripes and the heel patch is confounding the

20   issue.

21       Q.   Because it's not measuring true noise in

22   that case?

1        A.   If the -- if the target market corresponds

2   to the actual market, then it becomes relevant.  But

3   from a marketing point of view, you might target,

4   you know, girls 14 to 25, but your product might be

5   bought by anyone.

6             And so with your advertising, you might

7   target a particular segment, but if the product

8   could be bought and was bought by virtually

9   everyone, then narrowing the universe to that target

10  market would be inappropriate.

11       Q.   Did you test forward or reverse confusion

12  in this case?

13       A.   In this case, it really wasn't a -- an

14  issue of reverse confusion or forward confusion,

15  given the widespread distribution and purchasing --

16  widespread distribution of the purchasing population

17  for both the products.  The overlap is so huge that

18  whether it's forward or reverse confusion wasn't a

19  problem here.

20       Q.   What's your understanding of what forward

21  confusion is?

22       A.   Forward confusion would be a situation in

1   which the potential purchasers of the junior user

2   are confused and think that the product comes from

3   the senior user.

4       Q.   And reverse confusion?

5       A.   Where potential purchasers of the senior

6   product are confused and think that the product

7   comes from the junior user.

8       Q.   And just so I understand your testimony,

9   are you saying that you tested one, the other or

10  both?

11      A.   Either.  Because -- well, either.

12      Q.   So it's possible to do a confusion survey

13  where you're testing both forward and reverse

14  confusion with the same set of questions?

15      A.   Yes.

16      Q.   In this case, did you ask people whether --

17  you asked people -- strike that.

18           Okay.  Let's talk about LG.  What's your

19  understanding of what LG makes?

20      A.   It's my understanding that LG makes a wide

21  variety of electronics, from cell phones to TVs to

22  computer monitors to refrigerators, washers, dryers,

1    alternatives for how to display that.

2        Q.   Is it your understanding that the only

3    objectionable part of LG's logo was the words

4    "Life's Good"?

5                MR. KIRBY:   Object to the form.

6                THE DEPONENT:   It's my understanding

7    that that is the focus of their -- of the -- you

8    know, confusion and concern about confusion.

9    BY MR. RETTEW:

10       Q.   Did you talk about different survey designs

11   during that meeting?

12       A.   I don't have a specific recollection of

13   that.   We certainly -- you know, it certainly would

14   have been an appropriate topic.

15       Q.   Okay.   Did you talk about specific

16   controls; do you remember?

17       A.   I don't recall whether we discussed

18   specific controls at that point or not.

19       Q.   And what happened after that meeting?

20       A.   After that meeting, there were -- we

21   conducted some exploratory interviews at a mall in

22   New Jersey to get a better understanding of people's

1   awareness of various slogan's including "Life is

2   good." as well as recognition of different symbols

3   and logos.  And finally, sort of testing different

4   ways of showing people products.

5       Q.   Why did you do that?

6       A.   It's an important step in any survey

7   research design is to first get a better

8   understanding.  Often, your client's version of kind

9   of what people believe or know can be different than

10  what you actually find in the market and it's

11  important to test those things yourselves.

12      Q.   What did this pretest show?

13      A.   Pretest showed that -- that awareness of

14  Life is good. as a trademark was relatively low,

15  that awareness of LG was relatively high as a -- as

16  a company that most people associated with cell

17  phones.  And kind of if we, you know, showed people

18  the Life is good. emblem and LG's use of "Life's

19  Good" with the face and the initials LG, that there

20  was -- that people saw the connection and identified

21  that in connection as being related to the use of

22  the phrase "Life's Good."

1   by virtually anyone"?

2       A.  The products that they make are not, you

3   know, exclusively, for example, male or female.

4   They're not just for people over 65.  There's no

5   constraint on marketing that would prevent someone

6   from, if not actually purchasing an LG or Life is

7   good. product, from certainly considering it and

8   being in a position to react to the trademark.

9       Q.  Have you ever done any other surveys where

10  the universe was all adults?

