LIFE IS GOOD, INC. V. LG ELECTRONICS U.S.A., INC
Civil Action No. 04 11290 WGY

DECLARATION OF TIMOTHY LEMPER IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE
TO STRIKE THE SURVEY OF PLAINTIFF'S EXPERT ROBERT KLEIN

# Exhibit 4

**Evaluation of: "Report of Robert L. Klein in the Matter of Life is good, Inc. v. LG Electronics USA, Inc. and LG Electronics Mobilecomm USA, Inc. Likelihood of Confusion Survey Results and Conclusions"**

**February 3, 2006**

Prepared for:

Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Ave., NW
Washington, DC 20001-4413
Voice: 202-408-4000

Prepared by:

Maureen Morrin, PhD. of Market Analytix, LLC
102 Summit Lane
Bala Cynwyd, PA 19004
Voice : 856-225-6713
Fax: 610-664-4789
E-mail: mmorrin@rutgers.edu

1

**TABLE OF CONTENTS**

1. Purpose and Authorship                                              page  3

2. Stimuli                                                             page  5

3. Questionnaire Design                                               page 10

4. Universe and Screening                                             page 12

5. Procedure and Validation                                          page 13

6. Conclusions                                                        page 15

7. References                                                         page 16


Appendix 1: Dr. Maureen Morrin's Vita                                 page 17

Appendix 2: Prior Expert Witness Consulting by Dr. Maureen Morrin     page 24

Appendix 3: Materials Reviewed                                        page 25

## 1. PURPOSE AND AUTHORSHIP

I, Maureen Morrin, Ph.D. of Market Analytix, LLC have prepared this evaluation for Finnegan, Henderson, Farabow, Garrett & Dunner LLP, on behalf of LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. ("LG"), a manufacturer of consumer electronics, computers, appliances, and mobile phones. The purpose of this evaluation is to assess the design and implementation of a likelihood of consumer confusion study conducted for Life is good, Inc. ("LIG"), a manufacturer of clothing, headwear, coffee mugs, pet supplies and other items, by Robert L. Klein (titled "Report of Robert L. Klein in the matter of Life is good, Inc. v. LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. Likelihood of Confusion Survey Results and Conclusions," dated December 14, 2005; the "Klein study").

The Klein study was commissed by counsel for plaintiff. The Klein study was carried out to "determine the likelihood that customers who see the LG trademark in conjunction with the slogan 'Life's Good' will be confused and believe that LIG and LG are either the same company or are affiliated in some way" (Klein study, p. 2).

I am a tenured associate professor of marketing at Rutgers University in Camden, New Jersey. For over a decade I have taught courses at the undergraduate, MBA, EMBA and doctoral levels, including courses in consumer behavior, customer analytics, database marketing, and marketing management. I have taught at New York University, Boston University, the University of Pittsburgh, and Rutgers University.

A copy of my vita is attached as Appendix 1. I have published 15 peer-reviewed journal articles, several in some of the most prestigious publications in my field (such as the *Journal of Marketing Research* and *Journal of Consumer Research*). Among my publications are several related to branding and trademark theory, including the following:

Morrin, Maureen, Jonathan Lee and Greg Allenby, "Determinants of Trademark Dilution," (forthcoming Sept 2006) *Journal of Consumer Research*.

Morrin, Maureen and Jacob Jacoby (2000), "Trademark Dilution: Empirical Measures for an Elusive Concept," *Journal of Public Policy & Marketing*, 19 (2), 265-276.

Morrin, Maureen (1999), "The Impact of Brand Extensions on Parent Brand Memory Structures and Retrieval Processes," *Journal of Marketing Research*, 36 (4), 517-525.

Jacoby, Jacob and Maureen Morrin (1998), "'Not Authorized or Sponsored by...': Recent Federal Cases Involving Trademark Disclaimers," *Journal of Public Policy & Marketing*, 17 (1), 97-107.

3

I am on the Editorial Review Board of the *Journal of Consumer Psychology* and regularly provide scholarly reviews for numerous conferences, seminars, research competitions, and journals including the *Journal of Marketing* and the *Journal of Consumer Research*. My research on trademark dilution was cited in a brief of amicus curiae for the U.S. Supreme Court by the International Trademark Association (No. 01-1015; p. 16 and p. 30).

I am being compensated at the rate of $175 per hour. My previous experience as an expert witness is listed in Appendix 2. Materials I reviewed for this evaluation are in Appendix 3.

"I certify that the information in this evaluation is, to the best of my knowledge, true and accurate."

Signed: _____        Date: ___February 3, 2006_____

(Maureen Morrin)

4

## 2. STIMULI

One of the major problems with the Klein study, in my professional opinion, concerns the nature of the designs presented as stimuli to the respondents. The designs created for this study were presented almost entirely devoid of any marketplace context. The designs were not presented to respondents in a manner in which consumers would ordinarily encounter the marks, making the study far removed from what might occur in the marketplace. Thus, the results that are obtained indicate little, if anything, about the likely impact of the two marks on consumer perceptions in the real world. Presenting the designs without any product-related or other real-world contextual information, as was done in the Klein study, likely created an unnatural state of mind in the respondents whereby some reported being 'confused' as to the source of or affiliation between the designs, when in the real world many, if not most or all of these respondents, would not be confused as to source, based on how they would normally encounter these marks. To provide information regarding the likelihood of consumer confusion, this study should have presented stimuli that more closely reflected real-world marketplace representations, as consumers would normally encounter them in the marketplace. The key issue is what is likely to happen in the real world, not what is likely to happen in a staged environment where just a limited element or two of the marks at issue, devoid of any marketplace contextual information, are presented in quick succession to respondents.[1]