11      A.  Well, sure.  But I mean --

12      Q.  What was the product involved in those

13  cases?

14      A.  I mean, it wasn't necessarily a trademark

15  issue or litigation.

16      Q.  I'm sorry.  Let me clarify.  Litigation

17  survey for a trademark case.

18      A.  No.  I don't -- wait a minute.  Let me --

19  hold that answer for a second.  Yeah.  No, that's

20  fine.  No is the answer.

21      Q.  And you don't know whether the people

22  included in your survey own cell phones?

1     A.   No.

2     Q.   And you don't know if the people included

3   in your survey intended to purchase a cell phone?

4     A.   That's correct.

5     Q.   And you don't know if people in your survey

6   owned appliances?

7     A.   That's correct.  Well, okay.  No.

8     Q.   You don't know if the people in your survey

9   owned the type of appliances that LG makes?

10    A.   That's okay.  Well, okay.  Although LG

11  makes refrigerators.  And so to the extent that most

12  households in the U.S. have a refrigerator, you know

13  --

14    Q.   Well, you don't know if people included in

15  your survey had actually bought appliances?

16    A.   That's correct.

17    Q.   And you don't know if people included in

18  your survey intended to buy appliances?

19    A.   That's correct.

20    Q.   And you don't know if people included in

21  your survey owned computer monitors?

22    A.   That's correct.

1        Q.  Or any other computer products?

2        A.  That's correct.

3        Q.  And you don't know if people included in

4    your survey intended to buy computer monitors?

5        A.  That's correct.

6        Q.  And you don't know if the people included

7    in your survey intended to buy any other computer

8    products?

9        A.  That's correct.

10       Q.  And you don't know if the people included

11   in your survey owned any Life is good. T-shirts?

12       A.  That's right.

13       Q.  And you don't know if the people included

14   in your survey intended to buy Life is good.

15   T-shirts?

16       A.  That's correct.

17       Q.  Now, you say you tested both forward and

18   reverse confusion in this survey; is that correct?

19       A.  I think what I said was that the survey

20   that I conducted was equally applicable to forward

21   as well as reverse confusion.

22       Q.  And you used a national sample in the

1    BY MR. RETTEW:

2        Q.  All right.  Mr. Klein, with your universe

3    being everybody over 18 years of age, do you have

4    any sense of the census data on how many people that

5    is?

6        A.  How many --

7        Q.  How many people total were in your

8    universe; how many people would have qualified?

9        A.  I thought, actually, I included that here,

10   but I didn't.  It was on the document that was

11   produced yesterday, I guess.  The document that says

12   quota.xls has census data in it.

13              MR. RETTEW:  Let's go off the record for

14   a second.

15              (Marked, Exhibit 88, AMS 003591.)

16   BY MR. RETTEW:

17       Q.  I'm showing you what's been marked

18   Exhibit 88.  Does that help you answer my previous

19   question on what was the total number of adults in

20   the U.S. that could have qualified for the survey?

21       A.  Yes.

22       Q.  And what is that number?

1    A.   247,110,005.

2    Q.   And you found that 18 -- you found that

3  there would be 18 percent confusion net?

4    A.   That's correct.

5    Q.   And so roughly how many people would that

6  be?

7    A.   Approximately 44 and a half million people.

8    Q.   And of that 44 and a half million people,

9  how many instances of actual confusion would you

10  expect there to be in this case?

11    A.   I don't have a basis for making that

12  estimate.

13    Q.   Would you -- just based on your experience

14  and expertise, would you expect that there would be

15  a lot of people would have expressed confusion?

16          MR. KIRBY:  Object to the form.  To

17  whom?

18  BY MR. RETTEW:

19    Q.   To either party.

20    A.   What I measured was likelihood of

21  confusion.  And actual confusion is going to depend

22  on the extent to which LG continues to advertise and

1    overseeing the results of the interviews.