Designs Used in Test Cells of Klein Study




The designs used in the Klein study consisted of renderings of the marks, which were presented to respondents on sheets of paper, with no indication of what type of products the designs were affiliated with. Moreover, the designs were created such that the elements were made to appear the same size, for example, with the circular elements presented about the same size, and in the same central location. The "Jake" symbol of LIG (i.e., a smiling face) was represented as a large and central element in the design presented to respondents, when, in fact,

---

[1] The importance of using actual real world stimuli to ensure survey validity is supported by Mr. Klein's deposition testimony (January 24, 2006, pp. 26-27).

the Jake symbol is typically depicted much smaller, often as an element of a more complex visual design in LIG products (see product examples from the Life is good website below).[2]  The LG design was also presented as a large central element, when it is typically depicted as a small element of an advertisement or web site.

Examples of Jake Symbol as Used on T-shirt Fronts from LIG website

  

Research has shown (e.g., Loken, Ross and Hinkle 1986), and common sense tells us, that similarity in appearance of two marks contributes to consumer inferences of a common business origin.  Thus, modifying the marks from the ways they normally are encountered by consumers, as was done in the Klein study, and presenting them devoid of any real world context, very likely significantly enhanced consumers' perceptions of a common business origin.  When lacking sufficient information, consumers must make inferences or "fill in missing information" about a product when assessing or choosing it (Balabanis and Craven 1997).  In this study's setting, because no contextual information was presented to consumers along with the designs, such as the types of products involved or the channels of distribution used to sell the products, a number of consumers may have assumed that the designs were associated with similar products or services and/or are affiliated in some way, when real world reasoning would lead them to conclude otherwise.

The problems associated with presenting the designs devoid of product context are especially troubling given that LIG's mark does not possess a high level of brand awareness (see report titled, Brand Analysis of Plaintiff's Mark "Life is Good," February 1, 2006).  Thus, it is likely few consumers would know from the LIG design what product category such a design is associated with. Lacking knowledge regarding the types of products associated with the LIG design (and how far afield they are from those of LG products) consumers are more likely to infer an association between the marks.

The rationale for the approach taken by Mr. Klein is on page 4 of his report, which states that because the slogans at issue can appear on or be used in advertising for a wide variety of

---

[2] The testimony of Mr. Klein (1/24/06) indicates that Mr. Klein obtained the LIG design used in his study not from one of LIG's products but from a business card (p. 206).  When asked whether the LIG design he used in the study was exactly like that on any other LIG materials, Mr. Klein replied "Not to my knowledge" (p. 207).  Mr. Klein also agreed that people do not, in real life, see the designs as presented in his study, without any product information and in the size and manner in which they were presented in his study (p. 224).

6

products, "I decided to show the graphics outside the context of a particular product or article of clothing in order to eliminate any bias associated with the specific product or category chosen."

Any potential "bias" associated with the selection of a single product category from each party could have been easily dealt with by using more than a single product category from each party's product lines. For example, randomly exposing a third of the respondents to one set of product categories (e.g., a t-shirt from LIG and a cell phone from LG), a third to another set of product categories (e.g., a baseball cap from LIG and a refrigerator from LG), and a third to another set of product categories (e.g., a coffee mug from LIG and laptop computer from LG) would easily have overcome any potential bias that might be associated with the use of a single stimulus set. Thus, several different products could have been employed across the study to ensure generalizability and lack of any "bias" that might be caused by the choice of single products.

Stimuli more representative of real-world consumer experiences could have also consisted of the two party's web sites, or one or more LG print advertisements, in addition to products (please see examples on the following two pages). The presentation of stimuli such as these, which much more closely approximate how consumers actually encounter the marks in the real world, would likely have resulted in significantly lower or even zero net confusion rates, as the stimuli are much more clearly differentiable when seen in their actual contexts.

Another valid approach would have involved exposing respondents to just one of the party's products or designs and seeing whether any others were called to mind by it. Indeed, it is not clear why respondents were not simply presented with an LG stimulus (such as an LG cell phone advertisement) and generally asked about whether or not it brought to mind any other goods or services. Indeed, such an approach would have more accurately achieved the stated purpose of the confusion study as described in the Klein report, which was carried out to "determine the likelihood that customers who see the LG trademark in conjunction with the slogan 'Life's Good' will be confused and believe that LIG and LG are either the same company or are affiliated in some way" (Klein study, p. 2). Instead, respondents were shown designs from both parties, devoid of any marketplace context.

If instead, the approach had consisted of showing respondents LG products or advertisements, it is likely that few or no respondents would have spontaneously mentioned LIG's goods or designs, because of the significant differences between the product categories involved (few are likely to think a maker of high end electronics or cell phones is in the t-shirt business) as well as the awareness level of LIG's mark (most are unlikely to be aware of and thus spontaneously mention LIG). Thus, the key issue, whether or not LG's mark, when encountered in a manner representative of marketplace reality (i.e., in conjunction with its products or advertising), would lead to source identification confusion with LIG, was not tested in the Klein study.

7

**Example 1 of a More Realistic Stimulus Presentation Approach: Utilizing theTwo Party's Websites**

1) Life is good website (www.lifeisgood.com):



2) LG website (www.us.lge.com):



**Example 2 of a More Realistic Stimulus Presentation Approach: Utilizing an LIG Product
and an LG Print Advertisement**

1) Life is good product:



2) LG print advertisement:



9

## 3. QUESTIONNAIRE DESIGN

Another major problem with the Klein study concerns the biased nature in which the key questions were asked. Two questions were utilized in the Klein study to categorize respondents as either confused or not confused. The first key question, Q3, asked respondents whether the two things they saw (i.e., the designs) "come from the same company, different companies, or do you not know or have no opinion?" A net confusion rate rate of 13.7% is reported based on this question (Table 1: (39-11)/205 = .13658).