2        Q.  And did any problems arise in this survey?

3        A.  Yes.

4        Q.  What happened?

5        A.  As I say in the report, the Florida field

6    site had a -- where's the part that I identify.  In

7    one location that was in Florida, our validation

8    identified a significant deviation from the

9    protocol.  When we called people to ask them the

10   validation questions, we would ask them, "Did you

11   receive $5 for your participation?"  And the people

12   in Florida said, no, they didn't.  They were told

13   they had to come back later to get their $5.

14   That -- I mean, if they couldn't do that part right,

15   we simply discarded all those questionnaires without

16   reviewing them, although you have copies of them.

17            And in a second location, the particular

18   interviewer apparently falsified nine out of ten of

19   the first interviews she did, and we discarded all

20   of her work.

21       Q.  How do you know -- well, what location was

22   that?

1      A.   San Francisco.

2      Q.   And how do you know she falsified her

3  interviews?

4      A.   Well, okay, we assumed she falsified the

5  interviews since nine out of ten of the people that

6  we contacted that she claimed to have interviewed

7  did not acknowledge being interviewed.

8              MR. KIRBY:   Sort of a give-away.

9              THE DEPONENT:   There were --

10  BY MR. RETTEW:

11     Q.   Any other problems?

12     A.   And then there were four additional

13  interviews that that did not validate, but they were

14  scattered in locations and we decided to exclude

15  them as well.

16            One of the things that happens in mall

17  intercept studies is that when you ask people for

18  their name and phone number in order to do the

19  validation, some people don't want to be recontacted

20  and are -- and so they give you a -- or they give

21  you their work number, but you only get their first

22  name.  And you call up asking for Jim at a company

O
D

1    of 1,000 people, so you don't get the appropriate

2    validation.  So as I said, there were four

3    additional interviews like that, two from Chicago,

4    one from Dallas, one from Des Moines.  And we

5    excluded those as well.

6         Q.  Have you ever had this many problems in a

7    survey?

8         A.  No.

9         Q.  Have you ever heard of there being this

10   many problems in a survey?

11        A.  No.

12        Q.  Do you usually discard the questionnaires

13   that are not validated?

14        A.  Yes.

15        Q.  That's your standard practice?

16        A.  Yes.

17        Q.  Did you discard any of the other surveys

18   that -- strike that.  Let me ask a better question.

19             Of the surveys that didn't -- the

20   questionnaires that didn't validate, did you examine

21   the other questionnaires that were done by those

22   particular interviewers to see if there were

1     problems that were systematic to the interviewer?

2          A.   As I said, in San Francisco, nine out of

3     the ten interviews done by this particular

4     interviewer didn't validate.   So we threw all of

5     hers away.

6               We did 100 percent validation.   So the

7     only other site was the Florida site where, in

8     reality, we might have kept those, those interviews.

9     The field site said that the check hadn't -- they

10    didn't have the cash in their account to pay these

11    people.   We sent them the check.   Everybody else got

12    their checks.   We don't know what happened there.

13    But it was just such a screwy thing to happen that

14    we felt better about throwing away the interviews

15    than, you know, accepting what was at least, I'd

16    say, a significant deviation from the protocol we

17    specified.

18         Q.   When these documents were produced to us,

19    there were some sticky notes that had some

20    explanation of what appears to be an explanation of

21    why these were discarded.

22         A.   Uh-huh.

1    BY MR. RETTEW:

2        Q.  Mr. Klein, I've shown you what's been

3    marked as Exhibit 90.  Can you tell me, after going

4    through it, what these are?

5        A.  Well, I'm not sure whether we -- I mean, I

6    guess, first of all, these are all Florida

7    interviews.  They were all discarded.  I can find

8    out for you what "exhibit rotation error" means.

9        Q.  Yeah.  We would request that you do that

10   because that was going to be my next question:  What

11   does that mean, exhibit rotation error?

12       A.  Well --

13       Q.  Is this the first time you've heard of

14   there being an exhibit rotation error?