Then, another question, Q4, is asked only of those respondents who were not categorized as confused via Q3. Q4 asked, "Which of the following statements best decribes what you believe about what you viewed?
- What you saw first and what you saw second come from companies that <u>have</u> a business affiliation or connection.
- What you saw first and what you saw second come from companies that <u>do not have</u> a business affiliation or connection.
- You don't know or have no opinion."

QUESTION INTERPRETATION (Q4)

One issue regarding these key questions is how Q4 was interpreted by respondents. For most consumers, the distinction between same companies versus affiliated/connected companies is probably not very meaningful. The Klein study provides no evidence that respondents understood the meaning of business affiliation or connection (is this a licensing agreement, a subsidiary arrangement, corporate divisions, etc. and do consumers understand what these mean and whether or not they are different from the meaning of "same company"?). A basic guideline for survey development is that questions asked of respondents use the respondents' "core vocabulary" (Burns and Bush 2005, p. 305). There is no evidence that the intended meaning of Q4 was communicated or accurately understood by respondents.

CONVERSATIONAL NORMS (Q3, Q4)

An even more critical problem with Q4 has to do with the inferential processing it likely caused among respondents due to the perceived repetitious nature of the information asked in Q3 and Q4. Many of the respondents likely perceived they were being asked essentially the same question in Q3 and Q4, for reasons described in the paragraph above. Yet, conversational norms theory (Grice 1975) suggests that participants in a conversation and respondents to a survey don't believe they should give the same answer twice in a row. This is because survey questions and responses to them are perceived as a conversation with norms of interaction. Research has shown that when survey respondents are asked largely redundant questions on the same survey, they are more likely to answer the second question differently, than if they had been asked the two questions on separate surveys (Strack, Schwarz and Wanke 1991). This result occurs because respondents try to make sense out of the questions they are asked, and they use conversational norms to help them do this. A key norm of conversations is not to provide redundant information. Thus, answering Q3 and Q4 in the Klein study in the same way (i.e., not the same company for Q3

10

and no affiliation for Q4) would violate a basic conversational norm, which is that speakers should provide information that is new to the recipient (Clark and Haviland 1977). Gricean principles of conversational norms have been found to operate in research settings using surveys (Schwartz 1994, 1996).

As a result, when consumers who have said in Q3 that the two "things" come from different companies are then asked Q4, many will think they are being asked essentially the same question again. Their thinking would be along the lines: *I just said they come from different companies. Why are they asking me this again? Maybe Q4 means something different that I don't understand? I'd better give a different answer now. I don't want to provide redundant information. They surely wouldn't ask me the same thing twice -- although it seems to me they are doing so).* Thus, the perceived repetitive nature of the questioning involved in Q3 and Q4 likely sets up consumer inferential processing that would lead several respondents who actually believed that the designs came from different companies having no connection or affiliation to state that there was an affiliation in Q4 after stating they were different companies in Q3. The repetitive nature and wording used in Q3 and Q4 thus violates a basic guideline of survey design, that questions should not lead the respondents to a particular answer (Burns and Bush 2005, pp. 311-312).

SOCIAL DESIRABILITY

Further, for those respondents who in Q3 said they did not know or had no opinion, they are asked a question in Q4 that many would perceive to be the same question, and thus to which they would likely have the same response (i.e., don't know or no opinion). But to have to state twice in a row that you do not know something or have no opinion can be uncomfortable for individuals for social desirability reasons (*I do not want to appear unintelligent or wishy-washy. I'd better give a different answer,* Burns and Bush 2005, p. 312). Thus, the perceived repetitive questioning for those giving a don't know reply or without an opinion in Q3 is likely to result in some respondents giving a different answer in Q4 (i.e., anything other than don't know/no opinion), resulting in some being categorized as confused, when in fact they were not.

ALTERNATIVE APPROACH

On page 3 of the Klein report it is stated that "Prior to the design of the final survey instrument, a limited number of exploratory, pre-test interview questions were conducted at a shopping mall in Livingston, NJ….no data from test interviews was included in the results reported below." Based on a review of the completed survey questionnaires used in the pretest, respondents, after being shown the two designs, were asked a single confusion question. Thus, Mr. Klein used a different format in the pretest to measure confusion. Such a format in the main study would have avoided the problems discussed above.

In sum, the sequential questioning approach and wording used in the Klein study in Q3 and Q4, in my opinion, is biased toward classifying many respondents as confused when they were not actually confused.

11

## 4. UNIVERSE AND SCREENING

Another problem with the Klein study is with the overly inclusive nature of the universe. On pages 2-3 of the Klein report it states, "...virtually every person in the United States is a potential customer of either company." Based on this assessment, the study included individuals aged 18 and over, with no upper age limit or any other demographic criteria for inclusion in the Klein study.[3] This overly inclusive universe includes individuals whose state of mind is simply irrelevant to the issue at hand. When designing a survey, it is critical that the universe (i.e., the population from which respondents are selected) represents, as closely as possible, the relevant population of current and prospective purchasers.