15       A.  Yes.  At least to the best of my memory.

16           MR. KIRBY:  What I can't tell you is

17   whether that sticky went to all of the interviews

18   attached to Exhibit 90 or just the front one.  And

19   it could be a mistake on my behalf or by our copy

20   service.  I just don't know.

21   BY MR. RETTEW:

22       Q.  Do you, Mr. Klein, have any thoughts on

1    that, can you enlighten us as to whether that is the

2    case or is not the case?  If you don't know then --

3         A.   I don't know.  I mean, I think I can --

4              MR. KIRBY:  We can try to find out for

5    you.

6              THE DEPONENT:  I can try to track it

7    down.

8              MR. KIRBY:  If they threw them all out

9    for that other problem with the payment issue, it

10   was academic and they didn't pursue it.  But we can

11   find out, too.

12   BY MR. RETTEW:

13        Q.   I appreciate that.  And rather than waste

14   your time, I'll just move on to the next one and

15   just ask that you follow up on that.

16              (Marked, Exhibit 91, AMS 000430-000477.)

17   BY MR. RETTEW:

18        Q.   The next one I'm showing you is Exhibit 91.

19   It's got a Post-it that says, "Bad skip pattern

20   errors caught by field site."

21        A.   Right.

22        Q.   My question is, what is this?

1        A.   Well, I'll use the first one as an example.

2    I'll assume that the -- or I can go through each one

3    to make sure that it's the same way.  But what this

4    would -- yeah, it looks like they're all done the

5    same way.  If you look at question 3, page AMS 434.

6        Q.   Yes.

7        A.   So this person said "different companies"

8    and was supposed to have skipped then to question 4.

9    Okay?  And instead, the interviewer continued with

10   question 3A.  Now, these interviews and screeners

11   were all prenumbered with the rotation and exhibit

12   rotation marked on them.  And so this was caught by

13   the field site and replaced -- you know, they did an

14   extra interview to replace it.  But they returned

15   the documents to us so we would have the complete

16   set.  But these would not be part of the data set

17   that was analyzed.

18       Q.   So documents 430 to 477 were all excluded?

19       A.   Yes.

20       Q.   And were all of Barbara Jackson's

21   interviews excluded?

22       A.   Well, these weren't Barbara Jackson's

1    report?

2        A.  Right.

3        Q.  And these interviewer errors spanned among

4    different interviewers and different markets?

5        A.  Yes.

6        Q.  Does this at least suggest to you that

7    perhaps the questions were confusing for

8    interviewers?

9        A.  No.

10       Q.  But you've never seen this many mistakes

11   before.

12       A.  Correct.

13       Q.  What does that tell you, if anything?

14       A.  We did a really bad job of laying out the

15   questionnaire.  I mean, it should have been much

16   clearer to the interviewers that -- where they went

17   at each -- at each stage.  And there should have

18   been arrows on these pages; and when they got here

19   it should have said, end.  You know, if you've done

20   something here, you're done, you know, go on.  It

21   was -- it was laid out in a way that was confusing

22   to interviewers, and they -- when they weren't able

1    to follow the instructions, we didn't feel we could

2    include those results that didn't follow the

3    instructions, regardless of what those results were.

4                    MR. RETTEW:  Mark this one.

5                    (Marked, Exhibit 94, AMS 000586-000810.)

6    BY MR. RETTEW:

7        Q.  Okay.  Mr. Klein, looking at Exhibit 94,

8    this says "tossed because of site error."  And my

9    question is, were all of the interviews shown in --

10   excuse me -- all the questionnaires shown in

11   Exhibit 94 excluded?

12       A.  Yes.

13       Q.  And was this for the reasons you said

14   earlier, for the site error in Fort Lauderdale?

15       A.  That's correct.  At least, I mean, that's

16   why I would have tossed them all.  They are all from

17   Fort Lauderdale and none of them are in the

18   database.

19       Q.  Are part of the problems with this

20   interview due to the company that you used to

21   administer the survey?

22       A.  I don't think so.  I think it was the --

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700        800-336-6646        410-684-2550