It is my opinion that the customers of LIG products likely skew younger (teens to late twenties is likely their core target market[4]), given the nature of their goods (t-shirts with cartoon-like characters, etc.) and that the consumers of LG products likely skew upper-income, given the cost and sophistication of their product offerings (laptop computers, cell phones, advanced consumer electronics/appliances).

A more appropriate universe for this study would thus have consisted of younger respondents from higher income households. Such a universe would likely possess greater knowledge of the two product categories involved, which would likely have resulted in confusion rates lower than those reported in the Klein study. Such a universe would be more appropriate because it would better simulate the impact of the two marks on the types of consumers who might actually come into contact with both an LIG product and an LG product or advertisement.

The Klein study was conducted instead on the basis of a universe that included "virtually anyone" (Klein report, p. 4). Indeed, there was no upper age limit utilized for the study, as evidenced by the interviewer quotas, which include the category of "55 or older." Including the elderly, especially the very elderly, in a survey is likely to increase confusion rates, due to cognitive processing issues as well as lower brand and category awareness levels.[5] The raw data provided by Mr. Klein indicates that 30.7% of respondents in his survey were aged 55 and older.[6]

In addition, the study does not appear to have screened out persons employed in the two product categories at issue, namely clothing/souvenir type products and consumer electronics and appliances. The inclusion of such individuals might bias the results; such an exclusion is fairly routine for studies of this nature.

---

[3] According to the 2000 US census, there are 209,128,094 individuals aged 18 and over in the U.S., out of a total population of 281,421,906 (www.census.gov/prod/cen2000/dp1/2kh00.pdf)

[4] See testimony of J. Jacobs (Oct. 14, 2005, p. 114).

[5] Thus it is not surprising that research suggests that older individuals are more likely to be confused by "lookalike" products (Balabanis and Craven 1997)

[6] 21.1% of the population is aged 50 years or older (www.census.gov/prod/cen2000/dp1/2kh00.pdf).

12

## 5. PROCEDURE AND VALIDATION

There was a significant amount of data omitted from the analysis in the main study. Page 5 of the Klein report states that, "In one location, there was a significant deviation from the prescribed interview protocol and all the questionnaires from that location were discarded...." Moreover, "In another location, a significant number of interviews conducted by a single interviewer failed to validate and all of that interviewer's work was discarded."

My examination of the survey materials used in the Klein study indicates that 112 or more respondents were omitted from the analysis. Fifty-one respondents were omitted due to interviewer errors, 6 were omitted due to validation failures, 8 were omitted due to a bad skip pattern, 10 were omitted due to questionable interviewer, and 37 were omitted due to a site error. Thus at least 112 respondents were omitted due to a variety of errors that were detected. These 112 respondents represent over one-fifth of the original sample size. This is a considerable amount of data omission, which could bias the results. This is particularly true since the number of respondents omitted varied considerably by market rather than being about equally distributed across all the markets (e.g., one or two respondents omitted in several markets, versus 18 or more omitted in Atlanta, and 37 omitted in Fort Lauderdale). In my experience, it is unusual to experience such a wide array of inappropriate data collection procedures in a single study necessitating such a large amount of data omission.

Moreover, the confusion rates vary considerably among the markets, from a low net confusion rate of -2.1% in the Chicago market (where a higher proportion of respondents were confused in the control cell than in the test cell) to a high net confusion rate of 41.5% in the Denver market. It is quite possible that interviewer biases, inadequate interviewer training, or confusing skip patterns in the survey could account for the wide variation in confusion rates by market. Statistical tests indicate that the confusion rates differ among the different markets at greater than chance levels (with 96% confidence in the control cells (Chi-square $(8) = 16.18$, $p = .040$), and directionally, with 85% confidence in the test cells (Chi-square $(8) = 12.06$, $p = .148$; see Table below). These tests indicate that the results across the different markets differ by more than random fluctuations or noise, and accordingly indicate systematic differences among the markets.

**Confusion Rates by Market (in Klein Study)**

| Market | Confusion Rate in Test Cell | Confusion Rate in Control Cell | Net Confusion Rate (Difference) | Reported Sample Size |
|---|---|---|---|---|
| Boston | 25.0% | 0.0% | 25.0% | 47 |
| Philadelphia | 18.2% | 4.0% | 14.2% | 47 |
| Chicago | 24.0% | 26.1% | -2.1% | 48 |
| Dallas | 21.7% | 16.0% | 5.7% | 48 |
| Nashville | 20.8% | 8.3% | 12.5% | 48 |
| Atlanta | 42.3% | 16.7% | 25.6% | 44 |
| Des Moines | 30.4% | 8.3% | 22.1% | 47 |
| Denver | 45.8% | 4.3% | 41.5% | 47 |
| San Francisco | 7.1% | 0.0% | 7.1% | 34 |
| Total | 27.3% | 9.3% | 18.0% | 410 |

14

## 6. CONCLUSIONS

In summary, the Klein study has substantial and major design and implementation problems that violate basic rules of consumer research. The main problems are with:

1)  the nature of the stimuli presented, which were devoid of any marketplace context
2)  the repetitive nature and wording of the sequential questions employed to assess confusion (Q3, Q4).
3)  an overly inclusive universe and inadequate screening
4)  extensive data collection errors and data omission.

Taken as a whole, the problems with this study leave little question that significantly inflated confusion rates were produced. Because the magnitude of the inflated confusion rates cannot be quantified, and considering the combination of the above problems, the Klein survey is neither a valid nor reliable measure of the likelihood of consumer confusion, if any, in the marketplace.

## 7. REFERENCES

Balabanis, George, and Samantha Craven (1997), "Consumer Confusion from Own Brand Lookalikes: An Exploratory Investigation," *Journal of Marketing Management*, 13, 299-313.

Burns, Alvin C. and Ronald F. Bush (2005), *Marketing Research*, Upper Saddle River, NJ: Prentice Hall.

Clark, H.H. and S. E. Haviland (1977), "Comprehension and the Given New Contract," in R.O. Freedle (ed.), *Discourse Production and Comprehension*, Norwood, NJ: Ablex.

Diamond, Shari Seidman (2000), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, 2nd ed. Federal Judicial Center, pp. 229-276.

Grice, H. Paul (1975), "Logic and Conversation, " in *Syntax and Semantics III: Speech Acts*, ed. Peter Cole and Jerry L. Morgan, NY: Academic Press, 41-58.

Loken, Barbara, Ivan Ross and Ronald L. Hinkle (1986), "Confusion 'Confusion' of Origin Brand Similarity Perceptions," *Journal of Public Policy & Marketing*, 5(1), 195-211.

Schwarz, N. (1994), "Judgment in a Social Context: Biases, Shortcomings, and the Logic of Conversation," Advances in Experimental Social Psychology, 26, 123-162.

Schwarz, N. (1996), *Cognition and Communication: Judgmental Biases, Research Methods, and the Logic of Conversation*, Hillsdale, NJ: Erlbaum.

Strack, F., N. Schwarz, and M. Wanke (1991), "Semantic and Pragmatic Aspectsof Context Effects in Social and Psychological Research," *Social Cognition*, 1, 111-125.

Appendix 1

Dr. Maureen Morrin's Vita

## MAUREEN MORRIN

**Office**:
Rutgers University
School of Business, SBC 225
Camden, NJ 08102
E-mail: mmorrin@rutgers.edu

**Home**:
102 Summit Lane
Bala Cynwyd, PA 19004
Home: (610) 664-4789
Office: (856) 225-6713

## ACADEMIC POSITIONS

**Rutgers University** School of Business, Camden, NJ
Associate Professor with tenure, July 2005 to present
Associate Professor, July 2003 to June 2005
Assistant Professor, July 2002 to June 2003

**University of Pittsburgh** Joseph M. Katz Graduate School of Business, Pittsburgh, PA
Assistant Professor, January 1998 to May 2002
(taught at St. Joseph's University Fall 2001)

**Boston University** School of Management, Boston, MA
Assistant Professor, September 1994 to December 1997

## EDUCATION

**New York University** Leonard N. Stern School of Business
Doctor of Philosophy, Marketing major, Psychology minor, 1994

**Thunderbird** The American Graduate School of International Management
Master of Business Administration, International Marketing concentration, 1985

**Georgetown University** School of Foreign Service
Bachelor of Science in Foreign Service, International Economics major, 1982

## HONORS/AWARDS

- Consumer Behavior Track Chair, AMA Winter Conference, St. Pete, FL Feb. 2006
- Rutgers University School of Business Research Award ($1,800) 2005
- NASD Foundation two-year research grant ($73,404) 2005
- MSI/JCP Research Proposal Competition on Assortment, Finalist 2004
- Bright Idea Award in Marketing and Brands, NJPRO/Seton Hall 2004
- Rutgers University School of Business Superior Achievement Award for Teaching 2004
- Rutgers University Research Council Grant ($1,050) 2003
- Direct Marketing Association Fellowship, DMDNY Conference 2003
- Direct Marketing Association Fellowship, Advanced Institute in Direct Marketing 2001
- Faculty Representative at the Haring Symposium, Indiana University 2001

17

- University of Pittsburgh Central Research Development Fund Grant ($3,525) 1999-2000
- University of Pittsburgh CIBER Grant ($4,150) 1999-2000
- Boston University Dean's Development Grant (course relief) 1997
- Boston University Research Development Award ($7,000) 1996
- AMA John Howard Dissertation Competition Honorable Mention 1995
- New York University Outstanding Teaching Award 1993-94
- AMA Doctoral Consortium Fellow 1993

## PUBLISHED JOURNAL ARTICLES

Chebat, Jean-Charles and Maureen Morrin, "Colors and Cultures: Exploring the Effects of Mall Decor on French- and Anglo-Canadian Consumer Perceptions," (forthcoming) Journal of Business Research.

Morrin, Maureen, Jonathan Lee and Greg Allenby, "Determinants of Trademark Dilution," (forthcoming Sept 2006) Journal of Consumer Research.

Morrin, Maureen and Jean-Charles Chebat, "Person-Place Congruency: The Interactive Effects of Shopper Style and Mall Atmospherics on Consumer Expenditures," (2005) Journal of Service Research, 8 (2), 181-191.

Schindler, Robert, Maureen Morrin and Nada Nasr Bechwati (2005), "Shipping Charges and Shipping Charge Skepticism: Implications for Direct Marketers' Pricing Formats," Journal of Interactive Marketing, 19(1), 41-53.

Bechwati, Nada Nasr and Maureen Morrin (2003), "Outraged Consumers: Getting Even at the Expense of Getting a Good Deal," Journal of Consumer Psychology, 13 (4), 440-453.

Morrin, Maureen and S. Ratneshwar (2003), "Does It Make Sense to Use Scents to Enhance Brand Memory?" Journal of Marketing Research, 40 (1), 10-25. Received Bright Idea in Marketing and Brands Award from NJPRO/Seton Hall, 9/2004.

Morrin, Maureen, Jacob Jacoby, Gita Johar, Xin He, Alfred Kuss, and David Mazursky (2002), "Taking Stock of Stockbrokers: Exploring Momentum Versus Contrarian Investor Strategies and Profiles," Journal of Consumer Research, 29 (2), 188-198.

Alon, Anat, Maureen Morrin, and Nada Nasr (2002), "Comparing Journal of Consumer Psychology and Journal of Consumer Research," Journal of Consumer Psychology, 12 (1), 15-20. Reprinted in Consumer Behaviour, ed. Margaret Hogg, University of Lancaster, Sage Publications, June 2005, vol. 1, as part of the Sage Library in Business and Management series.

Jacoby, Jacob, Maureen Morrin, James Jaccard, Zeynep Gurhan, Alfred Kuss, and Durairaj Maheswaran (2002), "Mapping Attitude Formation as a Function of Information Input: On-line Processing Models of Attitude Formation," Journal of Consumer Psychology, 12 (1), 21-34.

Jacoby, Jacob, Maureen Morrin, Gita Johar, Alfred Kuss, Zeynep Gurhan, and David Mazursky (2001), "Training Novice Investors to Become More Expert: The Role of Information Accessing Strategy," Journal of Psychology and Financial Markets, 2 (2), 69-79.

Morrin, Maureen and Jacob Jacoby (2000), "Trademark Dilution: Empirical Measures for an Elusive Concept," Journal of Public Policy & Marketing, 19 (2), 265-276.

Morrin, Maureen and S. Ratneshwar (2000), "The Impact of Ambient Scent on Evaluation, Attention and Memory for Familiar and Unfamiliar Brands," Journal of Business Research, 49 (2), 157-165.

Morrin, Maureen (1999), "The Impact of Brand Extensions on Parent Brand Memory Structures and Retrieval Processes," Journal of Marketing Research, 36 (4), 517-525.

Jacoby, Jacob, Gita Johar, and Maureen Morrin. (1998), "Consumer Behavior: A Quadrennium," Annual Review of Psychology, 49, 319-344.

Jacoby, Jacob and Maureen Morrin (1998), "'Not Authorized or Sponsored by...': Recent Federal Cases Involving Trademark Disclaimers," Journal of Public Policy & Marketing, 17 (1), 97-107.

## PUBLISHED BOOK CHAPTERS AND CONFERENCE PAPERS

Michelfelder, Richard A. and Maureen Morrin (2005), "Product Diffusion Sales Forecasting Models," as Appendix F (pp. 817-827) of Gordon V. Smith and Russell L. Parr, Intellectual Property: Valuation, Exploitation, and Infringement Damages, Somerset, NJ: John Wiley and Sons.

Shoaf, F. Robert, Joan Scattone, Durairaj Maheswaran, and Maureen Morrin (1995), "Gender Differences in Adolescent Compulsive Consumption," in Advances in Consumer Research Conference Proceedings, Vol. XXII, 500-504.

Douglas, Susan P., Maureen Morrin, and C. Samuel Craig (1994), "Cross-National Consumer Research Traditions," in Research Traditions in Marketing, edited by G. Laurent, G. Lilien, and B. Pras, Boston: Kluwer Academic Press, pp. 289-306.

Morrin, Maureen (1992), "Advertising and the Self: Is Negative Affect Effective?" in Enhancing Knowledge Development in Marketing, AMA Summer Marketing Educators' Conference Proceedings, 64-71.

## ARTICLES UNDER REVIEW

Lee, Jonathan, Maureen Morrin and Janghyuk Lee, "Targeting Service Innovations to Non-adopters: A Retail Banking Illustration," under second review at Journal of Interactive Marketing.

Bechwati, Nada Nasr and Maureen Morrin, "Understanding Choice Behavior in Competitive Contexts: The Phenomenon of Voter Vengeance," under second review at Journal of Consumer Psychology.

## RESEARCH IN PROGRESS

Krishna, Aradhna and Maureen Morrin, "The Impact of Nondiagnostic Touch on Consumer Perceptions," write up in progress.

Morrin, Maureen, Susan Broniarczyk, Jeffrey Inman and John Broussard, "Boundary Conditions for the 1/n Heuristic," data analysis for study 3 in progress. Research proposal was finalist in MSI/JCP proposal competition on choice and assortment 4/2004.

Morrin, Maureen, Susan Broniarczyk, Jeffrey Inman and John Broussard, "Exploring Gender Differences in Retirement Investing Behavior," data analysis for study 1 in progress. Research proposal was basis for NASD $73,404 grant received 2/2005.

Bickart, Barbara, Maureen Morrin and S. Ratneshwar, "Admitting to Not Knowing: Understanding Consumers' Trust in Financial Advisors," data collection for study 4 in progress.

Lwin, May, Jochen Wirtz, Aradhna Krishna and Maureen Morrin, "The Relative Impact of Scent versus Color on Consumer Memory for Brand Information," data collection for study 2 in progress.

Kaufman-Scarborough, Carol, Eric Bradlow, Maureen Morrin and Greg Petro, "Improving the Crystal Ball: Integrating Retail Buyer and Consumer Forecasts," data analysis for study 1 in progress.

Chebat, Jean-Charles and Maureen Morrin, "The Impact of Ambient Scent and Music on Consumer Perceptions of Time," data analysis for study 1 in progress.

19

Yordanova, Gergana, John Hulland, Maureen Morrin, Barry Schwartz and Andrew Ward, "Re-Examination of Decision Maximization: Psychometric Properties and Derivation of a Short Form," data analysis across multiple studies in progress.

Lee, Janghyuk, Kyungdo Park, Jonathan Lee and Maureen Morrin, "Exploring the Antecedents of Brand Trust for High Technology Products," data analysis in progress.

## INVITED LECTURES

"The Impact of Ambient Scent on Consumer Behavior: Recent Findings," invited talk presented at University of Montreal, January25, 2006.

"The Impact of Ambient Scent on Consumer Behavior: Recent Findings," invited talk presented at University of Kansas, Distinguished Visiting Scholars Series, October 21, 2005.

"When Relying on Your Attitudes Leads to Poorer Quality Decision-Making Behavior" with Susan Broniarczyk, Jeff Inman, and John Broussard, invited talk presented at University of Montreal, HEC, November 23, 2004.

"When Less Is More: The Impact of Fund Assortment, Decision Alternatives, and Decision Maker Style on Retirement Investing Behavior" with Susan Broniarczyk, Jeff Inman, and John Broussard, invited talk presented at Wharton, Decision Sciences Seminar, October 25, 2004

"Atmospherics and Mall Shopper Response," invited talk presented at University of Montreal, HEC, March 2004.

"401k Assortment and Investor Decision Making: Impact of Decision Flexibility," invited talk presented at Villanova University, February 2004.

"Ambient Scent and Consumer Behavior," invited lecture presented in Ph.D. proseminar at New York University, November 21, 2003.

"The Impact of Ambient Scent on Evaluation, Attention and Memory for Familiar and Unfamiliar Brands," presented at University of Pittsburgh Brown Bag Seminar, October 1998.

"Olfaction and Consumer Processing of Brand Information," invited talk presented to Boston University Psychology department, December 1997.

"Memory Models in Consumer Behavior," invited lecture presented in Columbia University Marketing Ph.D. Seminar, New York, NY, February 1996.

"The Impact of Brand Name Dilution on Memory Retrieval and the Formation of Consideration Sets," invited talk presented at University of Connecticut seminar series, Storrs, CT, November 1995.

"The Application of Memory Theory to Consumer Behavior Issues," invited lecture presented to Boston University Psychology department, Boston, MA, October 1995.

## CONFERENCE PRESENTATIONS

"Does it Pay to Beat Around the Bush? Salesperson Motives and the Effects of Obfuscation versus Honesty in Communications," with Barbara Bickart and S. Ratneshwar, presented by Barbara Bickart, as part of special session titled, "Marketplace Motives and Consumer Meta-Skepticism," Association for Consumer Research conference, October 2, 2005, San Antonio, TX.

"Colors and Cultures: Exploring the Effects of Mall Decor on Consumer Perceptions," with Jean-Charles Chebat, presented at the Royal Bank International Research Seminar, September 24, 2005, Montreal, Canada.

"Person-Place Congruency: The Interactive Effects of Shopper Style and Atmospherics on Consumer Expenditures," with Jean-Charles Chebat, presented at the Summer APA Conference Division 23, Washington, DC, August 19, 2005.

20

"Does It Pay to Beat Around the Bush? Persuasion Knowledge and Obfuscation Versus Honesty in Salesperson Communications," with Barbara Bickart and S. Ratneshwar, presented by S. Ratneshwar as part of special session titled, "Persuasion Knowledge and Its Effects on Marketing Communications," at Society for Consumer Psychology Winter Conference, St. Petersburg, Florida, February 25, 2005.

"When Less Is More: The Impact of Fund Assortment, Decision Alternatives, and Decision Maker Style on Retirement Investing Behavior" with Susan Broniarczyk, Jeff Inman, and John Broussard, presented as part of special session titled, "Predicting, Encouraging, and Improving Consumer Decisions Through Product Assortments," at Society for Consumer Psychology Winter Conference, St. Petersburg, Florida, February 25, 2005.

"When Less is More: The Impact of Fund Assortment, Decision Alternatives and Decision Maker Style on Retirement Investing Behavior," with Susan Broniarczyk, Jeff Inman, and John Broussard, presented as part of special session titled, "You (Still) Can't Always Get What You Want: Why Greater Choice is Demotivating," Association for Consumer Research conference, Portland, Oregon, October 9, 2004.

"Shipping Charges and Shipping Charge Skepticism: Implications for Direct Marketers' Pricing Formats," with Robert Schindler and Nada Nasr Bechwati, presented by R. Schindler, Fordham University Pricing Conference, New York, NY, November 2003.

"Outraged Consumers: What Lights Their Fire?" with Nada Nasr Bechwati, competitive paper presented by N. Bechwati, Association for Consumer Research Conference, Toronto, Canada, October 2003.

"The Importance of Barriers to Adoption for Radical Versus Incremental Service Innovations in the Retail Banking Industry," with Jonathan Lee and Janghyuk Lee, presented at INFORMS Marketing Science Conference, University of Maryland, June 2003.

"Taking Stock of Stockbrokers: Exploring Investor Decision Strategies Via Verbal Protocols," with Jacob Jacoby, Gita Johar, Xin He, Aflred Kuss, and David Mazursky, competitive paper presented at Association for Consumer Research conference, Austin, Texas, October 2001.

"The Effect of Adding and Deleting Asymmetrically Dominated Decoys on Choice" with Adwait Khare and Vikas Mittal, presented by A. Khare as part of the special session titled, "You Can't Always Get What You Want: An Examination of Consumer Responses to Constrained Choices," Association for Consumer Research conference, Austin, Texas, October 2001.

"Consumer Vengeance: Getting Even at the Expense of Getting a Good Deal," with Nada Nasr Bechwati, competitive paper, presented by N. Bechwati at Association for Consumer Research conference, Salt Lake City, Utah, October 2000.

"Does It Make Sense to Use Scents to Enhance Brand Memory?" with S. Ratneshwar, competitive paper presented at Association for Consumer Research conference, Salt Lake City, Utah, October 2000.

"A Model Selection Approach for Analyzing Repeated Measures Data Sets," competitive paper presented by Nada Bechwati at Association for Consumer Research conference, Columbus, Ohio, October 1999.

"A Review and Analysis of the *Journal of Consumer Psychology* From 1992 to 1997," with Anat Alon and Nada Nasr, competitive paper presented by A. Alon at Society for Consumer Psychology Winter conference, February 1999.

"Distinguishing Better From Poorer Decision Makers: A Study of Risk Propensity in the Face of Gains and Losses" with Jacob Jacoby, Gita Johar, Alfred Kuss, and David Mazursky, competitive paper presented by T. Heath at Behavioral Decision Research in Management Conference, Miami, Florida, June 1998.

"Olfaction and Consumer Information Processing," competitive paper presented at Society for Consumer Psychology conference, Austin, Texas, February 1998.

21

"Olfaction and Consumer Processing of Brand Information," poster session presented at
Association for Consumer Research conference, Denver, Colorado, October 1997.

"The Impact of Atmospheric Odors on Consumer Information Processing," competitive paper
with S. Ratneshwar presented at Symposium on Retail and Service Environment
Atmospherics Research, Montréal, Québec, October 1997.

"Incongruency Effects in Brand Recall: When Is It Better to Be Different?," with Durairaj
Maheswaran, competitive paper, presented at Society for Consumer Psychology
(Division 23), American Psychological Association Conference, New York, NY, August
1995.

"The Effects of Brand Name Dilution on Memory Retrieval and the Formation of Consideration
Sets," competitive paper presented at AMA Summer Marketing Educators' Conference,
Washington, DC, August 1995.

## REVIEWING ACTIVITY

• Editorial Review Board member *Journal of Consumer Psychology (since 7/05)*

• Ad hoc journal reviewer for *American Business Law Journal, Journal of Advertising, Journal of
Applied Psychology, Journal of Business Research, Journal of Consumer Research, Journal of
Marketing, Journal of Public Policy & Marketing, Marketing Letters, Psychology and Marketing.*

• Ad hoc conference reviewer for Academy of Marketing Science, American Marketing
Association, Association for Consumer Research, Fordham Pricing Conference, Royal Bank
International Research Seminar, SCP-Sheth Dissertation Competition, Society for Consumer
Psychology, Society for Marketing Advances.

## COURSES TAUGHT

• Consumer Behavior: Undergraduate, MBA, Doctoral
• Customer Analytics: MBA
• Database Marketing: Undergraduate, MBA
• Marketing Management: Undergraduate, MBA, EMBA
• Marketing Theory and Strategy: Doctoral

## INDUSTRY EXPERIENCE

**Playtex Family Products** Stamford, CT 1989-1990
*Associate Brand Manager*
Developed annual marketing plans for company's core brand, Playtex Tampons. Managed
brand's profit and loss statement, volume forecasts, trade and consumer promotion plans, and
advertising strategy.

**James River Corporation** Norwalk, CT        1987-1989
*Assistant Brand Manager*
Developed annual marketing plans for Bolt Paper Towels and Zee Paper Napkins. Responsible
for volume forecasts, trade and consumer promotion budgets. Helped establish quality control
system at recently acquired paper mill.

**Ted Bates Advertising** New York, NY   1985-1987
*Account Executive*

22

Managed broadcast and print campaigns for Kal Kan Pedigree Dog Food. As brand liaison for client and agency, provided strategic analyses of market positioning, media spending, and creative.

**MEMBERSHIPS**

- Association for Consumer Research
- American Marketing Association
- Direct Marketing Association
- Society for Consumer Psychology

Appendix 2

Prior Expert Witness Consulting by Dr. Maureen Morrin

**The Fresh Market:** A Study to Measure the Likelihood of Confusion, If Any, Between the Fresh Market and Arthur's Fresh Market, December 2005, on behalf of Finnegan Henderson for The Fresh Market grocery store.

**Intel:** Study to Measure Whether the Intell Mark Dilutes the Intel Mark, completed September 2004, on behalf of Howrey, Simon, Arnold and White, LLP, for the Intel Corporation. Deposition given in December 2004. This case was settled out of court prior to trial.

**Verizon:** Report on the Impact of the Yellow Book Advertising campaign completed December 2003, on behalf of Finnegan, Henderson for Verizon.

**Citizens National Bank:** Several reports provided on behalf of Malone Middleman, PC and Finnegan Henderson for Citizens National Bank of Evans City, PA. First report and deposition completed June 2002. Second report completed February 2003. Second deposition given in March 2003. Rebuttal report completed March 2003. Report on the Effectiveness of Trademark Disclaimers completed March 2003. Trial testimony given in May 2003.

## Appendix 3

### Materials Reviewed

In the course of this evaluation Dr. Morrin reviewed the following materials (in addition to the items listed in the References section):

- Report of Robert L. Klein in the matter of Life is good, Inc., v. LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. Likelihood of Confusion Survey Results and Conclusions, December 14, 2005, Applied Marketing Science, Inc., 303 Wyman Street, Suite 205, Waltham, MA 02451

- Surveys submitted by Mr. Klein.

- Complaint of Life is good, Inc. (plaintiff) v. LG Electronics U.S.A., INC. and LG INFOCOMM U.S.A., INC (defendant), 6/10/04.

- Web sites of Life is good, Inc. and LG Electronics.